AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
JULIA HARUMI MASS (SBN 189649)
WILLIAM S. FREEMAN (SBN 82002)
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437
Email: jmass@aclunc.org
        wfreeman@aclunc.org

COOLEY LLP
MARTIN S. SCHENKER (SBN 109828)
NATHANIEL R. COOPER (SBN 262098)
ASHLEY K. CORKERY (SBN 301380)
TREVOR M. KEMPNER (SBN 310853)
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222
Email: mschenker@cooley.com
        ncooper@cooley.com
        acorkery@cooley.com
        tkempner@cooley.com

Attorneys for Petitioners/Plaintiffs Lorenza Gomez, Ilsa Saravia, and Wilfredo Velasquez, on
behalf of themselves and others similarly situated.
(Additional Counsel listed on following page)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lorenza Gomez, as next friend for J.G., a minor, and on her own behalf; Ilsa Saravia, as next friend for A.H., a minor, and on her own behalf; and Wilfredo Velasquez, as next friend for F.E., a minor, and on his own behalf, <br> *Petitioners/Plaintiffs, on behalf of themselves and others similarly situated,* <br><br> v. <br><br> Jefferson B. Sessions, Attorney General of the United States; Thomas E. Price, M.D., Secretary of the Department of Health and Human Services of the United States; Steven Wagner, Acting Assistant Secretary of the Administration for Children and Families; Scott Lloyd, Director of the Office of Refugee Resettlement of the United States; Elicia Smith, Federal Field Specialist of the Office of Refugee Resettlement of the United States; Elaine Duke, Acting Secretary of the Department of Homeland Security of the United States; Thomas D. Homan, Acting Director of U.S. Immigration and Customs Enforcement; James McCament, Acting Director of U.S. Citizenship and Immigration Services; Brent Cardall, Chief Probation Officer of Yolo County; and Jose Esquivel, Interim Program Director, BCFS Health and Human Services, in their official capacities, <br> *Respondents/Defendants.* | Case No.: 3:17-cv-03615-VC <br><br> **FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** <br><br> **IMMIGRATION ACTION** |

i

ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
JUDY RABINOVITZ*
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2660
Facsimile: (212) 549-2654
Email: jrabinovitz@aclu.org

ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
STEPHEN B. KANG** (SBN 292280)
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
Facsimile: (212) 395-0950
Email: skang@aclu.org

*Pro Hac Vice Forthcoming
**Application to the Bar of this Court Pending

*Attorneys for Petitioners/Plaintiffs, on behalf of themselves and others similarly situated.*

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

# Table of Contents

INTRODUCTION ................................................................................................1

JURISDICTION ................................................................................................2

VENUE ................................................................................................3

INTRADISTRICT ASSIGNMENT ..............................................................3

PARTIES ................................................................................................3

FACTS AND LEGAL FRAMEWORK COMMON TO ALL PLAINTIFFS....................6

    ORR Custody of Unaccompanied Children................................................6

    Other Rights of Unaccompanied Children.................................................7

    ICE "Sweeps" Target Unaccompanied Minors .........................................8

    Resulting Deprivations of Plaintiffs' Rights.............................................12

FACTS PERTAINING TO INDIVIDUAL PLAINTIFFS.........................................16

    A.H. ................................................................................................16

    F.E. ................................................................................................20

    J.G. ................................................................................................23

CLASS ACTION ALLEGATIONS ........................................................................26

INJUNCTIVE AND DECLARATORY RELIEF ALLEGATIONS ..............................28

CLAIMS FOR RELIEF ................................................................................29

PRAYER FOR RELIEF ................................................................................35

# INTRODUCTION

1.     Under the guise of a "crackdown" on transnational street gangs, federal immigration authorities and the federal agency responsible for the care and custody of unaccompanied immigrant children have undertaken a concerted effort to arrest, detain, and transport children far from their families and attorneys, and to deny them immigration benefits and services to which they are entitled under U.S. law, based on flimsy, unreliable and unsubstantiated allegations of gang affiliation.

2.     The agencies in charge of this effort do not undertake any meaningful review of the allegations of gang affiliation on which their decisions are based; do not inform the children, their families or their immigration counsel of the basis of these allegations; and do not provide them any opportunity to review or challenge the evidence the government relies on to place the children in jail-like conditions, destroy family integrity, and deny or interfere with access to relief under U.S. immigration laws.

3.     This treatment is not only extremely harmful; it is unlawful. But official statements and actions confirm that the administration plans to continue and expand its efforts to deport children profiled as gang members based on the neighborhoods they live in and their countries of origin, and that responsible federal agencies will continue to deny these children their statutory and constitutional rights.

4.     Petitioners and Plaintiffs Lorenza Gomez, Ilsa Saravia, and Wilfredo Velasquez ("Named Plaintiffs"), each acting as next friend for a minor child ("Named Minors"), and the class they seek to represent (collectively "Plaintiffs") have been victims of this unlawful conduct. Each of the minor children had previously been evaluated by the U.S. Department of Health and Human Services ("HHS"), Office of Refugee Resettlement ("ORR"), and each had been released to a parent under an ORR sponsor agreement. All have been living with family in the United States for extended periods of time. Though they have had only minor, if any, trouble in the juvenile justice system, they were each arrested, denied access to family and legal counsel, transported far from home, and held in jail-like conditions for weeks without any process

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

1    through which they could challenge their confinement or deny the gang allegations that were the

2    reason for their harsh treatment. These and other actions by the federal authorities also threaten

3    Plaintiffs' access to lawful status in the United States and therefore may result in their

4    deportation to countries from which they have fled abuse and violence.

5        5.       Named Plaintiffs bring this action on behalf of the Named Minors and a class

6    consisting of all unaccompanied immigrant children (also referred to as "UCs") who had

7    previously been detained in ORR custody and released by ORR to a parent or other sponsor, and

8    who thereafter have been or will be arrested by U.S. immigration authorities on or after April 1,

9    2017 with allegations of gang affiliation and detained in a secure or staff secure detention center

10   under the oversight authority of the San Francisco-based ORR Federal Field Specialist (the

11   "Class"). Plaintiffs seek declaratory and injunctive relief to prevent Defendants from continuing

12   to carry out an unlawful scheme to arrest, summarily incarcerate, and deny immigration benefits

13   to Class members in violation of (1) federal immigration law; (2) a federal court consent decree

14   setting forth additional protections to which they are entitled; and (3) fundamental rights

15   guaranteed to all persons under the U.S. Constitution. Injunctive relief is necessary to end these

16   ongoing violations of Plaintiffs' constitutional and statutory rights.

17                                    **JURISDICTION**

18       6.       This Court has subject matter jurisdiction over a writ of habeas corpus and

19   Plaintiffs' complaint for injunctive and declaratory relief pursuant to Art. I, § 9, cl. 2 of the

20   United States Constitution; 28 U.S.C. § 2201; 28 U.S.C. § 2241; 28 U.S.C. § 1331; 28 U.S.C.

21   § 1343; 28 U.S.C. § 1361; and 5 U.S.C. § 702. This action arises under the First, Fourth and

22   Fifth Amendments of the United States Constitution; the Immigration and Nationality Act

23   ("INA"); the William Wilberforce Trafficking Victims Protection Reauthorization Act

24   ("TVPRA"), 8 U.S.C. § 1232; the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; and

25   Paragraphs 24A and 24B of the class action consent decree entered in *Flores v. Reno*, Case No.

26   85-cv-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997) ("*Flores* Decree"), which is binding on

27   Defendants.

**VENUE**

7.      Venue is properly with this Court pursuant to 28 U.S.C. § 2241 and 18 U.S.C. § 1391(e).  A substantial part of the events or omissions giving rise to the claims occurred in the Northern District of California, including decisions concerning the detention of each of the Plaintiffs, who are currently, or have been, or will be held in ORR custody in Yolo or Solano Counties in northern California. Specifically, Defendant Elicia Smith, the Federal Field Specialist who serves as the approval authority for transfer and release decisions pertaining to unaccompanied minors within the Northern California region, is based in San Francisco. Venue is proper in this Court pursuant to *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 493-94 (1973).

**INTRADISTRICT ASSIGNMENT**

8.      Pursuant to Civil L. R. 3-2(c), this case is properly assigned to the San Francisco Division of this Court because the action arises in the City and County of San Francisco.

**PARTIES**

9.      Plaintiff Lorenza Gomez, the next friend of J.G., is the mother of J.G. and is filing this complaint and petition on J.G.'s behalf.  She also seeks injunctive relief on her own behalf as to the Second Claim for Relief only. Plaintiff Gomez resides in Brentwood, Suffolk County (Long Island), New York. Plaintiff  Gomez is J.G.'s sponsor under an agreement with ORR, and is dedicated to J.G.'s best interests.

10.      J.G. is a seventeen year old unaccompanied immigrant child and a citizen of El Salvador. Until April 19, 2017, he resided with his mother on Long Island, but was then arrested by the Suffolk County, New York Police Department ("SCPD") and held in a local jail for nearly two months.  SCPD turned him over to ICE on June 16, 2017, and Defendants thereafter transported him to a secure detention facility in Yolo County, California, in the custody of ORR. ORR subsequently transferred him to an ORR contract facility in the state of Washington. However, he remains subject to being transferred back to Yolo or another secure or staff secure facility in Northern California at any time. As such, he is in custody under color of

3

the authority of the United States, and he is in custody in violation of the Constitution or laws of the United States, within the meaning of 28 U.S.C. § 2241.

11.    Plaintiff Ilsa Saravia, the next friend of A.H., is the mother of A.H. and is filing this complaint and petition on A.H.'s behalf. She also seeks injunctive relief on her own behalf as to the Second Claim for Relief only. Plaintiff Saravia resides in Amityville, Suffolk County (Long Island), New York. Plaintiff Saravia is A.H.'s sponsor under an agreement with ORR, has been awarded sole custody of A.H. by the State of New York, and is dedicated to A.H.'s best interests.

12.    A.H. is a seventeen year old unaccompanied immigrant child and a citizen of Honduras.  Until June 12, 2017, he resided with his mother on Long Island, but was then arrested by ICE and transported by Defendants to a secure detention facility in Woodland, California, where he remained in the custody of ORR until being transferred by ORR to a staff secure facility in Dobbs Ferry, NY. However, he remains subject to being transferred back to Yolo or another secure or staff secure facility in Northern California at any time. As such, he is in custody under color of the authority of the United States, and he is in custody in violation of the Constitution or laws of the United States, within the meaning of 28 U.S.C. § 2241.

13.    Plaintiff Wilfredo Velasquez, the next friend of F.E., is filing this complaint and petition on F.E.'s behalf.  Plaintiff Velasquez resides in Brentwood, Suffolk County (Long Island), New York. Plaintiff Velasquez is dedicated to F.E.'s best interests.

14.    F.E. is a seventeen year old unaccompanied immigrant child and a citizen of El Salvador.  Until June 9, 2017, he resided with his mother and stepfather on Long Island, but was then arrested by the Suffolk County Police Department ("SCPD"), was released on June 14, 2016, re-arrested by SCPD on June 16, 2017, and turned over to ICE.  Defendants then transported him to a secure detention facility in Shenandoah, Virginia, in the custody of ORR. ORR then transferred him to an ORR contract facility in Fairfield, California, and then to another ORR contract facility in Lincolndale, New York. However, he remains subject to being

transferred back to Yolo or another secure or staff secure facility in Northern California at any time. As such, he is in custody under color of the authority of the United States, and he is in custody in violation of the Constitution or laws of the United States, within the meaning of 28 U.S.C. § 2241.

15.    Defendant Jefferson B. Sessions III is the Attorney General of the United States, responsible for the enforcement of the nation's immigration laws. He is sued solely in his official capacity.

16.    Defendant Thomas E. Price, M.D. is the Secretary of HHS, the federal agency upon whose orders the individual Plaintiff Class members were detained. He is sued solely in his official capacity.

17.    Defendant Steven Wagner is the Acting Assistant Secretary of the Administration for Children and Families. The Administration for Children and Families is an office within HHS that has responsibility for ORR, the agency that is directly responsible for Plaintiffs' detention. He is sued solely in his official capacity.

18.    Defendant Scott Lloyd is the Director of ORR. He is sued solely in his official capacity.

19.    Defendant Elicia Smith is a Federal Field Specialist for ORR, who serves as the approval authority for the transfer and release of unaccompanied children within the geographic region of Northern California. She works in the field and maintains a work space in San Francisco, California.  She is sued solely in her official capacity.

20.    Defendant Elaine Duke is the Acting Secretary of the U.S. Department of Homeland Security ("DHS"), the governmental department that is responsible for the arrests of the Plaintiff Class members that are the subject of this litigation.  She is sued solely in her official capacity.

21.    Defendant Thomas D. Homan is the Acting Director of ICE, the principal investigative agency of DHS that carries out the arrests of UCs that are the subject of this action. He is sued solely in his official capacity.

22.     Defendant James McCament is the Acting Director of U.S. Citizenship and Immigration Services ("USCIS"), an agency of DHS that oversees lawful immigration into the United States and, among other things, administers the process by which UCs can obtain Special Immigrant Juvenile ("SIJ") status, as explained more fully below.  He is sued solely in his official capacity.

23.     Defendant Brent Cardall is the Chief Probation Officer of Yolo County. Upon information and belief, he is responsible for providing care and custody to unaccompanied minor children through a contract with ORR. He is sued solely in his official capacity.

24.     Defendant Jose Esquivel is the Interim Program Director of BCFS Health and Human Services in Fairfield, California.  Upon information and belief, he is responsible for providing care and custody to unaccompanied minor children through a contract with ORR.  He is sued solely in his official capacity.

## FACTS AND LEGAL FRAMEWORK COMMON TO ALL PLAINTIFFS

### ORR Custody of Unaccompanied Children

25.     When a UC is initially detained by federal immigration authorities, the TVPRA requires that the child be transferred to the custody of the Secretary of HHS within 72 hours. The duties of the Secretary of HHS under the TVPRA are carried out by officials within ORR.

26.     The Secretary of HHS must then ensure that pending the completion of any removal proceedings, the child is "promptly placed in the least restrictive setting that is in the best interest of the child."  8 U.S.C. § 1232(c)(2)(A).

27.     Under the TVPRA, "[a] child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or had been charged with committing a criminal offense."  8 U.S.C. § 1232(c)(2)(A).

28.     According to rules published on the ORR website under the title "Children Entering the United States Unaccompanied" ("ORR Rules"), a "secure care facility" is, in essence, a maximum security prison for children, characterized by "a secure perimeter, major restraining construction inside the facility, and procedures typically associated with correctional

6

facilities." ORR Rules, § 1.2.4. A "staff secure facility" is for children "who may require close supervision but do not need placement in a secure facility." *Id.*, Guide to Terms. A "staff secure" facility "maintains stricter security measures . . . than a shelter in order to control disruptive behavior and to prevent escape," and may also contain a "secure perimeter with a 'no climb' fence." *Id.* Detention in either kind of facility constitutes a significant deprivation of liberty.

29.    The TVPRA permits ORR to consider a variety of factors in determining where to place an unaccompanied minor who has been transferred into its custody, including "danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(A). Section 1.2.4 of the ORR Rules permits ORR to place a UC in a secure care facility if the UC "[h]as been charged with, may be chargeable, or has been convicted of a crime," but such crimes are not to include "isolated offenses" or "petty offenses."

30.    As required by the TVPRA, many minors are released by ORR to the custody of a "sponsor" – typically a parent or other close family member – under an agreement pursuant to which the sponsor agrees to care for the UC ("Sponsored UCs"). 8 U.S.C. § 1232(c)(3)(A). The process of releasing a UC to a sponsor involves a comprehensive evaluation by ORR of both the UC and the sponsor.

**Other Rights of Unaccompanied Children**

31.    The TVPRA further provides that the Secretary of HHS shall ensure, to the greatest extent practicable, that unaccompanied minors in HHS custody "have counsel to represent them in legal proceedings" and "[t]o the greatest extent practicable . . . shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge." 8 U.S.C. § 1232(c)(5).

32.    Minors within the custody of ORR are also protected by the terms of the *Flores* Decree, a nationwide consent decree entered into in 1995 to resolve class action litigation in the U.S. District Court for the Central District of California. The *Flores* Decree sets national standards for the detention, release, and treatment of all immigrant children in Government custody, including a right of access to counsel.

33.    The *Flores* Decree also gives immigrant children the right to review of their custody determinations by an Immigration Judge. As the Ninth Circuit recently re-affirmed, this right to an Immigration Judge hearing remains valid today.  *See Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017).  The *Flores* Decree also provides for judicial review of such children's placement determinations and any other violations of the Decree in any United States District Court with jurisdiction and venue over the matter.

34.    The U.S. Constitution confers additional rights on minors in immigration proceedings since relevant protections extend to all "persons" regardless of immigration status. Among these rights are the First Amendment right to access to the courts and counsel and to petition the government; the Fourth Amendment guarantee of freedom from unreasonable searches and seizures; and Fifth Amendment guarantees of substantive and procedural due process.

**ICE "Sweeps" Target Unaccompanied Minors**

35.    On July 28, 2017, President Donald J. Trump gave a speech in Brentwood, NY, a hamlet within the Long Island town of Islip, in which he decried the fact that "unaccompanied alien minors arrived at the border and were released all throughout our country into United States communities" – even though the release of UCs into "the least restrictive setting that is in the best interest of the child" is explicitly required by the TVPRA.  The President repeatedly asserted that "the laws are stacked against us." He declared that "we will restore law and order on Long Island," but also made clear that his ambitions were broader, stating, "we're just getting started . . . one by one, we're liberating our American towns" from alleged gang members, whom he referred to as "animals."[1]

36.    In an interview with Fox News commentator Tucker Carlson broadcast on August 3, 2017, Defendant Sessions said: "[W]e need to be able to deport people rapidly who enter the country illegally, and we have to end this policy of taking unaccompanied minors . . . and turning

---

[1] "Trump's speech encouraging police to be 'rough,' annotated," Washington Post, 7/28/17, available at:  https://www.washingtonpost.com/news/politics/wp/2017/07/28/trumps-speech-encouraging-police-to-be-rough-annotated/?utm_term=.0be6120d2adc.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

them over to the Department of Health and Human Services, and then they take them to their 'destination city'. . . .  So this is a very bad and dangerous policy and it can be ended and it must be ended."[2]

37.    Consistent with these statements, Defendants enacted an aggressive enforcement program against Plaintiffs and other juveniles like them, resulting in the harms that are the subject of this lawsuit.

38.    In the spring of 2017, ICE agents began a program of conducting immigration "sweeps" in various locations, in which they arrest UCs whom local law enforcement authorities have identified to ICE as being affiliated with gangs.  One location in which such a sweep has commenced is Brentwood, NY.  As a result of this sweep, the individual Class members named herein – each of whom is a Sponsored UC – have been arrested, transported to distant locations, and incarcerated.

39.    On June 14, 2017, ICE announced in a press release that it had launched "Operation Matador," a joint initiative with several local law enforcement agencies in and around New York City including SCPD.  ICE announced that during the previous 30 days, "45 individuals were arrested during this ongoing enforcement effort, all of which were confirmed as gang members and affiliates."  This included 12 unaccompanied children, all of whom were allegedly "confirmed as MS-13 gang members."  According to the same press release, individuals are "confirmed as gang members" if they meet any of a number of criteria, including "if they admit membership in a gang" or have been "identified as a gang member by a reliable source."[3]

40.    Since the spring of 2017, numerous UCs living in and around Brentwood have been arrested by ICE, purportedly on the basis that they are somehow "affiliated" with gangs or gang members. They are then summarily transported to "secure care facilities," which are prison-

---

[2] Video of interview available at:  http://insider.foxnews.com/2017/08/03/jeff-sessions-tucker-carlson-tonight-ms-13-illegal-immigration.

[3] "Operation Matador nets 39 MS-13 arrests in last 30 days," 6/14/17, available at: https://www.ice.gov/news/releases/operation-matador-nets-39-ms-13-arrests-last-30-days.

like detention centers under the jurisdiction of ORR, including the Yolo County Juvenile Detention Facility ("Yolo") in Woodland, California. Yolo is under the jurisdiction of the Northern California Field Office of ORR and Defendant Elicia Smith, the Federal Field Specialist in charge of that office. Yolo is one of only two secure care facilities used by ORR, the other being the Shenandoah Valley Juvenile Center in Staunton, Virginia ("Shenandoah").

41.    Plaintiffs allege on information and belief that Operation Matador is the leading edge of a broader effort by the Trump Administration to target unaccompanied minors for arrest and detention based on claimed gang affiliation. On July 21, 2017, Reuters reported that based on an internal government memo it had seen, "U.S. immigration agents are planning nationwide raids . . . to arrest, among others, teenagers who entered the country without guardians and are suspected gang members . . . ." Reuters quoted ICE as contending that "a person can be identified as a gang member if they meet two or more criteria, including having gang tattoos, frequenting an area notorious for gangs and wearing gang apparel." According to the document, ICE field offices are directed "to identify people in their areas that meet the criteria."[4]

42.    ICE often relies on local law enforcement to identify suspected gang members. During a White House press briefing on July 27, 2017, Defendant Homan was asked, "[H]ow are suspected gang members being identified for ICE enforcement? Is it just through local law enforcement . . . ?" He responded, in part: "Local law enforcement, they're usually the ones that – you know, they – they have the most intelligence on gang members. It's part of what we look for to find gang members."[5]

43.    For their part, at least some local law enforcement officials view ICE enforcement as a way to remove from their communities youths that they view with suspicion, even in the

---

[4] "Exclusive:  U.S. Immigration raids to target suspected gang members," by Julia Edwards Ainsley, 7/21/17, available at:  http://www.reuters.com/article/us-usa-immigration-raids-exclusive-idUSKBN1A62K6?utm_source=twitter&utm_medium=Social.
[5] Video available at: https://www.youtube.com/watch?v=_CrNIU9vAbk (beginning at 18:30). The official White House text, which is slightly different, is available at: https://www.whitehouse.gov/the-press-office/2017/07/27/press-briefing-press-secretary-sarah-sanders-7272017-2.

absence of evidence sufficient to support a criminal arrest, much less a criminal conviction. Suffolk County Police Commissioner Timothy Sini recently admitted in an interview: "There are times when we know someone is an MS-13 gang member . . . but we're not in a position to make a criminal arrest.  So another tool in our toolbox is to work with the Department of Homeland Security to target active known MS-13 gang members for violation of civil immigration laws, which is another way to remove dangerous individuals from our streets."[6]

44.    In written testimony on May 22, 2017 to the Senate Committee on Homeland Security and Governmental Affairs, Commissioner Sini elaborated on SCPD's "gang eradication strategy," stating that its tactics include "effectuating street arrests" of suspected gang members, "debriefing all of our arrestees," and "shar[ing] intelligence with Homeland Security . . . in order to facilitate the commencement of removal proceedings . . . ."  He also stated that "we automatically notify the Department of Homeland Security when we arrest an individual for a misdemeanor or felony who was not born in this country so that immigration authorities can take appropriate action . . . ."[7]

45.    The SCPD is currently a party to an agreement with the U.S. Department of Justice that requires SCPD to implement "significant changes in how it engages the Latino community."  The agreement, entered into in 2014, is the culmination of an investigation commenced by the Department of Justice in 2009, arising out of allegations of discriminatory policing directed against Latinos.[8]

46.    Notwithstanding this troubling history, ICE uncritically accepts allegations of suspected gang membership made by SCPD in deciding to issue arrest warrants for

---

[6] "39 Members of MS-13 Are Arrested, Authorities Say," *New York Times,* June 14, 2017, available at: https://nyti.ms/2sq/JMWr.

[7] Timothy D. Sini, Testimony Regarding MS-13, given to the United States Committee on Homeland Security and Governmental Affairs, 5/22/17, at pp. 9-11, available at: https://www.hsgac.senate.gov/download/05/22/2017/testimony-sini-2017-05-24.

[8] U.S. Department of Justice Press Release, "United States Agrees to Comprehensive Settlement To Resolve Its Investigation Of The Suffolk County Police Department For Discriminatory Policing Against Latinos," 12/3/13, located at: https://www.justice.gov/usao-edny/pr/united-states-agrees-comprehensive-settlement-resolve-its-investigation-suffolk-county.

unaccompanied minors in Suffolk County.  To make matters worse, ORR does not subject these allegations to any form of review before placing a child in secure detention.

### Resulting Deprivations of Plaintiffs' Rights

47.     As a result of the administration's current crackdown, Plaintiff Class members have been subjected to a cascading series of deprivations of their statutory, court-ordered and Constitutional rights.  Because they are suspected of gang involvement – often based on nothing more than conjecture and profiling – they have been placed by ORR in secure care or staff secure facilities, making a mockery of the statutory requirement that they be placed in "the least restrictive setting that is in the best interest of the child."  The deprivations described herein are even more glaring in the case of the Plaintiff class members, who, as Sponsored UCs, have already been apprehended, released to the custody of ORR, and released by ORR to the custody of a sponsor.

48.     On June 12, 2017, ORR amended § 1.2.4 of the ORR Rules to permit it to consider, as a basis for placement in secure custody, whether the UC "has self-disclosed violent history or gang involvement prior to placement in ORR custody . . . ." and  "reported gang affiliation or display[ing] gang affiliation while in care." The timing of these amendments coincided with the rollout of "Operation Matador" and the arrests of multiple Class members.

49.     Evidence adduced in this case has shed light on Defendants' practices regarding the arrest, detention and transfer of UCs suspected of gang affiliation.  When ICE arrests a UC suspected of gang affiliation, it promptly notifies ORR of the arrest, but does not immediately transfer physical custody of the UC to ORR. Instead, ICE keeps the UC in secure detention at an undisclosed location, without making any effort to notify the UC's sponsor, family members, or counsel, or to provide the UC access to counsel.

50.     While ICE keeps the UC imprisoned, it sends a bare summary of information about the UC to ORR via email. This information may include significant errors, including reporting the existence of criminal charges that have been dismissed or otherwise resolved, or inaccurate notations that an individual is a "self-admitted gang member;" and relies on hearsay

allegations by local law enforcement authorities that have not been tested or questioned in any form by ICE.

51.     On information and belief, ICE's uniform policy and practice is to recommend that ORR place UCs suspected of gang affiliation in a secure care facility.

52.     Plaintiffs allege on information and belief that before ICE arrests an unaccompanied minor in a non-exigent situation in the interior of the United States *(i.e.,* not in the course of committing an alleged serious crime and not proximate to the minor crossing the border), it has the ability to access information maintained by ORR or other agencies that would indicate whether the child is already a Sponsored UC.

53.     Notwithstanding, these Sponsored UCs have been re-arrested by ICE based on arrest warrants stating only that "there is probable cause to believe that [the UC] is removable from the United States . . . based upon . . . the pendency of ongoing removal proceedings against the subject."

54.     As to Sponsored UCs, such re-arrest based on nothing more than "removability" violates the TVPRA. If ICE can upend ORR's decisions to reunify UCs with their parents under sponsor agreements and serially re-arrest Sponsored UCs solely based on "removability," the protections afforded UCs under the TVPRA are meaningless.

55.     In addition, ICE arrests of sponsored UCs based on removability absent reliable information about changed circumstances that justify such arrest—as opposed to a process by which ORR reviews its own prior custody determination based on information provided by ICE or other sources—are unreasonable under the Fourth Amendment.

56.     When ICE notifies ORR that it has re-arrested a Sponsored UC, ORR treats the UC as though this were the first time it had ever been in contact with the UC, ignoring its own previous evaluation of the UC and his or her sponsor.  In sworn testimony given in this Court on June 29, 2017, ORR Senior Field Specialist Supervisor James De La Cruz stated that in the case of a re-arrest of a Sponsored UC, it is ORR policy *not* to contact the UC's sponsor prior to deciding to place the UC in secure detention and permitting ICE to transport the UC to a location

13

distant from the sponsor.

57.     Within a few hours of receiving ICE's notification and recommendation, ORR takes steps to place the unaccompanied minor in accordance with ICE's recommendation. In making this decision, ORR relies exclusively on information provided by ICE via email, without any attempt to review any of its own files concerning the UC or its own prior custody determination, to corroborate any of ICE's information, or to provide notice to the child (or his or her guardian or attorney) as to what information is being considered.  In his sworn testimony in this Court, Mr. De La Fuente admitted that it has "no procedures for reviewing or challenging [ICE's] recommendation" before making a decision to send a UC to secure detention. In essence, ORR merely accepts whatever is reported by ICE.

58.     After ORR determines where the child will be detained, ICE transports the UC to that facility, and transfers physical custody of the minor to ORR only after the transportation process has been completed.  During this time, neither ICE nor ORR makes any effort to inform the minor's family members, sponsor, or counsel concerning the child's whereabouts, or to permit them any opportunity to be informed of, much less challenge, ICE's and ORR's placement decision.

59.     Also during this time, ICE systematically deprives unaccompanied minors of their Fifth Amendment rights by interrogating them without counsel present, even if the child has attempted to resist answering questions and/or requested to contact his or her counsel before answering.

60.     ORR, for its part, is summarily placing these children in secure detention without the required "determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." 8 U.S.C. 1232(c)(2)(A).  ORR's placement decisions also violate its obligation that a UC be placed in "the least restrictive setting that is in the best interest of the child."  By reflexively accepting the recommendations of ICE, it is only considering the alleged "interest" of law enforcement authorities.  Moreover, because ORR's policy and practice is to take 30 days to complete any re-evaluation of its initial placement

decision, ORR's conduct imposes a 30-day period of confinement in jail-like conditions on Plaintiffs.

61.    Even in the 30-day period following this initial placement, ORR does not provide unaccompanied minors, their sponsors, or their attorneys the evidence upon which ORR relies to detain them in the most restrictive settings available for children in ORR custody. Neither a UC, nor his or her counsel or sponsor, has any opportunity to test this evidence, to cross examine the witnesses who may be the source of incriminating information, or to present additional facts to a neutral decision-maker who could weigh the evidence impartially.

62.    The arrest and transfer of unaccompanied minors to distant locations and their detention in jail-like conditions is extremely harmful. It a severe deprivation of liberty that imposes psychological harm and suffering upon the children who are detained. It also prevents unaccompanied minors from seeing their families, meeting with counsel, and participating meaningfully in ongoing immigration proceedings and other matters that impact their ultimate ability to remain in the United States. These harms are imposed even when not required by geographic limitations of available facilities. Many unaccompanied minors, including two of the Named Minors, who were originally placed in secure facilities were later "stepped down" to "staff secure" facilities geographically distant from their families, lawyers, and court proceedings, despite the presence of "staff secure" ORR facilities in their home regions.

63.    In addition to the practical effect that detention in remote facilities has on unaccompanied minors' participation in ongoing legal proceedings, USCIS has issued notices of intent to deny or revoke approval of SIJ status for unaccompanied minors who are alleged to have gang affiliations. Plaintiffs are informed and believe, and thereon allege, that USCIS has issued these notices and taken other actions to deny or obstruct unaccompanied minors' access to immigration benefits to which they are entitled based on DHS's recommendations, without any independent review of the evidence upon with DHS's recommendations are made.

///

///

## FACTS PERTAINING TO INDIVIDUAL PLAINTIFFS

### A.H.

64.    After suffering severe abuse and neglect from his father in Honduras, A.H. fled Honduras and entered the United States as an unaccompanied minor on or about April 26, 2015. He was detained by U.S. Customs and Border Protection upon his arrival, and placed in the custody of ORR.  Upon his arrival, A.H. spent one month in ORR custody at Lincoln Hall Boys' Haven in Lincolndale, New York, before being released to the custody of his mother, Plaintiff Saravia, on or about May 28, 2015. Plaintiff Saravia signed a sponsor agreement with ORR and became A.H.'s official sponsor.

65.    For over two years, between May 28, 2015 and June 12, 2017, A.H. lived with Plaintiff Saravia, his mother and sponsor, in Long Island, New York. By order of the New York State Family Court for Nassau County dated January 29, 2016, Plaintiff Saravia was awarded sole residential and legal custody of A.H.

66.    A.H. is eligible to apply for SIJ status upon the issuance of an appropriate state court order (commonly referred to as a "Predicate Order") finding that (1) he is a dependent of the court; (2) he cannot be reunited with one parent due to abuse, abandonment and/or neglect; and (3) it is not in his best interest to return to his home country.  8 U.S.C. § 1101(a)(27)(J). A.H. qualifies for the issuance of the Predicate Order. Once the Predicate Order is issued, A.H. can file a SIJ Status Petition (U.S. Citizenship and Immigration Services Form I-360), he can obtain lawful permanent residency and a path to citizenship, and he can be protected from removal from the United States.  On or about January 3, 2017, through his New York attorney, Stephanie Gibbs, A.H. filed a Motion for Special Findings in the Family Court in Nassau County, requesting that the Family Court issue a Predicate Order containing the findings required under the TVPRA.

67.    A.H. is also the subject of removal proceedings under 8 U.S.C. § 1229a in Immigration Court in New York, New York.

///

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

68.     On or about June 12, 2017, A.H. was arrested outside his home by two plainclothes officers who identified themselves as ICE officers and said they had an order to arrest him. The DHS arrest warrant stated, as the sole cause for the arrest, that DHS had "probable cause to believe" that A.H. was "removable from the United States … based on … the pendency of ongoing removal proceedings …."  A.H. asked why the officers were arresting him and they told A.H. he had admitted to being in a gang, which was untrue. The officers handcuffed him and transported him to a holding cell. They did not give him an opportunity to gather any belongings or to communicate with either his mother or his attorney.

69.     At the time of his arrest, A.H. did not meet any of the ORR's criteria for detention in a secure facility. During his time in the United States, A.H. has had two minor brushes with law enforcement, neither of which resulted in a conviction of any offense. In April or May 2016, a classmate alleged that A.H. had threatened him with a knife. Although A.H. was charged with "menacing with a weapon," A.H. denies having even been in possession of a knife and the charges were later adjourned in contemplation of dismissal. In March 2017, A.H. was charged with fifth degree marijuana possession, the lowest possible possession offense. This charge, too, was adjourned in contemplation of dismissal. At the time of his arrest, A.H. informed the arresting officers that his criminal cases had been resolved.

70.     Under New York criminal law, adjournment in contemplation of dismissal is a final adjudication that does not involve either an admission or a finding of guilt, and therefore should not be treated as a "conviction" that carries adverse immigration consequences.

71.     Shortly after arresting A.H., ICE informed ORR via email that it had arrested A.H., and provided ORR with information concerning A.H., much of which was incomplete or incorrect, or both.  ICE informed ORR of A.H.'s two arrests, but falsely stated that the arrest for "menacing" had occurred within the previous three weeks and that criminal charges were "pending," when in fact the arrest had occurred a year earlier and the charges had been adjourned in contemplation of dismissal.  ICE also falsely informed ORR that the charge for possession of marijuana was "pending," when in fact it too had been adjourned in contemplation of dismissal.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

Finally, ICE falsely reported that A.H. was a "self-admitted gang member," based on a double-hearsay statement in a SCPD arrest report that is inconsistent with an earlier statement in the same report, which explicitly stated that A.H. denied being a gang member.  ICE recommended to ORR that A.H. be placed in secure confinement.

72.    Based on this incomplete and largely inaccurate information, in less than three hours ORR accepted ICE's recommendation that A.H. should be sent to secure confinement, and arranged for him to be sent to Yolo.  During this time, ORR did not review its own extensive files on A.H. relating to its earlier decision to release him to the custody of his mother; did nothing to question or verify any of the third-hand information reported by ICE; did not inform A.H., his mother or his counsel of its determination or the information it was relying on in making the determination; and did not allow A.H., his mother or his counsel any opportunity to challenge the information or confront witnesses against him.

73.    A.H. remained in ICE custody for approximately 36 hours, during which time ICE transported him first to a secure detention facility in New York City; and then by airplane to Los Angeles and Sacramento, California; and finally to Yolo.  During this entire time he was detained by, and in the physical custody of, ICE agents.  A.H. was not formally transferred to ORR custody until after ICE had placed him in secure detention at Yolo.

74.    During his detention by ICE, A.H. made repeated requests to be permitted to contact his attorney, but every such request was denied.  He was interrogated by ICE officers notwithstanding that he had an attorney and had requested to be able to talk to his attorney.

75.    Even though ICE had already sent information to ORR stating that A.H. was a "self-admitted gang member," the ICE agents repeatedly asked A.H. if he was in a gang.  A.H. denied all involvement with a gang.

76.    A.H. also requested to be permitted to contact his mother, but his requests were denied until he told the agents that he would not talk to them until he had been permitted to speak with his mother.  When he was permitted to call his mother for a very short time, he told her that he had been arrested by ICE and that she should contact his attorney.

18

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

77.     During the time of his initial detention and transportation across country, A.H.'s attorney, Ms. Gibbs, repeatedly requested of Defendants and their agents information concerning A.H.'s location, his condition, and the reasons he had been detained.  Defendants did not even confirm that they had arrested A.H. until the day after his arrest; and even then, they provided no information as to A.H.'s whereabouts until approximately 5:00 p.m. on Tuesday, June 13, 2017, when Mr. De La Cruz of ORR finally told A.H.'s attorney that A.H. was "en route" to Yolo. Even then, Mr. De La Cruz did not provide information about who had decided to send him there or why A.H. had been taken into custody.

78.     At a hearing in this case on June 29, 2017, after hearing testimony from Mr. De La Cruz of ORR, the Court ruled that because ORR "had already screened the child, screened the mother, made a decision that the child could be placed with the mother, and entered into a contract with the mother regarding the care of the child," ORR "had an obligation to investigate the information it was receiving from DHS about A.H."  The Court ordered Defendants "to look much more carefully than it has done up to now into whether it should have taken the child into custody," including that it must "conduct a careful check of the accuracy of the information it received from DHS … including contacting the appropriate local law enforcement officials who might have information about the child's status as a member or affiliate of MS-13."  The Court also ruled that "ORR must give the child an opportunity to be heard in the presence of his attorney and must give his attorney the opportunity to be heard in connection with this decision," and that "ORR must give the attorney access to all the information on which the decision would be based and give her an opportunity to respond to that information before the final decision is made . . . ."[9]

79.     ORR took some of the steps ordered by the Court.  In response to the Court's order, ORR produced a written report dated July 10, 2017.  That report described the steps taken by ORR in revisiting its initial decision regarding A.H.'s placement, but did not indicate that ORR had contacted local law enforcement officials about the allegations of gang membership,

_____

[9] ECF 22, at 5-6.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

noting only that "[w]e believe the documents we received are authentic, and A.H.'s counsel makes no claim that they are otherwise."[10]  While refusing to concede that it had acted improperly or reached an erroneous conclusion in connection with its initial decision to place A.H. in secure confinement, ORR decided that A.H. should be "stepped down" to a less restrictive "staff secure facility,"[11] and subsequently transferred A.H. to a staff secure facility in Dobbs Ferry, NY, closer to his home.

80.     In the time since A.H. was transferred to Dobbs Ferry, his attorney and Plaintiff Saravia have diligently provided information and access as required by ORR to seek his reunification with Plaintiff Saravia. To date, A.H.'s reunification petition has been denied.

81.     Among the documents ORR provided to A.H. in response to this Court's order was a memo dated June 26, 2017 bearing the seal of Defendant DHS that concludes, "In light of [A.H.'s] affiliation to a violent street gang, he should not be afforded any type of immigration services, relief, benefit or otherwise released from custody pending the outcome of removal proceedings." On information and belief, Defendants' refusal to release A.H. to his mother's custody is based in part on Defendants' continuing reliance on unfounded allegations of gang affiliation.

82.     As a result of Defendants' wrongful acts, A.H. was arrested without cause, placed in a secure holding cell 2,500 miles from his mother and guardian, deprived of access to his counsel, deprived of notice and an opportunity to be heard on whether he should be detained, and continues to be held in custody and denied reunification with his parent and release into her custody, in violation of due process and federal law.

**F.E.**

83.     F.E. is a seventeen year old who entered the United States in June 2014 to escape death threats from gang members in his native El Salvador, where he was living with his maternal grandparents.  After being apprehended by immigration authorities and released to the

---

[10] ECF 27-1, at 2.

[11] *Id*, at 5.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

custody of ORR, he was released by ORR to the custody of his mother under a sponsor agreement, and thereafter lived with his mother in Brentwood, NY.

84.     F.E. began to encounter problems with local police in the spring of 2017, after he was briefly suspended from Brentwood High School based on an unsubstantiated allegation of gang affiliation.  After that time, he was frequently stopped by local police, who repeatedly asked him his name and address.

85.     F.E. asked to meet with the police to explain that he was not in a gang and to ask them to stop harassing him.  Their response was that he should "stop hanging out with bad company," even though he did not spend time with gang members.

86.     On Friday, June 9, 2016, F.E. was walking home with a friend after playing soccer when he was arrested on a charge of disorderly conduct.  He was taken to the local police station, where he was held overnight.  For several hours, he was handcuffed and shackled to the wall, unable to walk around in the cell. An ICE officer showed up at the station but did not talk with him, and several police officers repeatedly told him he was "illegal" and would possibly be deported.  His mother came and tried to see him, but the police would not allow her to do so.

87.     At a court hearing the next day, Saturday, June 10, the judge told him that she could release him because his alleged offense was only an infraction, but that because the police had called immigration authorities, he would not be released.  F.E. was then taken to the Riverhead Correctional Facility in Riverhead, NY, where he was held until Wednesday, June 14, when family members posted bail.

88.     On Friday, June 16, F.E. was again apprehended by the same local police officer, who informed him that he was being detained because "you aren't legal. I need to give you to immigration. You'll probably be deported."  He was then taken to Central Islip, NY, where he was arrested by an ICE officer, who told him that he was not being arrested for gang affiliation, but because he had an open immigration case. From Central Islip he was taken to an ICE detention center in Manhattan. On Saturday evening, he was informed that he would be sent to Shenandoah.  On Sunday morning, June 18, he was driven to an airport, then put on a plane, and

1  taken to a secure facility in Shenandoah, Virginia.

2       89.    On information and belief, ICE recommended to ORR that F.E. be transferred to a

3  secure facility, and ORR accepted ICE's recommendation without ever reviewing or questioning

4  any of the evidence on which ICE was basing its recommendation; without informing F.E. or

5  anyone acting on its behalf of any of this information; or offering to F.E. or anyone acting on his

6  behalf an opportunity to review this evidence or offer evidence on his behalf.

7       90.    On information and belief, ICE based its recommendation, at least in part, on

8  unsupported and unreliable allegations of gang affiliation.  While he was as Shenandoah, F.E.

9  was told that he was there because he had been accused of being in a gang; but he was never told

10  who had accused him of this, or why.

11      91.    F.E. was held at Shenandoah until July 6, 2017, when he was "stepped down" to a

12  staff secure facility run by Baptist Child & Family Services under contract with ORR in

13  Fairfield, California.

14      92.    On August 4, 2017, shortly after meeting with an investigator from the ACLU of

15  Northern California, he was transferred to Lincoln Hall Boys' Haven, an ORR contract facility

16  located in Lincolndale, NY.

17      93.    Since he was taken into ORR custody in June, 2017, F.E.'s attorney and mother

18  have diligently provided information and repeatedly sought F.E.'s release and reunification with

19  his family. To date ORR has denied F.E.'s release. On information and belief, ORR's refusal to

20  release F.E. is based on Defendants' inaccurate, unfounded, and unreliable gang allegations.

21      94.    Meanwhile, F.E. had applied for SIJ status on October 28, 2016.  On February 13,

22  2017, USCIS issued a notice of action indicating its approval of SIJ status.  On the basis of this

23  approval, F.E. had applied to adjust his status to lawful permanent resident.  However, on June

24  21, 2017, just days after his arrest in Brentwood, USCIS notified F.E. of its intent to revoke his

25  SIJ status, based in part on a claim that the Family Court that had issued the predicate order on

26  which SIJ status was based had not been informed of F.E.'s alleged "gang activities."  On

27  information and belief, this action was nothing more than an attempt to interfere with F.E.'s

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

lawful and proper efforts to put himself on a path to U.S. citizenship. USCIS to this day has never explained who alleged that F.E. had participated in "gang activities," or what "activities" he is alleged to have participated in.

**J.G.**

95.     J.G. is a seventeen year old native of El Salvador who grew up in the care of his maternal grandparents after his mother had immigrated to the United States and his father had abandoned him when he was one year old. He entered the United States in 2015, was detained at the border and released to the custody of ORR. ORR subsequently released him to the custody of his mother under a sponsor agreement, and he went to live with her in Brentwood, NY.

96.     After being expelled from high school for cutting class in 2015, J.G. was frequently followed by members of SCPD, who would stop him and question him for no apparent reason. Since then, he has been charged with trespassing on several occasions.

97.     On April 19, 2017 at about 12:30 p.m., he was stopped by SCPD officers while walking to a deli with a friend. About five minutes after the initial stop, plainclothes detectives arrived and handcuffed and searched both youth. The detectives said J.G. was a member of a gang because of who he was associating with and because he was wearing a blue soccer jersey with the name of his country, El Salvador, on it. He responded that he was not in a gang. The detectives accused J.G. of killing someone, which he denied, and repeatedly referred to J.G. by using vulgar epithets. One of them, said "bye bye," and that he was going to be deported, and the rest of the police officers laughed.

98.     J.G. was taken to a police station where he was made to sit in an interrogation room with his handcuffs shackled to the floor. He asked to be able to call his mother, but his request was refused. Later that evening he was taken out of his cell and interrogated about a murder by two new detectives who accused him of the murder and of being a gang member; he denied both accusations.

///

///

99.     The next day, April 20, 2017, J.G. appeared in court, where the judge set bail at $250 for a charge of false personation, but told him that if he paid bail and were released, he would go straight into immigration custody.  On April 21, 2017, he was questioned by an ICE officer, who told him that even if someone made bail for him, "you're going with us to Virginia." Based on the threat that he would be taken into immigration custody rather than released on bail, J.G.'s family did not post bail, and J.G. was transferred to the Riverhead Detention Center in Riverhead, NY, where he remained for nearly two months, until June 16, 2017.

100.     At a court hearing on June 13, 2017, on the advice of his attorney, J.G. pled guilty in order to obtain his release, and he was returned to Riverhead.  But he was not immediately released.  ICE agents came to the jail at about 5:00 a.m. on June 16, 2017 and arrested him.  He was taken to an ICE detention center in Manhattan, and from there to an airport, and transported by plane to Sacramento and by car to Yolo.  J.G. was permitted to call his stepfather from Manhattan but did not have any information to share about what was happening to him. Therefore, neither his mother, his stepfather nor his criminal attorney were informed of his whereabouts or of ICE's plan to detain him and send him to Yolo.  He was not able to call his mother again until June 19, 2017.

101.     In response to a records request by counsel for Plaintiffs, ORR has made available records pertaining to J.G.  Among the documents created by personnel at Yolo are notes stating that J.G. is "self-admitted MS-13."  This information is not reflected in, or supported by, any other records made available by ORR and is inconsistent with J.G.'s denial of gang membership. Nowhere in any records made available by ORR is there any first-person account of any person to whom J.G. supposedly "admitted" gang membership.

102.     On July 26, 2017, following visits by counsel for Plaintiffs, J.G. was "stepped down" by ORR to the Selma Carson Home, a staff secure facility in Tacoma, Washington, where he remains to this day.

103.     Prior to his most recent arrest, J.G. had applied for a U-3 visa as a derivative of his mother's U Visa (a visa for which certain crime victims are eligible).  He was placed in

removal proceedings when he arrived in the U.S. in 2015, but those proceedings were administratively closed because of the pending U-3 visa application.  In February 2017, U.S. Citizenship and Immigration Service, the agency considering J.G.'s visa petition, notified his attorney that it considers J.G. inadmissible based on a record that includes "information indicating that he is a confirmed member of the Mara Salvatrucha (MS-13) street gang," based in part on such nebulous factors as "frequenting an area notorious for gangs," "being seen by law enforcement or by a source previously deemed reliable displaying gang signs or symbols," and "being identified as a gang member by documented or undocumented sources of information previously deemed reliable by law enforcement personnel."

104.    While J.G. was in local custody at Riverhead, DHS filed a motion to recalendar the removal proceedings that had been administratively closed, despite his pending U-3 visa application. The motion was filed in the Immigration Court in New York, New York and requested that J.G.'s removal proceedings be "recalendared and proceed to a final decision on the merits without further delay."

105.    On June 23, 2017, DHS moved the Immigration Court to change the venue of J.G.'s removal proceedings to Arlington, Virginia, based on an assertion that he had taken into custody and detained at Shenandoah. The Immigration Court granted the motion before J.G.'s attorney had received notice of the motion and had an opportunity to oppose it. DHS has since moved to change venue to San Francisco, California.

106.    J.G.'s transfers – first to Yolo and then to the Tacoma, Washington facility – and the changes of venue in his immigration proceedings to courts outside his immigration attorney's area have interfered with J.G.'s relationship with his immigration attorney. If J.G. were released to his mother's custody, his counsel would request a change of venue back to New York.

107.    At no time has J.G. been given any explanation of the reasons upon which ORR based its decision to place him in a secure facility or to move him to staff-secure facility far from his home, family, and immigration attorney, or any opportunity to examine the evidence on which ORR relied in making its decision, or any opportunity confront the evidence or witnesses

against him, or to present evidence on his own behalf.

## CLASS ACTION ALLEGATIONS

108.   Plaintiffs, as individuals and in their representative capacities, bring the claims set forth herein against Defendants pursuant to Federal Rule of Civil Procedure 23(b)(2) to certify an injunctive relief class (the "Class") defined as follows:

> All unaccompanied immigrant children (also referred to as "UCs") who had previously been detained in ORR custody and released by ORR to a parent or other sponsor, and who thereafter have been or will be arrested by U.S. immigration authorities on or after April 1, 2017 with allegations of gang affiliation and detained in a secure or staff-secure detention center under the oversight authority of the San Francisco-based ORR Federal Field Specialist.

109.   On information and belief, the Class consists of a large number of similarly situated individuals located throughout the country, such that joinder of all members of the Class is impracticable.

110.   There are common questions of law and fact affecting individual Class members, including but not limited to, the following:

a.   Whether Defendants' policies, practices and conduct of arresting and detaining unaccompanied minors based on allegations of gang affiliation are implemented without reliable information supporting those allegations;

b.   Whether ICE's arrests of Plaintiffs were based on reliable evidence of changed circumstances following ORR's release of Plaintiffs to a parent or other sponsor;

c.   Whether Defendants' policies, practices and conduct result in the placement of unaccompanied minors in secure or staff-secure care facilities without notice to the unaccompanied minors' family members, sponsors, or counsel;

d.   Whether Defendants' policies, practices and conduct result in the placement of unaccompanied minors in secure or staff-secure care facilities with the effect of interfering with their access to counsel;

e.   Whether Defendants' policies, practices and conduct result in the placement of unaccompanied minors in ORR secure or staff-secure care facilities without

notice or opportunity to rebut the allegations ORR relies on to justify secure or staff-secure custody;

f.  Whether Defendants' criteria for placement of unaccompanied minors in a secure or staff secure facility are so overbroad so as not to be justified by Defendants' interests;

g.  Whether Defendants have an obligation to transfer unaccompanied minors who are stepped down to lower security facilities to available facilities near the minors' homes and/or families;

h.  Whether Defendants' policies, practices and conduct with respect to Sponsored UCs unlawfully denies or obstructs the unaccompanied minors' access to immigration benefits and protections;

i.  Whether such policies, practices and conduct violated and continue to violate Plaintiffs' rights to be free from unreasonable seizures under the Fourth Amendment of the United States Constitution;

j.  Whether such policies, practices and conduct violated and continue to violate the Plaintiffs' rights, absent changed circumstances based on credible information, to remain in the custody of a parent or other sponsor once released thereto by ORR under the TVPRA, 8 U.S.C. § 1232;

k.  Whether such policies, practices and conduct violated and continue to violate the Plaintiffs rights to petition the government for access to the courts and/or immigration benefits, under the First and Fifth Amendments to the United States Constitution;

l.  Whether such policies, practices and conduct violated and continue to violate the Plaintiffs rights of access to counsel, under the First and Fifth Amendments;

m.  Whether such policies, practices and conduct violated and continue to violate the Plaintiffs rights to procedural and substantive due process under the Fifth Amendment;

n.  Whether such polices, practices and conduct violated and continue to violate the Plaintiffs' rights to be placed in the least restrictive setting under the TVPRA, 8 U.S.C. § 1232(c)(2)(A); and

o.  Whether injunctive relief should issue to enjoin the policies, practices and conduct of the Defendants' agents and employees.

111.    Plaintiffs' claims are typical of those of the Class members with respect to the constitutionality and legality of Defendants' policies, practices and conduct at issue here. The prosecution of individual actions against Defendants by individual members of the Class would create a risk of inconsistent and varying adjudications, which would result in variable standards of conduct for Defendants and a lack of uniform immigration policy nationwide.

112.    Plaintiffs will fairly and adequately protect the interests of members of the Class and are unaware of any conflict among or between the members of the Class that would preclude their fair and adequate representation. Plaintiffs are represented by counsel who have extensive experience litigating similar matters.

## INJUNCTIVE AND DECLARATORY RELIEF ALLEGATIONS

113.    Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as though fully set forth herein.

114.    An actual and substantial controversy exists between Plaintiffs and Defendants regarding their respective legal rights and duties. Plaintiffs contend that Defendants have violated Class members' constitutional and statutory rights as alleged above. Defendants deny that their conduct violates any such rights and intend to continue such conduct.

115.    Moreover, in view of Defendants' policies and practices, Plaintiffs are threatened with continuing and future deprivations of their rights, because they can be "stepped up" to secure detention without due process, or, in the event they are released to their sponsors, they can be re-arrested based on the continuing status of being in removal proceedings and sent again to secure detention.

///

116.    Defendants' conduct as alleged above has caused and, absent injunctive relief or a writ of habeas corpus, will continue to cause irreparable harm to Plaintiffs by denying Class members liberty without due process, as well as their statutory and contractual rights to be placed in the least restrictive setting that is in their best interest. In the absence of immediate relief, Class members will continue to be deprived of these rights.

117.    Under the Administrative Procedure Act, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. This Court "shall…hold unlawful and set aside agency action, findings, and conclusions found to be…not in accordance with law." 5 U.S.C. § 706.

118.    There is no adequate remedy at law for the continuing violations by Defendants of Class members' constitutional and statutory rights.

### FIRST CLAIM FOR RELIEF
**Unlawful Arrest**
**Fourth Amendment to the U.S. Constitution; 8 U.S.C. § 1232; 5 U.S.C. §§ 702, 706**
By All Plaintiffs Against Defendants Sessions, Duke and Homan

119.    Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as though fully set forth herein.

120.    At the time that ICE arrested each of the Plaintiffs, each Plaintiff had been released to a parent or other sponsor pursuant to an ORR sponsorship agreement and was living at liberty.

121.    Prior to their release to sponsors under an ORR sponsorship agreement, each of the Plaintiffs had been in ORR custody, and had been previously released to ORR by an agency of DHS pursuant to the TVPRA.

122.    Although ICE has broad authority to arrest undocumented persons, the TVPRA limits that authority in the case of Sponsored UCs, who have been previously arrested, placed in immigration proceedings, and transferred to the custody of HHS.  Consistent with the TVPRA's mandate that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and

29

Human Services," 8 U.S.C. § 1232(b)(1), from and after the time an arresting agency transfers custody of a UC to ORR, ORR takes responsibility for the UC care and custody, and is required to place the UC in "the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2).

123.    It is implicit in the structure and language of the TVPRA that once ORR makes a determination that it is in the best interest of a UC's to be released to a parent or other sponsor, ICE may not simply re-arrest a Sponsored UC on grounds of removability, but may act only in the face of changed circumstances that are exigent in nature and based on credible information. Were this not the case, the protections conferred by the TVPRA would be meaningless, as Sponsored UCs would be perpetually subject to re-arrest by ICE.

124.    ICE lacked reliable information of changed or exigent circumstances that would justify Plaintiffs' arrests after ORR had made a determination that it was in the best interests of each Plaintiff to be released to a parent or other sponsor pursuant to an ORR sponsorship agreement; and accordingly, ICE did not have a reasonable basis to re-arrest the Class members.

125.    For all of the above reasons, ICE's arrests of Class members violated the TVPRA, 8 U.S.C. § 1232.

126.    For all of the above reasons, ICE's arrest of Plaintiffs also constituted unreasonable seizures in violation of the Fourth Amendment to the U.S. Constitution.

127.    Unless enjoined, ICE will continue to re-arrest minors who have been previously released to sponsors by ORR without reliable information of changed or exigent circumstances that would justify arrest in violation of the TVPRA, 8 U.S.C. § 1232 and the Fourth Amendment to the U.S. Constitution.

**SECOND CLAIM FOR RELIEF**
**Deprivation of Liberty without Procedural Due Process**
**Fifth Amendment to the U.S. Constitution, 5 U.S.C. §§ 702, 706**
(By All Plaintiffs Against All Defendants except Defendant McCament)

128.    Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as though fully set forth herein.

129.    The Fifth Amendment to the U.S. Constitution protects all "persons" from deprivation of liberty without due process of law.

130.    Plaintiffs have liberty interests in family integrity, which is protected by procedural due process.

131.    Confinement in a secure or staff secure ORR contract facility is a significant deprivation of liberty.

132.    In making its determinations to place Plaintiffs in secure and staff secure facilities, ORR relies on DHS's unsubstantiated allegations of gang membership and fails to provide Plaintiffs, their attorneys, and their sponsors notice and an opportunity to be heard before a neutral decision maker, to examine the evidence upon which ORR purports to base its determinations, and to cross-examine witnesses.

133.    In addition to unlawfully transporting Plaintiffs far from family to detain them in secure facilities, Defendants fail to consistently transfer Plaintiffs who are "stepped down" to lower security facilities to available facilities near Plaintiffs' homes and families.

134.    By these actions, Defendants have violated and, unless enjoined, will continue to violate Plaintiffs' procedural due process rights under the Fifth Amendment.

### THIRD CLAIM FOR RELIEF
**Excessive Restraint of Liberty**
**Fifth Amendment to the U.S. Constitution, TVPRA (8 U.S.C. § 1232); 5 U.S.C. §§ 702, 706**
(By All Plaintiffs Against All Defendants except Defendant McCament )

135.    Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as though fully set forth herein.

136.    The TVPRA requires that unaccompanied minors in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child," and other protections to ensure compliance with the "least restrictive setting" standard and family reunification. 8 U.S.C. § 1232(c).

137.    The Due Process Clause of the Fifth Amendment permits civil detention of individuals only where it is reasonably related to the Government's stated interests in preventing

---

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

flight risk and danger.

138.    Plaintiffs do not meet Defendants' own criteria for placement in a secure or staff secure care facility.

139.    To the extent Plaintiffs meet Defendants' criteria for placement in a secure or staff secure care facility, those criteria are so overbroad as to impose liberty restrictions that are not reasonably related to Defendants' interests.

140.    Detention of Plaintiffs in secure or staff secure facilities is so unnecessarily restrictive as to be punitive in nature and therefore violates their right to substantive due process.

141.    Defendants have violated, and, unless enjoined, will continue to violate, Plaintiffs' rights under the TVPRA and the substantive due process component of the Fifth Amendment.

**FOURTH CLAIM FOR RELIEF**
**Violation of *Flores v. Reno* Consent Decree**
(By Named Plaintiffs Against All Defendants Except Defendant McCament)

142.    Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as though fully set forth herein.

143.    Named Plaintiffs, as individuals, seek the Court's review and an order to remedy violations of the Named Minors' rights under the *Flores* Decree pursuant to Paragraph 24B, which provides: "[a]ny minor who disagrees with the INS's determination to place that minor in a particular type of facility … may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination …."

144.    Defendants have violated, and, unless enjoined, will continue to violate the Named Plaintiffs' rights under the following paragraphs of the *Flores* Decree:

    a.    Paragraph 11: requiring the Government to detain a minor in the "least restrictive setting appropriate to the minor's age and special needs …."

    b.    Paragraph 14: requiring that the Government release a minor to the minor's parent unless "the detention of the minor is . . . required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's

32

safety or that of others."

    c.    Paragraph 27: "No minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived such notice . . . ."

**FIFTH CLAIM FOR RELIEF**
**Interference with Right to Counsel**
**First and Fifth Amendments to the U.S. Constitution, 5 U.S.C. §§ 702, 706**
**INA (8 U.S.C. §§ 1362, 1229a) and TVPRA (8 U.S.C. § 1232)**
(By All Plaintiffs Against All Defendants except Defendant McCament)

145.    Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as though fully set forth herein.

146.    The Due Process Clause of the Fifth Amendment guarantees respondents in removal proceedings the right to representation by counsel of their choice, at no expense to the government.

147.    Civil litigants and applicants for government benefits have a First Amendment right to be represented by counsel of their choice free from unreasonable interference with the attorney-client relationship.

148.    Plaintiffs have a statutory right to representation by counsel, at no expense to the government under the INA. 8 U.S.C. §§ 1362, 1229a(b)(4)(A).

149.    Defendant Price has a statutory obligation to ensure Plaintiffs' access to representation to the greatest extent practicable under the TVPRA. 8 U.S.C. § 1232(c)(5).

150.    By their conduct, Defendants have interfered with and denied, and, unless enjoined, will continue to interfere with and deny, Class members' access to counsel in violation of their constitutional and statutory rights.

///

///

///

33

### SIXTH CLAIM FOR RELIEF

**Interference with Constitutional Rights to Access the Courts and Petition the Government**
**First and Fifth Amendments to the U.S. Constitution, 5 U.S.C. §§ 702, 706**
(By All Plaintiffs Against All Defendants)

151.    Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as though fully set forth herein.

152.    The First Amendment right to petition the government includes the right to file civil actions in court that have a reasonable basis in law or fact and to seek government benefits and services, including immigration benefits and protection, from government agencies.

153.    The Fifth Amendment right to due process also includes the right to access the courts and government benefits without undue governmental interference.

154.    The arrest, transportation to distant locations and continuing detention of Class members impede their ability to participate in judicial proceedings, both in Family Court and in Immigration Court, that are critical to their ability to establish entitlement to immigration benefits and protections, to put them on a path to citizenship, and to prevent their removal.

155.    Defendant DHS has issued memos directing that, due to alleged gang allegations, Plaintiffs should be denied any immigration services or benefits or release from custody pending their removal from the United States.

156.    Defendant ORR has made custody decisions that interfere with Plaintiffs' ability to petition the government for immigration benefits and services.

157.    Defendant USCIS has denied or revoked approval for immigration protection, benefits, and services for which Plaintiffs are eligible under U.S. and international law.

158.    Through the above described conduct, Defendants have violated and, unless enjoined, will continue to violate Plaintiffs' rights to access the courts and government benefits, and to petition the government under First and Fifth Amendments to the U.S. Constitution.

///

///

///

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

1.   A declaration that Defendants have violated the rights of Plaintiff Class members under the First, Fourth, and Fifth Amendments to the U.S. Constitution, the TVPRA, the INA, and the *Flores* Decree in connection with their arrest, transportation, and detention to secure or staff secure detention facilities and their denial of immigration benefits and services;

2.   A declaration that:

   a.   ICE may not re-arrest UCs who have previously been released to the care and custody of ORR, including those that ORR has released to the care and custody of a parent or other sponsor, without reliable evidence of changed circumstances that are sufficiently serious and exigent to justify arrest;

   b.   Before placing a UC into secure or staff-secure custody, ORR must provide the UC notice of the evidence upon which ORR bases its custody decision and an opportunity to respond to that evidence at a hearing before a neutral decision maker in which ORR has the burden of justifying the custody decision and the UC has the right to be represented by counsel and cross-examine witnesses;

   c.   ORR may not place a UC in secure custody absent admissible evidence of non-trivial criminal conduct or evidence that the UC poses a danger to himself or others, and dangerousness cannot be based on gang allegations based solely on clothing, appearance, and associations; and

   d.   Defendants may not deny access to immigration benefits and services, including by interfering in a UC's state court proceedings, based on gang allegations that are based solely on clothing, appearance, and associations;

///

///

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC

3.    A preliminary and permanent injunction ordering Defendants, and all persons acting under their direction:

   a.    to immediately release Named Plaintiffs to the custody of their guardians, sponsors, or representatives;

   b.    to immediately afford Plaintiffs who are currently in custody in secure or staff secure facilities access to the evidence upon with ORR based its custody decision and an opportunity to be heard before a neutral decision-maker regarding that evidence, including the opportunity to cross-examine witnesses upon whose statements ORR relies;

   c.    to immediately transfer Plaintiffs in staff secure facilities to a facility within no more than two hours' driving distance from their guardians, sponsors or representatives;

   d.    to refrain from arresting UCs who were previously released by ORR to a parent or other sponsor without reliable information of changed circumstances that are sufficiently serious and exigent to justify arrest;

   e.    to afford Plaintiffs who come into ORR custody in the future and as to whom ORR receives or makes a recommendation to place in secure custody notice of the evidence upon which this recommendation is based and an opportunity to respond to that evidence at a hearing before a neutral decision maker in which ORR has the burden of justifying the custody decision and the UC has the right to be represented by counsel and cross-examine witnesses before transferring the UC to secure custody or within 48 hours of referral to ORR, whichever comes first; and

   f.    to refrain from interfering with Plaintiffs' access to counsel, to the courts, and to their efforts to petition the government for immigration services and benefits including by detaining them and denying benefits due to unsubstantiated gang allegations, including gang allegations that are based

1          solely on clothing, appearance, and associations;

2     4.     Attorneys' fees and costs; and

3     5.     For such other and further relief as the Court may deem proper.

4

5   Dated: August 11, 2017          AMERICAN CIVIL LIBERTIES UNION
                                    FOUNDATION OF NORTHERN CALIFORNIA
6

7                                   By: _/s/ Julia Harumi Mass_____
8                                        Julia Harumi Mass
                                         William S. Freeman
9

10                                  COOLEY LLP
11

12                                  By: _/s/ Martin S. Schenker_____
                                         Martin S. Schenker
13                                       Nathaniel R. Cooper
                                         Ashley K. Corkery
14                                       Trevor M. Kempner

15                                  ACLU FOUNDATION
                                    IMMIGRANTS' RIGHTS PROJECT
16

17                                  By: _/s/ Stephen B. Kang_____
18                                       Stephen B. Kang
                                         Judy Rabinovitz
19

20                                  Attorneys for Petitioners/Plaintiffs, on behalf of
                                    themselves and others similarly situated.
21

22

23

24

25

26

27

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF
CASE NO.: 3:17-CV-03615-VC