UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ILSA SARAVIA, et al.,

              Petitioners/Plaintiffs,

    v.

JEFFERSON B. SESSIONS, et al.,

              Respondents/Defendants.

Case No. 17-cv-03615-VC

**ORDER GRANTING THE MOTION FOR PRELIMINARY INJUNCTION; GRANTING THE MOTION FOR PROVISIONAL CLASS CERTIFICATION; GRANTING IN PART AND DENYING IN PART THE FEDERAL DEFENDANTS' MOTION TO DISMISS; GRANTING IN FULL THE NON-FEDERAL DEFENDANTS' MOTIONS TO DISMISS**

Re: Dkt. No. 51, 54, 58, 61

      The federal government sometimes releases noncitizens on bond or parole while their removal proceedings are pending. Release reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk. Once a noncitizen has been released, the law prohibits federal agents from rearresting him merely because he is subject to removal proceedings. Rather, the federal agents must be able to present evidence of materially changed circumstances – namely, evidence that the noncitizen is in fact dangerous or has become a flight risk, or is now subject to a final order of removal. And if the noncitizen disputes the notion that changed circumstances justify his rearrest, he is entitled to a prompt hearing before an immigration judge. These protections against the erroneous deprivation of liberty arose out of a 1981 decision by the Board of Immigration Appeals and are embodied in the current practices of the Department of Homeland Security.

      A small group of similarly situated noncitizens, however, has not been receiving

comparable protections when rearrested.  Specifically, some noncitizens enter the country as unaccompanied minors – that is, children with no parent or guardian available to care for them.  Under existing law, the federal government conducts an assessment of the minor, and either keeps him in custody while his removal proceedings are pending or places him with a suitable "sponsor" in the United States.  The sponsor is often a family member, and the minor's placement with the sponsor reflects a determination by the federal government that the minor is neither dangerous nor a flight risk (and that such a placement is in the child's best interest).

Recently, federal agents have been arresting noncitizens – including some minors who were previously placed with sponsors – based on allegations of gang involvement.  Instead of giving those minors a prompt hearing to dispute that their detention is now justified based on changed circumstances, the government has been transferring them to different parts of the country for placement in high-security facilities for an indefinite period.

The issue in this case is not whether federal agents may arrest and detain undocumented minors who truly are members of dangerous criminal gangs.  If federal agents have probable cause to believe that a minor is a member of a criminal gang, certainly that could be a "changed circumstance" that would justify detention, even if the government had previously determined that the minor was not dangerous.  But there is no reason to deny these minors protections that noncitizens typically get after having been released on bond or parole.  The minors and their sponsors have the right to participate in a prompt hearing before an immigration judge in which the government's evidence of changed circumstances is put to the test.  By shipping the minors across the country for indefinite detention in a high-security facility before providing that hearing, the government has violated their due process rights.

Accordingly, for any noncitizen minor previously placed with a sponsor who has been arrested on allegations of gang activity, the government is ordered to provide a hearing before an immigration judge by no later than November 29, 2017, to allow the minor and his sponsor to contest the government's evidence of changed circumstances.  The government must restore the minor to the sponsor's custody if such evidence is lacking.  Going forward, at least while this

lawsuit is pending, the government is ordered to provide such a hearing within seven days of arrest of any such minor.

The plaintiffs have asked for further relief, and they have asserted additional legal theories. Further relief may be warranted, but because the minors are clearly entitled to at least this due process protection, and because their need for that protection is time-sensitive, a preliminary injunction on this issue is warranted at this time.

## I.

In the Spring of 2017, agents from Immigration and Customs Enforcement ("ICE"), which is a division of the Department of Homeland Security ("DHS"), executed "Operation Matador" in two New York counties. Operation Matador targeted undocumented immigrants in Suffolk and Nassau Counties who had alleged connections to criminal gangs. After receiving allegations of gang affiliation from local law enforcement officers, ICE agents proceeded to arrest the alleged gang members, relying on ICE's authority under federal law to arrest noncitizens who are subject to removal from the country. *See* Tr. of Oct. 27, 2017 Hearing at 23-28, Dkt. No. 98.

Some of the people arrested were minors. And ICE decided, after making the arrests, that some of the minors fell within a certain legal category: "unaccompanied" minors. Under federal law, an unaccompanied minor is a child who comes across the border without any parent or legal guardian in the United States available to take care of them. 6 U.S.C. § 279(g)(2). When DHS takes custody of an unaccompanied minor, federal law requires that agency to transfer custody of the minor to the Office of Refugee Resettlement ("ORR"), a division within a different cabinet-level agency, namely, the Department of Health and Human Services ("HHS"). The statutory purpose behind this transfer requirement is to provide special protections for unaccompanied minors, a particularly vulnerable group. In particular, Congress created this framework to address the concern that unaccompanied minors may be victims of human trafficking operations or other criminal activity, concluding that HHS was better equipped to assess and attend to the needs of these minors than DHS. The primary federal statute that confers this and other

protections on unaccompanied minors is called the Trafficking Victims Protection Reauthorization Act, or TVPRA. Pub. L. No. 110-457, § 235, 122 Stat. 5044, 5074-82 (2008) (codified at 8 U.S.C. § 1232); *see also* 6 U.S.C. § 279.

When an unaccompanied minor is taken into custody by DHS and then ORR, typically proceedings begin before an immigration judge (under the auspices of the Department of Justice) to decide whether the minor should be removed from the country. The TVPRA requires ORR to decide where to place the minor while the removal proceedings are pending. The statute requires ORR to place the unaccompanied minor "in the least restrictive setting that is in the best interest of the child," considering, among other things, whether the minor is dangerous. 8 U.S.C. § 1232(c)(2)(A). ORR may release the minor to a "sponsor" who already lives in the country but was not with the minor when DHS picked him up – often a parent or relative – so long as the minor is not dangerous and the placement is otherwise suitable. If placement with a sponsor is not appropriate (either because there is no sponsor, or because the proposed sponsor is unsuitable, or because the minor is dangerous), ORR will detain the minor in a facility pending resolution of the removal proceedings. *Id.*; *see also* 6 U.S.C. § 279(b)(2)(B).

The facilities used by ORR have three security levels. The least restrictive level is a shelter facility, the medium level is a staff-secure facility, and the most restrictive level is a secure facility. The secure facility is akin to a local juvenile hall – in fact, ORR uses local juvenile halls to house the most dangerous unaccompanied minors, pursuant to contracts with local governments. *See, e.g.*, Supp. Decl. of Julia Mass (June 23, 2017), Ex. 2 at 1-3, Dkt. No. 19-3; Decl. of Ashley Corkery ("Corkery Decl."), Ex. B at 77, Dkt. No. 61-3. In addition to local governments, ORR contracts with private entities (typically nonprofits) to take custody of unaccompanied minors. *See, e.g.*, Corkery Decl., Ex. B at 77; Esquivel Mot. To Dismiss at 4 n.2, Dkt. No. 58.

But under Operation Matador, the minors that ICE arrested and classified as "unaccompanied" minors were not your typical unaccompanied minors. That is, they were not people who just came across the border, with no parent or guardian immediately available to care

for them.  Rather, these minors had come across the border previously – often years before – as unaccompanied minors, and had already once been placed into the custody of ORR.  As required by the TVPRA, ORR conducted an assessment of these unaccompanied minors shortly after they arrived, to determine where they should be placed while the federal government decided whether to remove them from the country.  And it appears that for each minor, ORR made the determination that the minors should be placed with sponsors rather than detained.  Placement was often with parents who were eventually identified as already living in the country.  In other words, the federal government had already determined, some time previously, that the minors arrested in Operation Matador were not dangerous.[1]

Three of those minors are now part of this lawsuit, although initially it was only one.  The first minor, who goes by the initials A.H., came into the country from Honduras in 2015, unaccompanied by a parent or guardian.  Decl. of A.H. (June 22, 2017) at 2, Dkt. No. 8.  He fled an abusive father, and shortly after arriving in the United States he was placed in an ORR facility in New York.  Approximately one month later, ORR released A.H. to live with his mother in Long Island, where he remained until this past June.  *Id.* at 2-3.  A.H. had two encounters with the criminal justice system during this time.  The first was an incident with a fellow student at his high school that resulted in charges of menacing and possession of a weapon, both of which were adjourned in contemplation of dismissal after A.H. completed a pre-plea community service program.  The second was a low-level charge for possession of marijuana, which also was adjourned in contemplation of dismissal.  Decl. of Stephanie Gibbs (June 22, 2017) at 4-5, Dkt. No. 10.  According to A.H., a friend with whom he was arrested admitted to having been part of a gang in the past, but A.H. denied any involvement with gangs.  Decl. of A.H. (June 22, 2017) at 3.

---

[1] As mentioned later, it's not clear whether ICE was correct to classify these minors as "unaccompanied minors" upon rearrest, at least to the extent the minors had been placed with sponsors who are parents or legal guardians, but both sides assume that ICE was correct, and it's not necessary to decide that question in the context of this motion.

On June 12, A.H. was arrested by two plainclothes ICE officers on the street near his house. A.H. was placed in a cell in Central Islip, New York, and then in a cell in Manhattan. Around 3:30 a.m. the next morning, A.H. was put on a flight to California. He was then taken to the Yolo County Juvenile Detention Facility in Woodland, California. Decl. of A.H. (June 22, 2017) at 3-5. The detention facility where A.H. was sent is run by Yolo County, in the Eastern District of California, pursuant to a contract with ORR. Supp. Decl. of Julia Mass (June 23, 2017), Ex. 2 at 1-3. Prior to his transfer, DHS reported to ORR that A.H. was gang affiliated and provided a criminal history summary. This summary incorrectly reported the date for A.H.'s 2016 menacing and weapons charges, stating they had occurred a few weeks prior to his arrest by ICE. The summary did not acknowledge that all of A.H.'s charges had been adjourned in contemplation of dismissal. *See* Corkery Decl., Ex. B at 12:24-15:25, 47:14-49:6, 52:20-53:16; Corkery Decl., Ex. N, Dkt. No. 68-3; Decl. of Daniel Loechner at 2, Dkt. No. 15-1.[2]

On June 22, 2017, while he was in the Yolo County Juvenile Detention Facility, A.H. filed this lawsuit, which was captioned as a "Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief." He brought the lawsuit against a variety of federal defendants, including the Attorney General, the Secretary of HHS, and the Director of ORR. The lawsuit also named as a defendant ORR Federal Field Specialist Elicia Smith, who is located in San Francisco and is responsible for ensuring that the Yolo County Juvenile Detention Facility performs its obligations under the contract with ORR. Finally, the lawsuit named Brent Cardall, who, as Chief Probation Officer for Yolo County, is in charge of day-to-day operations at the Detention Facility.[3]

As the caption implies, the lawsuit sought two different types of relief. First, it sought a

---

[2] The menacing and weapons possession charges have since been dismissed. Pls.' Mot. To Further Supp. Record, Ex. 1, Dkt. No. 99.

[3] Technically, A.H.'s mother has brought this lawsuit on behalf of her child (and the parents of the other two minors have brought suit on behalf of their children), because minors can't bring lawsuits on their own. But for ease of reference this ruling describes the lawsuit as having been brought by the minors.

writ of habeas corpus. The purpose of a petition for a writ of habeas corpus is typically to obtain release from custody, based on a wrongful conviction or some other unlawful detention. Second, A.H.'s lawsuit included a request for declaratory and injunctive relief. That is, he sought a judicial declaration that his detention by the federal government was unlawful, and an injunction requiring the government to either release him or give him a prompt hearing to allow him to challenge the determination that he was dangerous and needed to be locked in a secure facility. He asserted several different legal theories, including under the Due Process Clause of the Fifth Amendment and the TVPRA. He also complained that ORR's conduct was preventing him from participating in his ongoing immigration proceedings in New York. A.H. appeared to assert each of these legal theories in connection with his pursuit of habeas relief as well as his pursuit declaratory and injunctive relief, although the lawsuit was unclear on this point.[4]

Along with his lawsuit, A.H. filed an application for a temporary restraining order ("TRO") in which he asked the Court to order ORR to release him, or at least to require that ORR give him an opportunity to contest the allegations that he was gang-affiliated or otherwise dangerous enough to warrant placement in a secure facility. The Court held a hearing on a very tight timeframe and ruled on the TRO application from the bench. The Court concluded that A.H. had raised serious questions about whether the government had violated the TVPRA by failing to give him an opportunity to demonstrate that ORR had not placed him in the least restrictive setting appropriate for his circumstances, and ordered ORR to promptly provide him that opportunity to be heard. Tr. of June 29, 2017 Hearing at 86-94, Dkt. No. 28. In response to the presentation by A.H. and his lawyers regarding the alleged gang affiliation, ORR determined that A.H. should be moved from the secure facility in Yolo County to a staff-secure facility (which provides the middle level of security) in New York. *See* Notice of Decision, Ex. A at 5, Dkt. No. 27-1; Decl. of James De La Cruz (Sept. 14, 2017) at 1, Dkt. No. 54-3. Counsel for A.H. informed the Court at a case management conference that, in light of this transfer to a less

---

[4] Usually a habeas petition is brought separately from a complaint for declaratory and injunctive relief, but the government has not argued that it is improper to bring them together.

restrictive facility much closer to home and to his ongoing immigration proceedings, A.H. would not be seeking further emergency relief by way of the TRO application.

On August 11, an amended lawsuit was filed. The amended lawsuit is again a combined petition for a writ of habeas corpus and a complaint for declaratory and injunctive relief. But it adds two other minors in ORR custody – F.E. and J.G. – both of whom had previously been released by ORR to family members under sponsorship agreements. ICE arrested F.E. in Suffolk County on June 16, presumably as part of Operation Matador, and transferred him to a secure facility, Shenandoah Valley Juvenile Center in Virginia, three days later. Decl. of Bryan S. Johnson at 2, Dkt. No. 61-17. On July 6, F.E. was "stepped down" to a staff-secure facility in Fairfield, California, and on August 4, F.E. was further stepped down to a shelter facility in Lincolndale, New York. Decl. of James De La Cruz (Sept. 14, 2017) at 2. ICE also arrested J.G. on June 16 in Suffolk County. He was transferred the following day to the secure facility in Yolo County and, on July 26, was moved to a staff-secure facility in Tacoma, Washington. *Id.*; Decl. of J.G. at 4-5, Dkt. No. 61-9.

The lawsuit seeks relief for not just the three minors who are now bringing the action, but for a class of similarly situated minors in ORR custody. And the amended lawsuit names a wider array of defendants. Recall that A.H.'s initial lawsuit named the Attorney General, officials in HHS/ORR, and the person in charge of the Yolo detention facility. The new lawsuit continues to name those people as defendants, but adds the Acting Secretary of DHS and other officials within DHS/ICE. It also adds Jose Esquivel, an employee of the private nonprofit organization BCFS Health and Human Services, which operates, pursuant to a contract with ORR, the Fairfield staff-secure facility that F.E. passed through. Esquivel is the interim program director of that facility.

The amended lawsuit also asserts a somewhat different series of legal theories (all of which, again, seem to be put forward in connection with both the request for habeas relief and the request for declaratory/injunctive relief). The first alleged legal violation is that the minors were unlawfully arrested in violation of the Fourth Amendment, the TVPRA, and the

Administrative Procedure Act. (This new claim for unlawful arrest is why the amended lawsuit added the defendants from DHS/ICE – those officials were responsible for the arrests.) The second alleged legal violation is that the minors were deprived of their liberty without procedural due process, contrary to the Fifth Amendment. The third is that the minors were deprived of their liberty in violation of the substantive component of the Due Process Clause of the Fifth Amendment and the TVPRA. The plaintiffs further allege that the defendants violated the terms of the consent decree in *Flores v. Reno*, which sets standards the government must follow in housing noncitizen minors, and that the defendants interfered with their First and Fifth Amendment rights to access the courts and petition the government.[5]

The federal defendants have filed a motion to dismiss the entire case, on a variety of procedural and substantive grounds. The most significant procedural objections, described more fully below, are that there is no habeas jurisdiction in this judicial district with respect to any of the three minors, and that this district is also not the proper venue for their declaratory and injunctive relief claims. Meanwhile, the two non-federal defendants (Cardall, the official who runs the Yolo County detention facility, and Esquivel, the employee of the nonprofit organization that operates the facility in Fairfield) have filed motions to dismiss on the ground that they are not proper defendants in this lawsuit.

In turn, the minors have filed a motion for a preliminary injunction, and they seek to provisionally certify a class of unaccompanied minors for purposes of that motion. The minors contend that at least thirteen others have been arrested for similar reasons and are being detained without a meaningful opportunity to contest the basis for their detention. The minors assert only two of their legal theories in support of their request for a class-wide preliminary injunction: unlawful arrest and violation of procedural due process.

The minors and their attorneys ask the Court to rule quickly on their request for a

---

[5] The new petition/complaint also alleged a sixth claim for interference with the minors' right to counsel, but the plaintiffs have since agreed to dismiss that claim. Pls.' Consol. Br. at 19 n.7, Dkt. No. 61-1.

preliminary injunction. That is understandable – the minors are in custody, they've been in custody for several months now, and they contend the custody is unlawful. But the manner in which this action was brought and then expanded (beginning with a combined habeas petition and complaint by A.H., then growing to a combined habeas petition and complaint by three different minors, held in three different facilities around the country, against an expanded group of defendants, seeking relief not merely for themselves but for all other similarly situated undocumented minors) creates a host of difficult and time-consuming procedural questions. This puts the Court in a difficult position. In an effort to balance the need for a prompt ruling on the request for preliminary injunctive relief for minors being detained by the federal government against the need to ensure that such relief would be procedurally and substantively proper, this ruling addresses only the strongest claim for preliminary injunctive relief and only the one with no potentially significant procedural obstacles to granting that relief. The issues presented by the pending motions that are not decided in this ruling will remain under submission.

## II.

As discussed, three people are now suing in this case. They have combined two distinct types of action in this one lawsuit – a petition for a writ of habeas corpus and a complaint for declaratory and injunctive relief. They assert a variety of different legal claims, under a variety of different constitutional provisions and statutes, against a variety of different defendants. The case largely arises from a law enforcement operation that took place in New York and the implementation of policies developed in Washington, D.C. The first task, therefore, is to determine which people may properly sue in this judicial district, which types of action they may bring, and which defendants they may sue.

For the reasons that follow, A.H. may pursue habeas relief in this judicial district against Elicia Smith, the local ORR official. However, F.E. and J.G. may not pursue habeas relief in this district, because they have not named the proper respondents, nor do the proper respondents reside in this district. Furthermore, F.E. and J.G. may not pursue their claims for declaratory and injunctive relief in this district, because venue is not proper for those claims. F.E. and J.G. are

therefore dismissed as named plaintiffs, without prejudice to refiling their actions in the appropriate jurisdiction.

The most difficult procedural question is whether A.H. may, in conjunction with seeking habeas relief in this district, pursue his action for additional declaratory and injunctive relief here. In light of the unusual circumstances of this case, the Court will exercise its discretion to adjudicate the declaratory and injunctive relief claims under the doctrine of pendent venue, rather than requiring A.H. to pursue habeas relief in this judicial district while pursuing his closely-intertwined declaratory and injunctive relief claims in a different judicial district.

## A.

The first question is whether A.H. may seek habeas relief in this district. The government contends there is no habeas jurisdiction here, because A.H.'s custodian at the time he brought his original lawsuit does not reside here. As the government notes, when A.H. brought his habeas claim, he was held in the Juvenile Detention Facility in Yolo County, which is in the Eastern District of California. This means, according to the government, that the proper respondent to A.H.'s habeas petition is the head of the Detention Facility. In support of its position, the government cites *Rumsfeld v. Padilla*, a case that structures the inquiry but which does not resolve whether this Court has habeas jurisdiction over A.H. 542 U.S. 426, 435 n.8 (2004).[6]

*Rumsfeld v. Padilla* applied the "immediate custodian rule" to a habeas petition filed by a U.S. citizen detained in military custody in South Carolina. *See id.* at 430-32, 442. The

---

[6] The parties don't contest that, as to A.H., the relevant time period for purposes of determining the proper respondent is when he filed his initial habeas petition, notwithstanding his later transfer to a different facility and his decision to amend his pleading after that transfer. *See Mujahid v. Daniels*, 413 F.3d 991, 994 (9th Cir. 2005) ("[J]urisdiction attaches on the initial filing for habeas corpus relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change." (quoting *Francis v. Rison*, 894 F.2d 353, 354 (9th Cir. 1990))); *see also* 28 U.S.C. § 2242; Fed. R. Civ. P. 15(c)(1)(B); *Padilla*, 542 U.S. at 441 ("[W]hen the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release.").

immediate custodian rule is the long-held "default rule" that the proper respondent to a habeas petition challenging present physical confinement "is the warden of the facility where [a] prisoner is being held, not the Attorney General or some other remote supervisory official." *Id.* at 435-39; *see also Wales v. Whitney*, 114 U.S. 564, 574 (1885). Unlike a typical habeas petitioner challenging imprisonment following a criminal conviction, Padilla challenged detention resulting from a military order by the President deeming him an enemy combatant. 542 U.S. at 431. The Supreme Court concluded that, notwithstanding the unique circumstances leading to his detention, Padilla's habeas petition was ultimately still a challenge to present physical confinement by the executive branch and, as such, jurisdiction was governed by the default rule. *Id.* at 441-42. Applying the immediate custodian rule to Padilla's case, the Court held that the only proper respondent to his habeas petition was the commander in charge of the brig in South Carolina where he was held. *Id.* at 439-42.

Because Padilla had named the correct respondent, among other officials, the Court then turned to the question whether the Southern District of New York, the federal court in which Padilla's petition was filed, had habeas jurisdiction over that petition.[7] The Court interpreted its prior cases addressing the scope of habeas jurisdiction as consistent with "the general rule that for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement." *Id.* at 443. It then applied that rule to Padilla's case, concluding that Padilla was required to file in the District of South Carolina, the district of his confinement, and that the Southern District of New York therefore could not entertain Padilla's petition. *Id.* at 451.

*Padilla* refused to decide who the proper respondent is in the immigration detention context, and no controlling authority since has resolved the issue. *See id.* at 435 n.8.[8] Courts

---

[7] The Court made clear that the term "jurisdiction" as used in the habeas statute, 28 U.S.C. § 2241(a), and the *Padilla* opinion was not equivalent to subject-matter jurisdiction. 542 U.S. at 434 n.7; *see also id.* at 451 (Kennedy, J., concurring) (viewing the concept of habeas jurisdiction as akin to personal jurisdiction or venue).

[8] In a pre-*Padilla* opinion that was later withdrawn, the Ninth Circuit held that the proper

have taken various approaches. Some have applied the immediate custodian rule in a straightforward fashion. *See, e.g.*, *Kholyavskiy v. Achim*, 443 F.3d 946, 953 (7th Cir. 2006) (warden of the county facility holding an immigration detainee was the proper respondent); *Nken v. Napolitano*, 607 F. Supp. 2d 149, 159-61 (D.D.C. 2009) (correct respondent was the warden of the facility holding an individual subject to a final order of removal); *Zhen Yi Guo v. Napolitano*, No. 09 CIV 3023 PGG, 2009 WL 2840400, at *5 (S.D.N.Y. Sept. 2, 2009) (warden of county prison was the appropriate respondent).

Other courts have held that national-level policymaking officials are proper respondents. *See, e.g.*, *Carmona v. Aitken*, No. 14-CV-05321-JSC, 2015 WL 1737839, at *4 (N.D. Cal. Apr. 10, 2015) (U.S. Attorney General and DHS Secretary were the proper respondents, as officials "with the actual authority to effectuate the prisoner's release"); *Bogarin-Flores v. Napolitano*, No. 12CV0399 JAH (WMC), 2012 WL 3283287, at *2 (S.D. Cal. Aug. 10, 2012) (Attorney General and DHS were the proper respondents, not the warden of the contract facility in which the petitioner was held); *Farez-Espinoza v. Chertoff*, 600 F. Supp. 2d 488, 494 (S.D.N.Y. 2009) (DHS Secretary and Attorney General were proper respondents); *see also Santos v. Smith*, No. 5:17-CV-00020, 2017 WL 2389722, at *8 (W.D. Va. June 1, 2017) (declining to dismiss ORR director where a minor was held in an ORR contract facility).

Still other courts have concluded that the federal agent charged with overseeing the non-federal detention facility in which the noncitizen is held should be sued. *See Khodr v. Adduci*, 697 F. Supp. 2d 774, 776 (E.D. Mich. 2010) (proper respondent was the ICE District Director, not the warden of county jail); *Abner v. Sec'y of Dep't of Homeland Security*, No.

---

respondents to a habeas petition in the immigration context were the Attorney General and the Secretary of the Department of Homeland Security. *Armentero v. INS*, 340 F.3d 1058, 1071-74 (9th Cir. 2003), *reh'g granted, opinion withdrawn*, 382 F.3d 1153 (9th Cir. 2004). Rather than revisit the issue after withdrawing the opinion, the Ninth Circuit panel dismissed the appeal on grounds unrelated to the question of the proper respondent. *Armentero v. INS*, 412 F.3d 1088 (9th Cir. 2005). Judge Berzon dissented from that order and expressed the view that the panel's prior position was consistent with *Padilla*. *Id.* at 1090 (Berzon, J., dissenting).

06CV308(JBA), 2006 WL 1699607, at *3-4 (D. Conn. June 19, 2006) (ICE field office director, not warden of county facility, was the correct respondent); *Zabadi v. Chertoff*, No. C 05-01796 WHA, 2005 WL 1514122, at *3 (N.D. Cal. June 17, 2005) (ICE district director, also known as the field office director, who could direct the county warden to release the petitioner was the proper respondent); *see also Roman v. Ashcroft*, 340 F.3d 314, 320 (6th Cir. 2003) (INS District Director for the area including the detention center was the proper respondent).

There is no compelling distinction between criminal custody and immigration custody as such. Courts holding that immigration cases should be treated differently, and that the Attorney General or Secretary of DHS should be the proper respondent in those cases, tend to base this conclusion on the fact that these national officials have the true authority to order the release of the detainee. But if that logic drove the "proper respondent" inquiry, *Padilla* would have come out differently. Under the logic of *Padilla*, there's no reason to conclude that, if A.H. were confined in a detention facility administered by federal immigration officials when he brought his habeas petition, he could have named anyone other than the federal official acting as the warden of that facility.

But A.H. faced a different situation here: he was held in a facility run by an entity other than the federal government, pursuant to a contract with the federal government. Where a petitioner is held in a facility solely pursuant to a contract, rather than by the state or federal government itself, application of the immediate custodian rule must take account of that fact. *See, e.g.*, *Bogarin-Flores*, 2012 WL 3283287, at *2. Instead of naming the individual in charge of the contract facility – who may be a county official or an employee of a private nonprofit organization – a petitioner held in federal detention in a non-federal facility pursuant to a contract should sue the federal official most directly responsible for overseeing that contract facility when seeking a habeas writ. In other words, the distinction is not between a "traditional" detention and an immigration-related detention. The distinction is between a case where the detainee is held in a federal facility, and a case where the detainee is held in a facility operated by some other entity pursuant to contract with the federal government.

This rule is a sensible reconciliation of *Padilla*'s instruction to look to the person with "the power to produce the body of [the petitioner] before the court," ordinarily the warden of the facility holding the petitioner, and the reality that the named plaintiffs are being held in federal custody by other-than-federal actors who are poorly situated to defend federal interests. *Padilla*, 542 U.S. at 435 (citation omitted). When A.H. filed his original habeas petition, he was held in a secure facility administered by Yolo County. Decl. of A.H. (June 22, 2017) at 5-6. The federal defendants contend that A.H. should have named only Cardall, the Chief Probation Officer for Yolo County, as a respondent, because Cardall acted as the warden of that secure facility. But a Yolo County employee has custody of an immigration detainee like A.H. only to the extent provided by the facility's contract with the federal government. It is pursuant to the power and authority of the federal government – not Yolo County – that A.H. is in custody. So, the federal official with most immediate control over the facility holding the petitioner – that is, the federal official tasked with ensuring that Yolo County complies with the requirements of its contract with ORR – is the proper respondent.

This case provides a telling example of the conflicts of interest that could arise under the government's contrary rule. Were Cardall the only proper respondent to A.H.'s habeas petition, he would presumably be tasked with defending the federal government's decision to hold A.H. in custody. But Cardall, who is not a federal actor and who is not represented by the Department of Justice in this case, has taken the position that the Yolo County Probation Department did not have just cause to keep most of the undocumented minors that passed through Yolo County prior to August 26, 2017 in secure custody. *See* Corkery Decl., Ex. C at 3; Corkery Decl., Ex. D, Dkt. No. 61-3. Requiring Cardall to be the sole defender of the federal government's interests under the circumstances would make little sense. *Padilla*, which held that the *federal* actor with immediate control over the petitioner was the proper respondent for a petitioner in federal custody, does not stand for the proposition that a person in what is indisputably federal custody should sue a county official like Cardall (or, as would be true in many cases, an employee of a private nonprofit organization) to seek habeas relief.

Therefore, A.H. properly sued Federal Field Specialist Elicia Smith, the federal official tasked with enforcing the contract pursuant to which A.H. was held in Yolo County. ORR Senior Field Program Specialist Supervisor James De La Cruz agreed that it was Smith's responsibility to make "sure that [ORR] policies regarding the custody of unaccompanied minors are followed by those county officials." Corkery Decl., Ex. B at 80. She "has jurisdiction over the . . . detention of persons under ORR supervision within th[e] geographic area" including Yolo County, and her responsibilities include "ensur[ing] that children placed under the auspices of the Office[] of Refugee Resettlement receive the services required by the Office of Refugee Resettlement, and that the programs that are in [the] geographical . . . location assigned to her follow ORR's policies and procedures . . . ." *Id.* at 54-55. Since it appears that she is the individual most immediately responsible for enforcing the federal contract under whose authority A.H. is held, she is the proper target of his habeas petition.[9]

What makes Smith the proper respondent with respect to A.H. is not any power to make binding decisions about A.H.'s custody. The record strongly suggests she had no such authority over A.H. when he was in her custody, just as the commander of the brig in *Padilla* did not actually have legal authority to release Padilla. *See* Decl. of James De La Cruz (Sept. 14, 2017) at 1-2, Dkt. No. 54-3; Decl. of James De La Cruz (June 27, 2017) at 3-4, Dkt. No. 15-2. Although one can imagine a sensible contrary rule, *Padilla* instructs courts *not* to look to the official who exercises legal control over the petitioner where present physical confinement is at issue. 542 U.S. at 439. Otherwise, *Padilla* cautions, any convicted federal prisoner could name the Attorney General as a respondent, a result "the statutory language, established practice, and [Supreme Court] precedent" counsel against. *Id.* at 439-40. At least where a readily identifiable federal official exercises more immediate control over a contract facility than the Attorney General or another department head, as is the case here, *Padilla* requires a petitioner challenging

---

[9] Particularly in a situation in which it is difficult to discern who has oversight responsibility with respect to a given contract facility, the director of the local office might also be a proper respondent.

present physical custody to name that more immediate official. *See Abner*, 2006 WL 1699607, at *3.

Because Smith is the proper respondent, this Court has habeas jurisdiction over A.H.'s habeas petition. So long as the proper respondent falls within this Court's territorial jurisdiction, habeas jurisdiction exists. *See Padilla*, 542 U.S. at 442-44. No party disputes that Elicia Smith is based in San Francisco, within this Court's territorial jurisdiction. *See* Corkery Decl., Ex. B at 54; Corkery Decl., Ex. E (HHS) at 4493-94, 5733, Dkt. No. 68-4. A.H.'s individual habeas petition therefore is properly before this court, even if the practical effect of habeas relief would be that the conduct of officials elsewhere, and not the conduct of Smith, is affected.[10]

## B.

When the amended complaint was filed, J.G. and F.E. joined the case, and they sought habeas relief as well. However, unlike A.H., who was confined in Yolo County when he first filed the case on his own, J.G. and F.E. were not in ORR custody in California when they joined the case. Rather, J.G. was detained by ORR in a contract facility in Tacoma, Washington, and F.E. was in a contract facility in Lincolndale, New York. See Am. Pet. at 22, 24, Dkt. No. 31.

---

[10] It is true that *Padilla* states that a "core" habeas petition challenging present confinement should be filed in the "district of confinement." 542 U.S. at 443. Here, that district is arguably the Eastern District of California, which has territorial jurisdiction over Yolo County. However, *Padilla* also emphasizes that the habeas writ is directed toward the respondent. *Id.* at 442. *Padilla* did not address a situation where the custodian was physically located in a different district than the petitioner, and nothing in that opinion suggests that anything other than the respondent's location controls under the present circumstances. *See id.* at 442-47. Several courts considering analogous contractual arrangements in the criminal context have taken a similar approach. For instance, in *Al-Amin v. Davis*, the petitioner was serving a Georgia state court sentence in a federal prison in Colorado, pursuant to a contract between the Georgia Department of Corrections and the Federal Bureau of Prisons. No. 12-CV-01197-BNB, 2012 WL 1698175, at *1 (D. Colo. May 15, 2012). The U.S. District Court for the District of Colorado concluded that, under the circumstances, the Georgia Department of Corrections remained the petitioner's "true custodian," and therefore transferred the case to a federal court in Georgia. *Id.* at *3; *see also Holder v. Curley*, 749 F. Supp. 2d 644, 646-47 (E.D. Mich. 2010) (listing cases in which courts transferred a case "to the jurisdiction of conviction when the petitioner is housed in another state only for the convenience of and pursuant to a contractual relationship with the state wherein the conviction was rendered").

J.G. and F.E. do not contend that Elicia Smith is responsible for overseeing the operation of these ORR facilities in Washington and New York, nor do they name any other respondent who could plausibly be construed to be their immediate custodian. The plaintiffs instead contend that Smith is a proper respondent for J.G. and F.E. because it is possible that J.G. and F.E. will be returned to her custody in the future. Pls.' Reply Br. at 19-20, Dkt. No. 73. But as already discussed, where a habeas petitioner challenges his present physical confinement, as J.G. and F.E. do, *Padilla* leaves no room for him to select the proper respondent from among possible future custodians. *See* 542 U.S. at 439.

In light of the interpretation of *Padilla* articulated above, J.G. and F.E. have not named the proper respondents to their habeas petitions – the Federal Field Specialists (or perhaps the directors of the regional offices) charged with overseeing the contract facilities in which they presently are held. Even had they named the appropriate federal custodians, it is unlikely that this Court would have habeas jurisdiction over them, as the proper respondents presumably are based in the Pacific Northwest and on the East Coast. Accordingly, J.G. and F.E.'s individual habeas petitions must be dismissed without prejudice. *See Stanley v. Cal. Supreme Court*, 21 F.3d 359, 360 (9th Cir. 1994), *as amended* (May 18, 1994).

## C.

Although this Court does not have jurisdiction over J.G. and F.E.'s habeas petitions, their claims for declaratory and injunctive relief could in theory proceed separately in this district. But because venue is not proper in this district for these additional claims, J.G. and F.E. will be dismissed entirely from this case.

Because the defendants here have challenged venue, the burden is on the plaintiffs to demonstrate that venue is proper in the Northern District of California. *United Tactical Sys. LLC v. Real Action Paintball, Inc.*, 108 F. Supp. 3d 733, 751 (N.D. Cal. 2015); *see also Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). In the absence of any nexus to this district grounded in habeas, J.G. and F.E. must show that their declaratory and injunctive relief claims are independently subject to venue in this Court. Whether they can

depends on the provisions of the federal venue statute, which provides that, in a case against a federal officer acting in her official capacity, venue is proper where "(A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred . . . , or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). The Court works through these different bases for venue in reverse.

The first inquiry is straightforward. There is no contention that J.G. and F.E. reside in this district. Both J.G. and F.E. lived in Brentwood, New York prior to their arrests. Decl. of J.G. at 2, Dkt. No. 61-9; Decl. of F.E. at 1, Dkt. No. 61-11. When the amended complaint was filed, J.G. was detained in Tacoma, Washington, while F.E. was detained in Lincolndale, New York. Decl. of J.G. at 5; Decl. of F.E. at 4.

The second inquiry is somewhat closer, but the Court ultimately concludes that only an insubstantial portion of the events giving rise to J.G. and F.E's claims occurred in this district. "To determine whether a substantial part of the events giving rise to the claim occurred in the forum, the court first considers what acts or omissions by the defendants give rise to the plaintiffs' claims." *United Tactical Sys. LLC*, 108 F. Supp. 3d at 752 (alteration and citation omitted). After "identif[ying] the alleged wrongful acts, the court must determine whether a substantial part of those acts took place in the forum." *All. for Multilingual Multicultural Educ. v. Garcia*, No. C 11-0215 PJH, 2011 WL 2532478, at *7 (N.D. Cal. June 24, 2011) (citing *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005); and *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003)).

Some of J.G. and F.E.'s declaratory and injunctive relief claims are predicated on their allegedly unlawful arrests by ICE agents in New York. The remainder are based on the absence of any process provided by DHS and ORR for ensuring a reliable factual basis for their rearrests and detentions in ORR facilities, with the minors arguing that they should have received a hearing either before they were arrested in New York, or immediately after they were arrested in New York and before they were transferred across the country. Every indication is that DHS and ORR handled J.G. and F.E.'s cases in accordance with nationwide agency policy, set in

Washington, D.C.  *See* Corkery Decl., Ex. E (HHS) at 3728-31, Dkt. No. 60-3; Corkery Decl., Ex. N.  Pursuant to those challenged DHS and ORR policies, J.G. and F.E. were detained in various locations, each of which might give rise to venue but none of which was in the Northern District of California.  J.G. was transferred to a secure detention facility in Yolo County, in the Eastern District of California, shortly after his arrest, and then to a staff-secure facility in Tacoma, Washington, where he remains.  Decl. of J.G. at 4-5.  F.E. was first transferred to a secure facility in Shenandoah, Virginia, then to a staff-secure facility in Fairfield, California – also in the Eastern District – and finally to a shelter facility in New York.  Decl. of F.E. at 3-4.  The evidence shows that ORR officials in Washington, D.C., and Phoenix approved each of these custody changes.  Decl. of James De La Cruz Decl. (Sept. 14, 2017) at 1-2.

Although none of these events took place in the Northern District, the plaintiffs contend that Smith's involvement in J.G. and F.E.'s cases is sufficient to constitute a "substantial part of the events" giving rise to their claims for declaratory and injunctive relief.  The plaintiffs allege that Smith "serves as the approval authority for transfer and release decisions" regarding the named plaintiffs and proposed class members, but the evidence does not bear out this allegation.  Am. Pet. at 3, 5, Dkt. No. 31; *see Doe 1 v. AOL LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009) (stating that, when assessing a motion to dismiss for improper venue, "pleadings need not be accepted as true, and facts outside the pleadings may be considered").

The record merely shows that Smith was ORR's point of contact with Yolo County.  She ensured that Yolo County was aware of ORR's policies, facilitated communication between more senior ORR officials and Yolo County officials, and received feedback on the appropriateness of the named plaintiffs' placements.  Corkery Decl., Ex. F (YOLO) at 60-61, 69-70, Dkt. No. 60-4; Ex. E (HHS) at 818-19, 4493-94, 5904-11.  Smith also helped coordinate the response to the earlier TRO application in this case.  Corkery Decl., Ex. E (HHS) at 5904-11.  And after this Court granted the TRO application, she was apparently involved in helping ensure compliance with the Court's order, seeking corroborating information that would justify the minors' initial placements in secure facilities.  Corkery Decl., Ex. E (HHS) at 5734; Ex. F. (YOLO) at 13-16,

39-44. But this conduct largely took place after the fact – that is, after the allegedly unlawful arrest, and after the allegedly unlawful decision to deny A.H. a hearing before shipping him across the country to Yolo County.

It's true that the venue statute "does not require that a majority of the events have occurred in the district where suit is filed, nor does it require that the events in that district predominate." *United Tactical Sys. LLC*, 108 F. Supp. 3d at 752 (quoting *Rodriguez v. Cal. Highway Patrol*, 89 F. Supp. 2d 1131, 1136 (N.D. Cal. 2000)). But "*significant* events or omissions material to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere." *Id.* (citation omitted). In comparison to the primary events and omissions giving rise to J.G. and F.E.'s declaratory and injunctive relief claims – their arrests, their lack of a hearing before being transferred to ORR facilities, and their continued detention in those facilities without a proper assessment of dangerousness – Smith's role is marginal, not significant.

The final inquiry under the venue statute turns on a related analysis: whether Elicia Smith, the only defendant who resides in the Northern District of California, is a proper defendant as to J.G. and F.E.'s declaratory and injunctive relief claims. If she is, then it seems venue would be proper as to all the federal defendants. *See* 28 U.S.C. § 1391(e)(1) (providing that venue in a lawsuit against a federal officer exists "where *a* defendant in the action resides" (emphasis added)). But she is not a proper defendant.

As described above, Smith played a relatively minor role in the trajectory of the named plaintiffs' arrest and custody. She was not involved in the New York arrests, nor is there any evidence she was involved in developing the current policy providing for the transfer of previously released noncitizen minors to secure ORR custody without prior notice and an opportunity to be heard. Accordingly, the declaratory and injunctive relief the plaintiffs seek – which aims to halt such arrests and impose a process for testing the factual basis for detaining a previously released minor – is not directed at Smith, who appears to have no policy-making authority and no ability to finally approve placement decisions regarding minors in the named

plaintiffs' position. *See* Am. Pet. at 35-37; Decl. of James De La Cruz (June 27, 2017) at 3-4. To the extent Smith might be implicated at all by the amended petition's requested relief, it is only as to the request to release A.H. from custody, in other words, the habeas relief already discussed. Smith is therefore not a proper defendant to J.G. and F.E.'s declaratory and injunctive relief claims. She thus cannot serve as the anchor to the Northern District of California that makes venue proper in this district for their non-habeas claims.

Finally, the fact that J.G. and F.E. seek to be named plaintiffs alongside A.H., whose action is properly brought in this district, does not allow them to overcome these venue problems. At least in most instances, the rule in a proposed class action is that each named plaintiff must independently establish venue. *See Ambriz v. Coca Cola Co.*, No. 13-CV-03539-JST, 2014 WL 296159, at *5 (N.D. Cal. Jan. 27, 2014) (citing *Dukes v. Wal-Mart Stores, Inc.*, No. 1-cr-2252-MJJ, 2001 WL 1902806 (N.D. Cal. Dec. 3, 2001) for the proposition that "the general rule [is] that each plaintiff in a class action must individually satisfy venue"); *Amochaev v. Citigroup Glob. Markets Inc.*, No. C-05-1298 PJH, 2007 WL 484778, at *1 (N.D. Cal. Feb. 12, 2007). The plaintiffs have provided no convincing explanation for why that rule should not apply here.

Therefore, along with their habeas claims, the declaratory and injunctive relief claims by J.G. and F.E. are dismissed without prejudice. This means J.G. and F.E. are dismissed entirely as named plaintiffs from this lawsuit.[11]

## D.

Notwithstanding the conclusion that there is habeas jurisdiction over A.H.'s petition in this district, whether venue is proper for A.H.'s additional declaratory and injunctive relief claims is a separate and difficult question. For the same reasons discussed above, Elicia Smith, the only defendant with a nexus to this district, is not the proper defendant for the separate declaratory

---

[11] It's worth noting that, even though J.G. and F.E.'s individual claims were not properly brought in this forum, as members of the proposed class, they could still benefit from relief granted on a class-wide basis.

and injunctive relief A.H. seeks.[12]  And, even as to A.H., no substantial portion of the events giving rise to his declaratory and injunctive relief claims occurred here.  Like J.G. and F.E., A.H. grounds these additional claims on an arrest that occurred in New York and the absence of a prompt and adequate process for challenging the bases for that arrest and his subsequent detention in ORR custody.  Importantly, A.H. seeks through this lawsuit to implement a process that would occur before similarly situated minors are transported from their place of arrest to Yolo County, where they might plausibly fall under Smith's jurisdiction.

Because there appears to be no independent basis for venue over declaratory and injunctive relief claims going beyond the relief sought in A.H.'s habeas petition, venue in this district would have to arise under the doctrine of pendent venue.  Under this doctrine, "[o]nce a court has determined that venue is proper as to one claim, it may exercise pendent venue to adjudicate closely related claims."  *United Tactical Sys. LLC*, 108 F. Supp. 3d at 753; *see also, e.g.*, *Beattie v. United States*, 756 F.2d 91, 100-04 (D.C. Cir.1984), *overruled on other grounds in Smith v. United States*, 507 U.S. 197 (1993); *Legal Additions LLC v. Kowalski*, No. C-08-2754 EMC, 2009 WL 1226957, at *11 (N.D. Cal. Apr. 30, 2009).  Whether to do so is a discretionary determination, and informing the exercise of discretion are "principles of judicial economy, convenience, avoidance of piecemeal litigation, and fairness to the litigants."  *Am. Civil Liberties Union of N. Cal. v. Burwell*, No. 16-CV-03539-LB, 2017 WL 4551492, at *4 (N.D. Cal. Oct. 11, 2017); *see also Martensen v. Koch*, 942 F. Supp. 2d 983, 998 (N.D. Cal. 2013), *on reconsideration in part*, No. C-12-05257 JSC, 2013 WL 4734000 (N.D. Cal. Sept. 3, 2013).

On the one hand, A.H.'s habeas petition is properly before this Court, and it's quite clear

---

[12] There is, to be sure, some tension in saying that a person can be a proper respondent – indeed, perhaps the only proper respondent – to a habeas petition and yet an improper defendant to the same petitioner's claims for declaratory and injunctive relief targeting the same official actions that resulted in the allegedly unlawful detention.  This tension appears to be a natural result of the Supreme Court's instruction to name not the person exercising legal control over a habeas petitioner as the respondent but instead the immediate custodian.

that any additional declaratory and injunctive relief he seeks is closely related to the factual and legal bases for his habeas petition. The same witnesses and evidence are relevant to both sets of claims. Resolution of each requires this Court to identify DHS and ORR's policies and practices concerning children released to sponsors who are later rearrested, as well as to evaluate the statutory, constitutional, and contractual limits that circumscribe those policies and practices. Where a case is built around a "single wrong, common issues of proof, and similar witnesses," pendent venue is more likely to be appropriate. *Am. Civil Liberties Union of N. Cal*., 2017 WL 4551492, at *5. Further, the federal government and its lawyers are already required to appear in this district to defend against A.H.'s habeas petition, so the additional burden imposed on the government by requiring it to defend against A.H.'s declaratory and injunctive relief claims, too, is minimal. In contrast, requiring A.H. to split his claims would result in duplicative proceedings concerning the same series of events regarding his arrest and custody, the same policies, and the same legal theories. And, as A.H. and those similarly situated are minors detained in federal custody, a rule that requires him to file two lawsuits about the same series of events in two separate forums seems unduly burdensome.

On the other hand, additional defendants are implicated by A.H.'s claims for declaratory and injunctive relief, and pendent venue is generally invoked to decide additional claims between the same parties. *See, e.g.*, *Martensen*, 942 F. Supp. 2d at 998; Charles Alan Wright et al., Venue Issues Raised by Assertion of Multiple Claims, Including Exercise of "Pendent Venue," 14D Fed. Prac. & Proc. Juris. § 3808 (4th ed. 2017). However, this court would not be the first to conclude that the concerns animating pendent venue can apply with equal force where closely related claims against additional defendants are at issue. *See Pacer Glob. Logistics, Inc. v. Nat'l Passenger R.R. Corp*., 272 F. Supp. 2d 784, 789-91 (E.D. Wis. 2003) (applying the doctrine of pendent venue to hear claims against a defendant over which the court otherwise would not have had venue and noting that, "[i]f two or more claims arise out of the same set of facts, it is wasteful of judicial resources and unfair to one or more of the parties to require that the claims be litigated in separate judicial districts"). *But see Gamboa v. USA Cycling, Inc.*, No. 2:12-CV-

10051-ODW (MRWx), 2013 WL 1700951, at *4 (C.D. Cal. Apr. 18, 2013) (rejecting the notion of "pendent-party venue"). In a somewhat analogous procedural context, courts often conclude that they may hear claims against third-party defendants added to a case after it is filed, even though venue would not otherwise be proper over those third-party defendants. *See, e.g.*, *Gundle Lining Constr. Corp. v. Adams Cty. Asphalt, Inc.*, 85 F.3d 201, 209 (5th Cir. 1996) ("[S]tatutory venue limitations have no application to Rule 14 claims even if they would require the third-party action to be heard in another district had it been brought as an independent action." (citation omitted)); *Stronghold Sec. LLC v. Sectek, Inc.*, 582 F. Supp. 2d 726, 728 (D. Md. 2008) ("Under the doctrine of ancillary venue, third party defendants do not have standing to challenge the venue of the primary action."); Wright et al., *supra*, § 3808. Courts have allowed such claims to proceed even though a forum that does not otherwise satisfy venue requirements is as likely to be inconvenient for a third-party defendant as for an original defendant.

Although it's a close question, application of the doctrine of pendent venue is warranted here. A.H.'s habeas, declaratory, and injunctive relief claims challenge one course of conduct, carried out by various federal actors, and one part of his case is clearly before this Court; indeed, this Court may well be the only place he can bring his habeas petition. Moreover, the concerns that would normally attend application of pendent venue to claims against new defendants – namely, the inconvenience and expense imposed on the additional defendants – are attenuated where all the defendants objecting to venue are also federal officers. *See Kings Cty. Econ. Cmty. Dev. Ass'n v. Hardin*, 333 F. Supp. 1302, 1303 (N.D. Cal. 1971) (noting that Congress amended the federal venue statute to "make it easier to sue" the "head of a governmental department"); *but see Am. Civil Liberties Union of N. Cal.*, 2017 WL 4551492, at *5 (questioning whether an exercise of pendent venue would be appropriate in the context of claims against the government). The Department of Justice has appeared in this case to represent all the federal defendants for purposes of defending the lawfulness of A.H.'s custody. In light of the statutory framework governing his detention, this defense will involve the actions of multiple agencies, acting pursuant to several statutes. Judicial economy, convenience, and avoidance of piecemeal

litigation all counsel in favor of evaluating the decisions of these actors at once.[13]

Having concluded that all of A.H.'s claims may proceed in this district, the Court must next determine whether to grant his motion for a preliminary injunction. And, because A.H. seeks relief on behalf of a class of similarly situated minors in ORR custody, the Court must also decide whether it is appropriate to provisionally certify the plaintiffs' proposed class for purposes of issuing a preliminary injunction.

# III.

A.H. seeks, on behalf of the proposed class, a preliminary injunction to halt the practices giving rise to his unlawful arrest and Fifth Amendment procedural due process claims. He also seeks his own immediate release from ORR custody, on the theory that his continued confinement violates his substantive due process rights and the *Flores* consent decree. Pls.' Consol. Br. at 31 n.21.

To obtain a preliminary injunction, A.H. "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, *Inc.*, 555 U.S. 7, 20 (2008). He may also be able to obtain preliminary injunctive relief if he has raised "serious questions going to the merits" and the balance of hardships "tips sharply towards" granting an injunction, so long as he also shows that he is likely to suffer irreparable harm and that the injunction is in the public interest. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)).

In light of the time-sensitive nature of the claims at issue in this case, the Court addresses in this order only the claim on which A.H. is most likely to succeed on the merits: his procedural due process claim. The remainder of the claims on which A.H. seeks preliminary injunctive

---

[13] Because the allegations against the two non-federal defendants, Cardall and Esquivel, are based only on their roles as one-time custodians of A.H., F.E., and J.G. under federal contract, and because they are not the proper respondents for any of the named minors' habeas petitions, Cardall and Esquivel's motions to dismiss are granted.

relief will remain under submission, as will the aspects of defendants' motions to dismiss not addressed by this order.

## A.

When the federal government has previously deemed an unaccompanied minor suitable for placement in the community with a sponsor, and when federal agents later arrest and detain the minor based on allegations of gang affiliation, the government cannot simply ship the minor across the country and place him in a secure detention facility for an indefinite period. Rather, due process requires the government to give the minor a prompt hearing before an immigration judge or other neutral decisionmaker, where the government must set forth the basis for its decision to rearrest the minor, and where the minor and his sponsor may seek to rebut the government's showing.

As a threshold matter, it is clear, notwithstanding the government's argument to the contrary, that minors like A.H. have procedural due process rights rooted in the Constitution. The arrests and detentions at issue raise questions regarding the extent to which a person is entitled to notice and an opportunity to be heard before being removed from the custody of a sponsor in the United States – often a parent or family member – and sent across the country to a juvenile detention facility. The Due Process Clause imposes limits on what the government can do under these circumstances. *See Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017) ("[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process."); *id.* at 993-94 (analyzing constitutional procedural due process requirements in the context of a class of noncitizens detained pursuant to 8 U.S.C. § 1226(a)); *F.L.B. v. Lynch*, 180 F. Supp. 3d 811, 817-21 (W.D. Wash. 2016) (concluding that "non-admitted" juvenile noncitizens "[c]learly" had Fifth Amendment procedural due process rights); *cf. Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903); *United States v. Raya-Vaca*, 771 F.3d 1195, 1202-03 (9th Cir. 2014) ("The Supreme Court has categorically declared that once an individual has entered the United States, he is entitled to the protection of the Due Process Clause," even if that person "has run some fifty yards into the United States.").

The government's citation to *Angov v. Lynch*, 788 F.3d 893 (9th Cir. 2015), is of limited relevance. *Angov* addressed a question regarding the evidence an immigration judge can consider in adjudicating an asylum petition. *Id.* at 896-97. Angov presented himself at a port of entry and sought asylum, then asserted that the Due Process Clause imposed limits on how the government could conduct that asylum hearing. *Id.* at 898. The Ninth Circuit concluded that Angov had no constitutional right to procedural due process in the asylum proceeding. *Id.* Here, unlike in *Angov*, the rights at issue do not concern the procedures by which the validity of an application for admission will be assessed; they concern the arrest and detention of minors living under the supervision of sponsors in the United States, pursuant to a prior decision by the federal government.

The government next contends that, even assuming minors like A.H. have constitutional procedural due process rights, its existing procedures adequately protect their rights. But the government understates the nature of the liberty interest possessed by these minors, as well as the degree to which existing procedures protect against the erroneous deprivation of that liberty interest.

To determine what due process requires, courts consider: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

With respect to the private interest at stake, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" the Due Process Clause protects. *Hernandez*, 872 F.3d at 990 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)); White Decl., Dkt. No. 61-16 (depicting the secure detention facility in Yolo County); *compare Reno v. Flores*, 507 U.S. 292, 302 (1993) (addressing the interest of a child where no "shackles, chains, or barred cells" are at stake). "In the context of

immigration detention, it is well-settled that 'due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Hernandez*, 872 F.3d at 990 (quoting *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011)). Although A.H. and the other similarly situated minors are not adults, and thus are always in some form of custody, they retain a strong interest in being free from unnecessary government interference with their liberty. *See Schall v. Martin*, 467 U.S. 253, 265 (1984); *cf.* 8 U.S.C. § 1232(c)(2)(A) (requiring placement in the "least restrictive setting that is in the best interest of the child").

Moreover, the government seems to assume that minors like A.H. have no greater interest in freedom from detention than any noncitizen caught crossing the border. This ignores the context in which these detentions arose. The federal government has already made a determination that minors like A.H. should not be detained, and has therefore made a decision to place them with a parent or other sponsor in the community. There is, as discussed previously, a statute that requires the federal government to protect unaccompanied minors in this way, rather than simply processing them as other immigrants caught crossing the border would be processed. And by placing people like A.H. with their parents, as opposed to other suitable sponsors, the federal government triggers the long-recognized interest of a parent in "the companionship, care, custody and management of his or her children." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981); *see also D.B. v. Cardall*, 826 F.3d 721, 740 (4th Cir. 2016) (recognizing this right along with the reciprocal right held by children "to be raised and nurtured by their parents" (citing *Berman v. Young*, 291 F.3d 976, 983 (7th Cir. 2002))). Therefore, the liberty deprivation in this case is not the same as when someone is caught coming across the border and detained in the nearest facility. The minors in this case have been taken away from their families, their schools, and their communities, often to be shipped across the country to a high-security institution and held for an indefinite period.

Given the nature of the liberty deprivation involved, a minor previously placed with a

sponsor by ORR cannot be rearrested solely on the ground that he is subject to removal proceedings. That the minor was subject to removal proceedings formed the basis of his first arrest; after DHS transferred the minor to ORR custody, as the TVPRA requires DHS to do on every occasion in which an unaccompanied minor is arrested, ORR determined that the appropriate place for the minor was *not* in federal custody. If DHS could, the day after a minor was released to a parent or other sponsor, arrest the minor on the same basis and restart the process, the TVPRA's instruction to place the minor in the least restrictive appropriate setting would mean little. *See United States v. Holmes*, 452 F.2d 249, 261 (7th Cir. 1971); *United States v. Kordosky*, No. 88-CR-52-C, 1988 WL 238041, at *7 n.14 (W.D. Wis. Sept. 12, 1988) ("Absent some compelling justification, the repeated seizure of a person on the same probable cause cannot, by any standard, be regarded as reasonable under the Fourth Amendment.").

This is not to say that DHS may never rearrest, using a removability warrant, a minor previously released by ORR to a sponsor. But to be lawful, the arrest must be based on evidence that the circumstances relevant to that original release decision have changed. In other words, DHS must have probable cause to believe that, notwithstanding ORR's prior determination, the minor is now a danger to himself or the community, or a flight risk. *See* 8 U.S.C. § 1232(c)(2)(A).

A similar rule governs DHS conduct in a closely analogous context, namely, when DHS arrests noncitizens previously released on bond or parole pending a removal decision. This includes, by the way, DHS rearrests of minors who are classified as "accompanied" rather than "unaccompanied."[14] As with ORR's decision to release proposed class members to their sponsors, prior release of an accompanied minor on bond or parole means that a federal agency has already made a determination that he is not dangerous or a flight risk. *See Matter of Guerra*,

---

[14] Because the parties agree that A.H. and the minors in the proposed class are properly classified as "unaccompanied alien children" notwithstanding their prior release to a sponsor, and because the accuracy of this classification does not matter for purposes of determining the minors' procedural due process rights, there is no need to decide in this ruling whether the parties are correct. *Cf. D.B.*, 826 F.3d at 744 (Floyd, J., dissenting).

24 I. & N. Dec. 37, 38 (B.I.A. 2006).  By statute, DHS "at any time may revoke a bond or parole" issued pending a removal decision and then "rearrest the alien under the original warrant."  8 U.S.C. § 1226(b).  But, notwithstanding the breadth of this statutory language, the Board of Immigration Appeals ("BIA") has recognized an important implicit limitation on DHS's authority.  The BIA has held that "where a previous bond determination has been made by an immigration judge, no change should be made by a District Director absent a change of circumstance."  *Matter of Sugay*, 17 I. & N. Dec. 637, 640 (B.I.A. 1981).  According to government counsel, DHS has incorporated this holding into its practice, requiring a showing of changed circumstances both where the prior bond determination was made by an immigration judge and where the previous release decision was made by a DHS officer.  "Thus," says the government, "DHS generally only re-arrests an alien pursuant to § 1226(b) after a material change in circumstances."  Defs.' Second Supp. Br. at 1, Dkt. No. 90.

And when an accompanied minor (or other noncitizen) is rearrested after having been released on bond, he is entitled to a prompt hearing to ensure that changed circumstances indeed justify the rearrest.  *See* Tr. of Oct. 27, 2017 Hearing at 148-49, 157-58.  As counsel for the government stated during the November 9, 2017 oral argument, this "bond redetermination hearing" typically takes place before an immigration judge within seven to fourteen days.  And at the hearing, DHS must make a showing of the changed circumstances that justify rearrest, and the rearrested noncitizen has the opportunity to rebut DHS's basis for his rearrest and detention. *Id.*

If any noncitizen released on bond is entitled to this process, surely an unaccompanied minor placed with a sponsor is entitled to at least the same level of protection.  ORR previously determined that the minor should be released to a suitable sponsor.  That decision reflects its determination that the minor is neither dangerous nor a flight risk.  *See* 8 U.S.C. § 1232(c)(2)(A).  And because the minor cannot reasonably be rearrested absent a material change in circumstances, due process likewise requires that the minor receive a prompt hearing in which the government must show that these changed circumstances exist.  At that hearing, the minor

must have the opportunity to rebut the government's showing, and, if he does so successfully, the neutral decision maker must have the ability to order a return to the status quo.

Although the government is in the best position to determine precisely how such proceedings are conducted, certain minimal protections are required to ensure that a minor is not erroneously taken away from his family, transported across the country to a high-security facility, and processed no differently from an unaccompanied minor first entering the country. For example, the sponsor, as well as the minor, must receive notice of the basis for the rearrest and an opportunity to be heard. The hearing must, consistent with existing practice for other immigrants rearrested on grounds of changed circumstances, take place within seven days of arrest, absent extraordinary circumstances. The hearing must take place in the jurisdiction where the minor has been arrested or where the minor lives, to provide a meaningful opportunity for the minor, his sponsor, and any existing counsel to rebut the factual basis for the minor's rearrest and detention. This requirement will allow the parties to call necessary witnesses, and the hearing may even occur before the same immigration judge already presiding over any removal proceedings in which the minor is involved.

The government has raised concerns about which federal agency could keep custody of the minor from the time DHS arrests him until the hearing takes place. But the government can address these concerns consistent with its constitutional, statutory, and contractual responsibilities. On the one hand, the government notes that the TVPRA requires DHS to transfer custody of an unaccompanied minor to ORR within 72 hours, except in exceptional circumstances. 8 U.S.C. § 1232(b)(3). But this provision would not prevent DHS from retaining custody of minors like A.H. in a facility appropriate for minors for up to seven days to give them a hearing before shipping them across the country to a secure ORR facility – the rearrest of a previously released minor, and the need for a prompt hearing on the propriety of that rearrest, is an "exceptional circumstance" that would allow DHS to hold the minor for longer than 72 hours. On the other hand, the government expresses concern that if the minor is indeed transferred to ORR custody pending the hearing, then any ruling by an immigration judge repudiating the

decision to rearrest the minor could not automatically result in the minor's release. According to the government, the TVPRA requires ORR to conduct a reassessment of the sponsor's fitness to care for the child once the child is returned to ORR custody. But it's not at all clear why this is so – if an immigration judge determines that no changed circumstances justified the rearrest, this means the immigration judge has restored the status quo. The status quo is the decision ORR made previously, which is that the minor should be placed with the sponsor, whom ORR already deemed suitable.[15]

The government contends that the process set forth above is not necessary, because current ORR procedures adequately protect against the risk of erroneous deprivation of liberty for these minors. At least on the current record, existing ORR procedures appear to be inadequate. A prompt hearing after rearrest before an immigration judge, like those already given to noncitizens rearrested after having been released on bond, is far better suited to protect the liberty of minors placed with sponsors who are rearrested by federal agents on the basis of alleged gang affiliation.

Although current ORR procedures – the right to challenge a finding of dangerousness in a *Flores* bond hearing, the right to challenge a placement under the Administrative Procedure Act, and regular review by ORR to determine the appropriate security level – may be adequate for an unaccompanied minor first arriving in the country, they appear inadequate to protect against the risk of minors being erroneously taken away from their sponsors by federal agents through a program like Operation Matador. It's not clear, for instance, that the sponsor with an interest in the minor's release could participate in any of the government's existing processes, or that the result of a successful challenge to the basis for the minor's rearrest and detention would be an

---

[15] To the extent ORR has legitimate concerns about the sponsor's suitability, its existing procedures, including coordination with state welfare agencies, would presumably be sufficient to address those concerns. *See* Tr. of Oct. 27, 2017 Hearing at 104-08. And, to the extent that the logistical difficulties associated with housing minors for the period between their rearrests and hearings prove daunting, the government could instead have a hearing before arresting them in the first place. *See Zinermon v. Burch*, 494 U.S. 113, 132 (1990) (noting the preference for a pre-deprivation hearing).

immediate return to the sponsor already deemed suitable.

In the absence of a prompt adversarial hearing of the type other rearrested noncitizens receive, there is a serious risk that minors who were appropriately placed with sponsors, in accordance with the TVPRA and the *Flores* settlement agreement, will – after rearrest on the basis of insufficiently substantial allegations of gang affiliation – erroneously be placed into ORR custody, and without an opportunity obtain prompt relief. As the Ninth Circuit has recognized, "[d]etermining whether an individual is an active gang member presents a considerable risk of error. The informal structure of gangs, the often fleeting nature of gang membership, and the lack of objective criteria in making the assessment all heighten the need for careful factfinding." *Vasquez v. Rackauckas*, 734 F.3d 1025, 1046 (9th Cir. 2013). As the evidence regarding A.H., F.E., and J.G. shows, DHS sometimes makes an inference of gang membership from conduct, clothing, or associations that are far from unequivocal evidence of that conclusion. For instance, F.E. was classified as a gang member because he wrote "503," the country code for El Salvador, in his school notebook, and because he had been seen associating with known gang members at school and in the community. Decl. of Joe Pisciotta (F.E.) at 2-5, Dkt. No. 67-3. As a direct result of DHS's inference, F.E. was arrested and taken to a secure facility in another state. Although he has since been stepped down, five months later he remains in an ORR facility and not in his mother's care. Moreover, Defendant Cardall (the local official in charge of the facility in Yolo County) has asserted that evidence regarding allegedly gang-affiliated minors sent to that facility was often insufficient, and that the Yolo County Probation Department concluded it did not have just cause to detain most of these minors. Corkery Decl. Ex. C at 3; Corkery Decl., Ex. D.

The record does not show that the current procedure permits the necessary adversarial factfinding process to occur close enough in time to the minor's arrest, thus making it significantly more likely that the minor will be sent across the country to a secure facility without sufficient evidence of dangerousness. In that event, the secure placement would not be reasonably related to a legitimate government purpose. *See Hernandez*, 872 F.3d at 990 (citing

*Zadvydas*, 533 U.S. at 690). And it would fly in the face of the requirements of the TVPRA and *Flores* decree that the child be in the least restrictive setting that is in his best interest. 8 U.S.C. § 1232(c)(2)(A); Fed. Defs.' Mot. To Dismiss, Ex. A (Flores Consent Decree) ¶ 11, Dkt. No. 54-2.

Nor will these procedural protections impose any significant burden on the federal government. In fact, the process required by this ruling, which is similar to the process provided to noncitizens rearrested after release on bond, seems less cumbersome than attempting to subject these minors to a process that was designed for a different situation (namely, the situation where a minor is first picked up by the federal government after coming across the border and before a suitable caretaker has been identified). To the extent the procedural protections required by this ruling impose some additional burden, this burden is reasonable in light of the government's asserted interests in public safety and welfare, including the welfare of the minor. First, this safeguard will enhance, rather than hinder, the government's capacity to act in the child's best interest by ensuring that the child is placed in the least restrictive setting appropriate to his needs and the needs of the community. Second, adopting an additional procedural safeguard that will reduce the risk that a child is erroneously removed from a sponsor's custody and placed into a taxpayer-funded juvenile detention facility will in no way negatively impact the government's interest in public safety. If the government adduces sufficient credible evidence of gang-related conduct during the hearing, the child will be placed into appropriate ORR custody.

It's also worth recalling that this ruling applies only to situations where the government arrests a noncitizen minor without probable cause to believe he committed a crime. If there is probable cause to believe the minor actually committed a crime, local law enforcement may arrest him and charge him with the crime. Furthermore, federal immigration agents may arrest noncitizens for committing federal felonies. *See* 8 U.S.C. § 1357(a); Tr. of Oct. 27, 2017 Hearing at 21-22. But if federal agents choose to rearrest a minor based on something short of that – such as allegations of gang involvement or other changed circumstances that would warrant detention notwithstanding ORR's prior determination that the minor should be placed with a sponsor – any cost of providing a prompt hearing before an immigration judge is far

outweighed by the benefit of protecting against erroneous deprivation of liberty.

## B.

A.H. has shown a likely deprivation of his constitutional rights. That is generally sufficient to demonstrate irreparable injury. *See Hernandez*, 872 F.3d at 994-95 (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). A.H. and the putative class members' procedural due process rights were violated when they were shipped across the country to a secure facility on the basis of gang allegations without adequate notice and an opportunity to be heard. And the evidence suggests they will remain in ORR custody on that basis indefinitely in the absence of a preliminary injunction. *See* Corkery Decl., Ex. E (HHS) at 3729; *e.g.*, Motion To Supp. Record, Ex. 1, Dkt. No. 80-1 (denying F.E.'s mother's reunification petition primarily on the basis of F.E.'s alleged gang affiliation).

In addition to the irreparable harm of the constitutional violation itself, A.H. has submitted evidence suggesting that the magnitude of the harm will increase as time goes on. According to the declaration of child psychiatrist Dr. Fortuna submitted by A.H. in support of his motion, the longer children remain in confinement, the more likely they are to experience lasting negative mental health repercussions. *See* Decl. of Dr. Fortuna at 9-10, Dkt. No. 61-8. Further, if the putative class members are still in detention when they turn eighteen, they will be transferred to ICE custody and lose the protections afforded to juveniles. Corkery Decl. Ex. E (HHS) at 3729. Thus, the required showing of irreparable harm has been more than satisfied here.

## C.

When the government is a party, the balance of the equities and public interest analysis generally merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). On the one hand is the public interest in ensuring the protection of constitutional rights, together with the individual interests of the proposed class members in being free from unnecessary detention. *See Hernandez*, 872 F.3d at 994-95. Also on the plaintiffs' side of the balance are the interests of the sponsors in the care and custody of their children. *See id.*

The government contends that the public's interest in enforcement of the immigration laws weighs against an injunction here. But the added procedural protections required by this preliminary injunction will protect the interests embodied in immigration statutes directed toward minors. A prompt adversarial hearing after arrest will ensure that only those minors actually eligible for secure and staff-secure detention are held in such custody. It will also support the goal of the TVPRA and the *Flores* decree that minors be placed with a sponsor whenever it is in their best interest. As already discussed, any administrative burden this injunction places on the government is greatly minimized by the fact that the government already has a process in place for adjudicating allegations of changed circumstances for a different group of noncitizens who have previously been released – a process it simply hasn't been using for this particular class of rearrested minors. And the burden is justified in light of the hardships endured by minors taken from their sponsors and placed in ORR custody. *See id.*.

A.H. has thus shown that he is highly likely to succeed on the merits of his procedural due process claim, that he (and, as discussed below, others like him) will suffer irreparable harm in the absence of an injunction requiring a prompt hearing to test the basis of the government's gang allegations, and that the equities and the public interest weigh strongly in favor of issuing the injunction he requests. Even assuming that implementation of the hearing process described above constitutes a "mandatory" rather than a "prohibitory" injunction, A.H. is entitled to the relief he seeks. *See id.* at 998-99. The detention of minors without due process results in "extreme or very serious damage" to this vulnerable population that is not "capable of compensation in damages." *Id.* at 999 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). And, as discussed above, with respect to A.H.'s procedural due process claim "the merits of the case are not doubtful." *Id.* (internal quotation marks and citation omitted).[16]

---

[16] In addition to meeting the first prong of the preliminary injunction analysis, A.H.'s likelihood of success on his procedural due process claim requires the Court to deny the federal defendants' motion to dismiss as to that claim.

# IV.

As alluded to throughout this ruling, A.H. moved the Court to provisionally certify a class of similarly situated minors in conjunction with his motion for a preliminary injunction. Whether class treatment of A.H.'s claims is appropriate is determined by the requirements of Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Rule 23 sets out the four basic requirements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed R. Civ. P. 23(a). Because A.H. seeks to provisionally certify the class for purposes of obtaining declaratory and injunctive relief, he must also demonstrate that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

For the reasons that follow, the Court will provisionally certify, for the limited purpose of issuing a preliminary injunction, a class of noncitizen minors meeting the following criteria: (1) the noncitizen came to the country as an unaccompanied minor; (2) the noncitizen was previously detained in ORR custody and then released by ORR to a sponsor; (3) the noncitizen has been or will be rearrested by DHS on the basis of a removability warrant on or after April 1, 2017 on allegations of gang affiliation.[17]

---

[17] The plaintiffs initially requested certification of a similar class but limited to those minors "who have been detained or would, if arrested, be considered for detention in" a secure or staff-secure facility under the oversight of the San Francisco Federal Field Specialist. Pls.' Consol. Br. at 43. They then argued that "*any* Sponsored U[naccompanied] C[hild] who is arrested by ICE and referred to ORR with allegations of gang affiliation" would fall within the proposed class, because all minors with allegations of gang affiliation are referred to a secure facility under current policy, and therefore are considered for placement in Northern California. Pls.' Reply Br. at 25, Dkt. No. 73. In lieu of the plaintiffs' unwieldy definition, the Court concludes that a class definition clearly applicable to all noncitizen minors with the characteristics above is both advisable for purposes of administering the preliminary injunction and warranted on the facts of this case so far – facts which show that the defendants have adopted a policy that applies to sponsored noncitizen minors nationwide. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (noting that, even without class certification, injunctive relief may be extended beyond the named plaintiffs "if such breadth is necessary to give prevailing parties the relief to which they are entitled" (citation omitted)).

# A.

To succeed in his motion for class certification, A.H. must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The government contends that A.H. has failed to identify a sufficiently large number of existing class members and has not shown that joinder of all the class members would be impracticable.

The plaintiffs' showing is sufficient to meet the numerosity requirement for purposes of provisional class certification. The evidence suggests that at least 15 sponsored minors aside from A.H. already have been detained on the basis of alleged gang affiliation. Decl. of Trevor Kempner at 1, Dkt. No. 73-1; *id.*, Ex. A (HHS) at 2572-802, Dkt. No. 82-2. Although this is not itself an especially large number of undocumented minors, there is evidence that additional class members will be added. *See Bruce v. Christian*, 113 F.R.D. 554, 557 (S.D.N.Y. 1986) (concluding that, although the plaintiff had identified only 16 class members, it was clear that the conduct at issue affected or would affect additional individuals, and further noting that the "fluid composition of the public housing population" supported class certification). In particular, a memorandum from ORR to the Domestic Policy Council notes that ORR currently has 58 beds available in secure facilities nationwide but that, "[d]ue to increased numbers of domestic apprehensions, particularly from DHS enforcement operations targeting gang members, as well as ORR's new policies regarding initial designation to secure beds of all [unaccompanied alien children] with past or present gang affiliation, additional secure beds are required." Corkery Decl., Ex. E (HHS) at 3731. Indeed, news reports suggest that DHS has recently arrested dozens more individuals who arrived in the United States as unaccompanied minors on allegations of gang affiliation, as part of "Operation Raging Bull."[18] Where a plaintiff seeks "only injunctive

---

[18] Makini Brice, *More Than 200 Arrested in U.S. Crackdown on MS-13 Gang*, Reuters (Nov. 16, 2017), https://www.reuters.com/article/us-usa-crime-gang/more-than-200-arrested-in-u-s-crackdown-on-ms-13-gang-idUSKBN1DG32Z [https://perma.cc/7QCG-68DC]; Operation Raging Bull, Immigration and Customs Enforcement, https://www.ice.gov/features/raging-bull [https://perma.cc/E3YQ-ETN4].

and declaratory relief, the numerosity requirement is relaxed and plaintiffs may rely on reasonable inferences arising from plaintiffs' other evidence that the number of unknown and future members is sufficient to make joinder impracticable." *Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 317 F.R.D. 91, 100 (N.D. Cal. 2016), *aff'd*, 867 F.3d 1093 (9th Cir. 2017) (internal quotation marks, alterations, and citation omitted).  In light of the tens of thousands of undocumented minors released to sponsors and currently living in the United States and ORR's anticipated expansion of the number of children held in secure facilities on the basis of gang affiliation, the plaintiff class is sufficiently numerous.  *See* Decl. of Stephen B. Kang at 1, Dkt. No. 61-6.

Furthermore, given the characteristics of the members of the proposed class, joinder of all the class members would be impracticable.  *See McCluskey v. Trustees of Red Dot Corp. Emp. Stock Ownership Plan & Tr.*, 268 F.R.D. 670, 674 (W.D. Wash. 2010).  The class consists of a changing population of noncitizen minors in government custody, some of whom have limited English proficiency.  *See, e.g.*, Decl. of A.H. (June 22, 2017) at 3; Decl. of J.G. at 3.  The record in this case demonstrates that they are frequently held in detention far from the location in which they were arrested, and where they would presumably have improved access to the assistance of their sponsors and any existing counsel.  Moreover, the class members are moved to different detention facilities with some frequency, which creates additional logistical difficulties.  *See, e.g.*, Decl. of Linda Nanos at 1, Dkt. No. 61-19.  And, although unnecessary detention for the period of time prior to the minors' eighteenth birthdays is sufficient to constitute a serious deprivation of their constitutional rights, it is not reliably enough time to develop an individual lawsuit.

## B.

A.H. next must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, A.H. must show that proceeding as a class will not only raise common questions but also will "generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 564 U.S. at 350 (citation omitted).  The defendants seize

upon likely differences in each class member's circumstances – regarding, for instance, the nature and quantity of the evidence of gang affiliation adduced by DHS – to argue that commonality is lacking here.

The procedural due process claim for which A.H. seeks class-wide preliminary injunctive relief is amenable to common answers.  *See id.*  A.H. has shown "a common policy or practice" of rearresting sponsored minors using a removability warrant, on the basis of suspected gang affiliation, and then transferring the minors to ORR custody.  *See Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1105 (9th Cir. 2017); Corkery Decl., Ex. E (HHS) at 3407, 3549, 3729-31.  A.H. contends that all minors previously released to a sponsor are entitled to a prompt hearing to determine whether there is any factual basis supporting DHS's arrest and ORR's decision to detain the minor in secure custody.  If A.H. is correct, all the class members' rights were violated, regardless of whether, after the hearing is conducted, sufficient evidence supported the arrest and detention.

The Court does not, in provisionally certifying the class, purport to resolve whether every class member should be released from ORR custody; it seeks to determine whether DHS and ORR policies violate class members' rights in a systematic way.  This basic question is common to all class members, and the answer is the same for each.  *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (observing that commonality "does not . . . mean that *every* question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single *significant* question of law or fact" (internal quotation marks and citation omitted)); *see also Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) ("Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." (alteration and citation omitted)).

## C.

The typicality requirement is satisfied where the named plaintiff's claims "are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The government does not specifically dispute that A.H.'s claims are typical of the class, and for good reason.

A.H., like all of the proposed class members, was rearrested by ICE after having been placed with a sponsor by ORR. And, like all of the class members, he was placed in a secure facility by ORR on the basis of alleged gang affiliation. Although he has since been stepped down to a staff-secure facility, he has experienced the same trajectory of release, rearrest, and transfer back to ORR custody on the basis of gang affiliation that characterizes all the class members. His claims are therefore "reasonably coextensive with those of absent class members," and, to the extent he has been harmed, he has experienced "the same or similar injury" as the unnamed class members. *Parsons*, 754 F.3d at 685 (internal quotation marks and citations omitted).

## D.

To demonstrate that "representative parties will fairly and adequately protect the interests of the class," the Court must determine (1) whether A.H. and his counsel "have any conflicts of interest with other class members," and (2) whether A.H. and his counsel will "prosecute the action vigorously on behalf of the class." Fed. R. Civ. P. 23(a)(4); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citation omitted).

The government does not dispute that A.H. and his counsel will adequately represent the class members' interests. There is no reason to believe that A.H.'s interests, or those of his counsel, will conflict with those of the unnamed and similarly situated minors who are in the proposed class. A.H.'s declaration suggests he is aware of his role as a class representative and is willing to serve in that role. Decl. of A.H. (Sept. 20, 2017) at 3. Therefore, having reviewed the proof submitted by plaintiffs' counsel regarding their experience litigating complex civil actions and cases involving issues similar to those raised in this case, the Court is satisfied that the adequacy requirement is met. *See* Decl. of Julia Mass (Sept. 25, 2017), Dkt. No. 61-4; Decl. of Martin S. Schenker, Dkt. No. 61-5; Decl. of Stephen B. Kang at 3-7.

## E.

A.H. has likewise demonstrated that the government "has acted or refused to act on grounds that apply generally to the class," such that preliminary injunctive relief would be

appropriate as to the class as a whole. *See* Fed. R. Civ. P. 23(b)(2). For purposes of class certification, the Court need not "examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010).

The evidence demonstrates that DHS and ORR have adopted policies that subject all sponsored minors alleged to be gang affiliated to rearrest using a removability warrant, transfer to secure custody, and prohibition of their release to the sponsors previously charged with their care. Corkery Decl., Ex. E (HHS) at 3729-31 (stating, among other things, that "[a]ll [unaccompanied alien children] identified as having current or past gang affiliation are placed in secure facilities," and that "[n]o current gang members are eligible for release to a sponsor from the program"); *see also id.* at 3407, 3549; Corkery Decl., Ex. B at 53:6-54:4. This preliminary injunction clarifies how the federal government must treat those people after they've been rearrested. Because a single injunction can protect all class members' procedural due process rights, the requirements of Rule 23(b)(2) are satisfied. *See Wal-Mart*, 564 U.S. at 360.

Because A.H. has met the requirements for provisional certification of an injunctive relief class, and because he has shown that a preliminary injunction is warranted to remedy the procedural due process violation he has alleged, the Court orders a prompt hearing not only for A.H. but for all members of the class.[19]

## V.

In conclusion, for the reasons discussed above, the motion for a preliminary injunction on behalf of a class of noncitizen minors is granted to remedy the government's likely violation of the class members' procedural due process rights. The government is ordered to provide A.H. and all other noncitizen minors previously released to a sponsor who were rearrested and are

---

[19] Because this preliminary injunction neither enjoins nor restrains the proper operation of any part of Part IV of the immigration statutes, 8 U.S.C. § 1252(f)(1) does not bar the relief ordered. *See Rodriguez*, 591 F.3d at 1120-21.

currently in federal custody based on allegations of gang affiliation with a hearing before an immigration judge by no later than November 29, 2017, to challenge the basis for those allegations, in conformity with the requirements set out in Part III.A of this order. The minor's sponsor must receive notice and be given an opportunity to participate in the hearing. At the hearing, the government must present evidence that the minor is a danger to the community, notwithstanding ORR's prior determination to the contrary. For all sponsored minors who will be arrested on the basis of gang affiliation, the government must provide this hearing within seven days of rearrest, in the jurisdiction where the minor was arrested or lives. A decision by the immigration judge that the government has not made an adequate showing of changed circumstances, or that the minor has successfully rebutted the showing, requires release into the custody of the previous sponsor. With respect to the class members currently in federal custody, the government must also provide prompt notice to class counsel about where the class member is being held, the basis for the detention, and the details regarding the hearing the minor will receive.

The defendants' motions to dismiss are granted as to the claims brought by F.E. and J.G. individually. The non-federal defendants, Brent Cardall and Jose Esquivel, are dismissed from the lawsuit. The federal defendants' motion to dismiss is denied with respect to the procedural due process claim, and otherwise remains under submission. Also under submission are A.H.'s motion for class-wide preliminary injunctive relief on his unlawful arrest claim, as well as his request for his own release from custody.

**IT IS SO ORDERED.**

Dated: November 20, 2017

_____

VINCE CHHABRIA
United States District Judge