UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

SARAVIA, )
)
Plaintiff, )
)
vs. ) No. C 17-03615-VC
)
SESSIONS, et al., )
)
Defendants. )
_______________________________)

San Francisco, California
Thursday, November 9, 2017

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 11:05 - 12:56 and 1:02 - 1:19 = 128 MINUTES

APPEARANCES:

For Plaintiff:

Cooley, LLP
101 California Street
5th Floor
San Francisco, California 94111
BY: NATHANIEL R. COOPER, ESQ.
ASHLEY K. CORKERY, ESQ.
TREVOR M. KEMPNER, ESQ.

University of California, Davis School of Law
Immigration Law Clinic
One Shields Avenue TB 30
Davis, California 95616
BY: HOLLY STAFFORD COOPER, ESQ.

(APPEARANCES CONTINUED ON NEXT PAGE)

APPEARANCES:

For Plaintiff:

ACLU Foundation of Northern California
39 Drumm Street
San Francisco, California 94111
BY: WILLIAM S. FREEMAN, ESQ.
JULIA H. MASS, ESQ.

For Defendants:

United States Department of Justice, Civil Division
Office of Immigration Litigation
Post Office Box 868 Ben Franklin Station
Washington, D.C. 20044
BY: SARAH B. FABIAN, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/
Transcriber
echoreporting@yahoo.com

Thursday, November 9, 2017 11:05 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: Calling case number 17-CV-3615, Saravia versus Sessions, et al.

Counsel, please step forward and state your appearances for the record.

MS. MASS: Good morning, your Honor. Julia Harumi Mass for the Plaintiffs, and with me at counsel table are William Freeman, Holly Cooper, Nathaniel Cooper -- no relation -- Trevor Kempner, and Ashley Corkery.

MS. FABIAN: Good morning, your Honor. Sarah Fabian, just me on behalf of --

THE COURT: All by yourself?

MS. FABIAN: -- the federal Defendant, yes.

THE COURT: Okay. Well, I've -- I talked a lot when we spoke on the phone the other day. So have you all talked about how you would like to proceed or do you want to just go first, start arguing or do you want to -- is that okay?

MS. FABIAN: Your Honor, I have four points as your Honor had directed us to come with points. So if Plaintiffs go first, then I will --

THE COURT: Great.

MS. FABIAN: -- address those. If I think it

would be helpful to address those as they're speaking, I'll --

THE COURT: Absolutely.

MS. FABIAN: -- make myself known. Otherwise, I'll --

THE COURT: Okay. Feel free, and if you prefer to stand there, that's fine. If you prefer to sit back and relax for now, that's fine.

MS. FABIAN: I'll stand here just in case so I'm not jumping up and interrupting.

THE COURT: Okay.

MS. MASS: We will be brief to begin. The Plaintiffs are in agreement with the Court's tentative, and we'll reserve most of our time for responding to the Defendant's arguments.

THE COURT: Okay.

MS. MASS: We would like to address -- to talk about the relief that we're seeking in the preliminary injunction motion. First, the Plaintiffs do request the Court order the release of A.H. based on the facts that have already been presented, and I'll go -- these are just the three points that I'd like to cover.

THE COURT: Okay.

MS. MASS: The second one is to talk about -- to clarify the details to be included in the preliminary

injunction related to the arrests of unaccompanied minors who ORR previously released to a sponsor and, third, to clarify some critical elements and procedural protections in the hearing that we would -- in the hearing process that we'd like to see included in the injunction.

THE COURT: Okay. Wait. Hold on. What was -- what was the third -- third point?

MS. MASS: Procedural protections in the hearing process that --

THE COURT: Okay. Good.

MS. MASS: -- the Court indicated --

THE COURT: And then -- so -- give me one second. So it sounds like you are not contesting any of the tentative rulings that I've given you on the procedural issues, is that right?

MS. MASS: That's right, your Honor. I mean, you did ask us to focus our arguments and --

THE COURT: Yeah. Oh, no, I appreciate that.

MS. MASS: -- talk about what we think is most important.

THE COURT: That's fine.

MS. MASS: So that's what we think is most important.

THE COURT: Yeah, and if you don't raise something, I don't take it to be a waiver or anything like

that. I just take the -- take it to be that you're focusing on what you think are the things that really need focusing on.

I do have one question about the procedural issue, though, for you all, and I don't -- if you want to sort of defer it until later in the hearing or address it now, either way is fine. The question is from the -- from the standpoint of the relief that you're seeking, why did you feel it was necessary to add claims for declaratory and injunctive relief? Why would it -- from the standpoint of what you are trying to accomplish and from the relief that you're seeking on behalf of A.H. and on behalf of other unaccompanied minors who have been placed with -- who ORR has placed with their sponsors, why would it not have been enough to bring a habeas claim by A.H. on behalf of himself and others similarly situated to establish the propositions that you're attempting to establish, which is that the -- the arrests were -- the two related propositions that you're attempting to establish, which is that the arrests -- that the Federal Government could not arrest these people simply based on removability or, you know, sort of something -- you know, information that doesn't rise to the level of, say, probable cause on the issue -- on changed circumstances or dangerousness and that they -- they are required to -- they are entitled to a prompt hearing if they are arrested to --

to challenge the Federal Government's decision to arrest them?

MS. MASS: So why isn't habeas jurisdiction sufficient? I think there are a few answers, and it depends a little bit on the different claims.

So, with respect to seeking injunctive relief for future arrests, those are people who aren't yet in custody. So I think that habeas jurisdiction doesn't as clearly apply. I do -- and then with respect to -- you know, as the Court ruled in the tentative, you ruled you didn't have habeas jurisdiction over the other two named Plaintiffs because they weren't in the district at the time that the amended complaint was filed, and I think that's another consideration, that we did know that there were people who were brought into the District and who had moved -- you know, people had moved around and it's just the nature of ORR detention that people will be moved around. So I think the -- in terms of that habeas jurisdiction over the custodian and over the -- over the person who's in the -- in the District at the time that the complaint is filed, that's -- that's one aspect of it.

Another --

THE COURT: But, I mean, so -- so that's one potentially -- the first thing you mentioned it seems as that's potentially, from your perspective important, that if

it were just a habeas case and there were just the -- you know, the only thing that could be considered was habeas relief, it could be pronounced by a court that it's unlawful for DHS to arrest people without probable cause to believe that there's changed circumstances from the time that ORR decided they should be placed with sponsors.

But the Federal Government couldn't be enjoined from -- like there couldn't be an injunction in the habeas context to prevent the Federal Government from doing it the way it apparently has been doing.

MS. MASS: I think there could be an injunction for people in the District. That's my understanding of the way habeas jurisdiction would work there, that the class -- the class would potentially be geographically limited to the Northern District so people who are under the supervision of the -- of the custodian in the Northern District --

THE COURT: Uh-huh.

MS. MASS: I think, you know, at the -- I believe that's -- I believe that's why. I mean, I think we -- in reality I think we have alternative -- alternative grounds for the Court's jurisdiction and the Court's authority to issue injunctive relief, and habeas is one, but it may not be complete. It isn't complete, for example, with respect to the unlawful arrest injunctive relief we are seeking. And also, claim six, which is not part of the preliminary

injunction motion, it's only part of the motion to dismiss, that really is only -- only -- it doesn't arise in habeas. It really arises under 1331 and the Administrative Procedure Act. It's a claim for injunctive relief without habeas.

So I think there are -- depending on which claim and which members of the class we're talking about, that there are -- but I think to your point, the core procedural due process right we're seeking, the -- the hearing, prompt hearing prior to deprivation of liberty, that is something that is appropriate to issue under the Court's habeas jurisdiction.

THE COURT: But only as to people who are being held by a jailer who's in this District?

MS. MASS: Yeah, or who -- if they were in the -- I mean, we made the argument with respect to the two other named Plaintiffs in part because of the extraordinary circumstances there where they were in the District. We, you know, had intended to and spoken to the Court and counsel about amending the complaint, adding class allegations. We were in the process of working with them to add them when they were taken out of the Court's -- you know, out of the Court's -- out of this District, and so -- and also the possibility that they could return. There were a lot of reasons why we thought that with respect to those two we had some extraordinary circumstances that we could

cite to, but I think we didn't feel as confident with habeas jurisdiction over people who may have left the District but still be in ORR custody at the time that the complaint was filed.

THE COURT: So, to the extent you're seeking class relief through habeas jurisdiction, that is on behalf -- that is not a -- you're not seeking nationwide relief. To the extent you're seeking class relief through the declaratory and injunctive relief actions, you're seeking nationwide. Is that correct?

MS. MASS: That's correct, your Honor. We -- I mean, the way we originally drafted the class definition, it was -- it wasn't -- it was -- there was a tie to the Northern District in the sense that those people who had come to, been brought to, or would be brought to the Northern -- to ORR custody under the oversight of the San Francisco office, but -- and I should note that Nathaniel Cooper is here and available to also speak to some of the class, questions if the come up, class certification questions, but the relief that we're seeking, I mean, particularly as it relates to the unlawful arrest, as we've argued in the briefs, that relief is -- in order to give relief to the members of the class or people -- you know, in order to give relief to the Plaintiffs, the -- you know, the Government needs a rule that it can apply at the point of

arrest, which is going to be difficult to apply in advance to -- on a geographic scope. And so, in some ways, the relief is different from the parameters of the class as we could find it, and -- and one of the things in the way the Court defined the class that you were leaning towards certifying on during our call on Tuesday, you indicated that you were -- you plan to certify a class consisting of all unaccompanied minors who had been placed by the Office of Refugee Resettlement with a sponsor and had been or are about to be arrested by the Department of Homeland Security. And given the substantive relief that the Court is inclined to grant, in particular, a pre-deprivation hearing before -- well, it seemed somewhat like a pre-deprivation hearing, at least the hearing prior to transfer of a trial outside of the state in which they're -- they were arrested. Again, difficult to -- you know, that's the kind of relief that is broader than the sort of geographic scope, but it's necessary, and so it makes more sense really to define the class as the Court did in the tentative ruling on Tuesday we believe.

THE COURT: Remind me of your -- what your proposed class definition was in the -- in the PI motion.

MS. MASS: In --

THE COURT: Or the complaint or whatever.

MS. MASS: I think in -- the way we defined it in

the reply brief, which was sort of the most recent -- we actually -- can I have -- can I let Mr. Cooper speak to this?

THE COURT: Sure.

MR. COOPER: Good morning, your Honor.

THE COURT: Hi.

MR. COOPER: So in our opening brief, we defined the class as all unaccompanied immigrant children who had previously been detained in ORR custody and released by ORR to a parent or other sponsor and who thereafter have been arrested or are now or in the future being considered for arrest by U.S. Immigration authorities on or after April 1st, 2017 with allegations of gang affiliation and who have been detained or would, if arrested, be considered for detention in a secure or staff secured detention center under the oversight authority of the San Francisco based ORR Federal Appeal Specialist. So that -- try to capture the class members that are in detention now and then prospective class members as well with that.

THE COURT: Okay.

MR. COOPER: So it's a bit of a mouthful compared to the way that you articulated it.

THE COURT: No, and it may be -- yeah, and that's -- that's something that hadn't fully -- I hadn't quite focused on the difference between your definition and the

definition that I gave you, and that -- and you propose that class definition both for your habeas claims and for your claims for declaratory and injunctive relief, right?

MR. COOPER: He did, and I think the way that we got there is this case originally was brought as an individual habeas petition by A.H.. The focus was on procedural due process. We didn't bring the unlawful arrest claim until we filed the amended petition, and our focus all along was really on the placement decision and the process or lack thereof. It was afforded to the Plaintiffs. I think the Court has kind of come at it from a different direction, and I think we all find that appealing. Really, the placement decision is derivative of the arrest, and thinking about it from the arrest, the point of arrest first makes a lot of sense, and once you do that, you really do need, for the reasons that Ms. Mass articulated, to redefine the class so that it covers class members nationwide.

THE COURT: Okay. Okay. Sounds good. So, Ms. Mass, do you want to now turn to your three topics?

MS. MASS: Sure. Thank you, your Honor.

So as to A.H., we did want to urge the Court to order his release -- grant the writ and order his release based on the evidence that's before the Court already. The parties have had an opportunity to present evidence of danger and flight risk. The Defendants had an opportunity in their

briefing and through their witness testimony, and we think the Court has what it needs now to make this determination, and that's what the courts did in Beltran v. Pardell (phonetic) and Santos v. Smith.

THE COURT: What was the latter one?

MS. MASS: Santos v. Smith, which is another -- a similar case against ORR on behalf of an unaccompanied child who was not released in response to a parent's reunification petition, and I have the Westlaw cite. It's also in our papers.

THE COURT: In your papers, that's fine.

MS. MASS: And then -- and I'm happy to address that evidence if you like, but just in the interest of time --

THE COURT: Yeah. I mean, so I have one question about that evidence.

MS. MASS: Yes.

THE COURT: You know, to the extent that it's not just a habeas claim, to the extent that it's a habeas claim and a claim for declaratory and injunctive relief, I think -- I think if it were just a habeas claim, there would be one inquiry, which is is there enough now to detain A.H.. Like even if they unlawfully arrested him, is there enough now to detain him. That would be the question on habeas. I think if it's a habeas inquiry as well as an inquiry about

declaratory and injunctive relief, it's two stages I think. One is was he -- did DHS have enough to arrest him when they arrested him. If not, it was an unlawful arrest, and presumably if the -- you know, if there were ever occasion to use the exclusionary rule, you know, he might be able to invoke the exclusionary rule, at least if he's litigating in the Ninth Circuit where it's recognized that aliens in removal proceedings can invoke the exclusionary rule, at least in some circumstances, and presumably he might have a Bivens action against the officers who arrested him unlawfully, but that wouldn't -- that wouldn't answer the question on habeas. The question on habeas would be is he being unlawfully detained.

And so we would just look at all the evidence together, whatever evidence DHS had at the -- when it arrested him plus whatever evidence DHS has gathered since then and ask is he being unlawfully detained should he be released. Because -- if this -- if this is also a dec relief, an injunctive relief action, I think that the -- the inquiries have to be separated. The first question is did they unlawfully -- you have a claim for unlawful arrest. So on the question of whether they arrested him unlawfully, we need to look at the evidence they had at the time. And on the question whether he should be, you know, released, we have to look at all the evidence they've gathered.

So I guess for -- feel free to dispute my formulation of the inquiry, but -- but if I'm right about that, then first we should look at the evidence that DHS had at the time of the arrest, and then we should turn to an examination of whatever additional evidence they gathered afterwards.

MS. MASS: I think we should look at all of it -- or for the Court may look at all of it. I think for purposes of the habeas there are -- and I guess I'd like to focus on the habeas part of it for a moment because I think when we talk about injunctive relief, then we want to talk about what are the Defendants' policies and practices and what's the appropriate framing of an order to avoid unconstitutional and --

THE COURT: Okay. But if you want --

MS. MASS: -- arrest in the future.

THE COURT: -- a declaration and an injunction preventing DHS from making false arrests, right, from making unlawful arrests, then you have to show that A.H. was unlawfully arrested, and the -- that question is -- that -- that question is -- is asked I think in relation to the evidence that DHS -- evidence and information that DHS had at the time.

MS. MASS: Yes.

THE COURT: If -- and -- and then maybe -- maybe

the answer is no, they didn't have enough evidence to arrest him at the time, but then, turning to the relief of -- the question of whether he should be released, then I think we have to look at all the evidence.

So to the extent that you are -- if you are still pursuing claim for declaratory and injunctive relief that -- with respect to DHS's practices of arresting people, I think that that's the first inquiry is we have to separate out and look at what the evidence was that DHS had at the time it arrested A.H..

MS. MASS: And as of today, with respect to the current motions that are pending before the Court, we are not seeking declaratory relief at this point because it's -- we're looking for preliminary injunctive relief.

THE COURT: Okay.

MS. MASS: And so the question really is whether we're likely to prevail on the merits of the -- of the claim that he was arrested unlawfully.

THE COURT: Okay.

MS. MASS: And then how does that weigh against the hardships and the rest of -- sort of the preliminary injunctive relief balancing test.

THE COURT: Right.

MS. MASS: So I definitely can -- I'm happy to talk through the arrest portion, and we can go to that. In

fact, I think it makes sense -- if I may, we did put together like a demonstrative exhibit for the Court and for counsel to consider just to have in front of you as I talk through what we'd like to see in terms of some of the -- the specifics of the relief we're seeking.

THE COURT: Uh-huh.

MS. MASS: And if we -- if we look at -- so what we did here is we have in regular print the provisions that we believe the Court, based on our understanding of the Court's tentative on -- on Tuesday on the phone, that's in regular print. And then we've added in italics some of the provisions that we'd like to ask the Court to include to be very clear about what does and doesn't constitute in terms of unlawful arrest probable cause of safety risk or flight risk. And in particular, we're focused on probable cause of dangerousness or safety risk.

And what we're seeking in here is that the probable cause for safety risk cannot be based on trivial or non-violent criminal conduct, including unconfirmed police reports or criminal charges that hadn't led to conviction or allegations of gang membership or affiliation where there's no evidence of conduct in furtherance of criminal gang activity and so that evidence based on clothing, appearance, and associations would not be sufficient to provide probable cause of dangerousness or safety to the community or the --

or one's self. And if you apply this standard, which I'm happy to argue about why we should apply this standard, to the -- to the arrest of A.H., we would say that, in fact, there wasn't probable cause or at least we're likely to succeed on the merits of that claim because it was based simply on this -- these police reports which contained -- well, we don't even know what they based their original decision on because the -- the Defendants haven't presented any evidence about what that original decision was based on. Mr. Kushoda (phonetic) testified that he didn't know what DHS had when they made the decision to arrest A.H.. We do know that --

THE COURT: He said that he didn't know, but I thought there was a declaration that they did submit from somebody else from DHS.

MS. MASS: I think he was the declarant also.

MS. FABIAN: There was the original declaration with the TRO hearing. That was a different witness.

THE COURT: Yeah. That's the one I was thinking of.

MS. FABIAN: I don't have it with me. I believe it -- I mean, I will say I don't -- if --

THE COURT: Daniel Lockner (phonetic).

MS. FABIAN: I don't believe that DHS's position about what they relied on -- I don't think there was more

information in that declaration than there was in Mr. Kushoda's declaration.

THE COURT: Sorry. Say that one more time.

MS. FABIAN: I don't think that -- I think that both witnesses and Mr. Lockner perhaps very quickly and early on before DHS had all of the information, both witnesses were trying to explain the basis for the arrest, but I believe Mr. Lockner's declaration just said that the arrest was based on the warrant, and I don't believe he laid out the evidence relating to gang membership.

THE COURT: No, he --

MS. FABIAN: I would --

THE COURT: No, he -- he -- he tried to, yeah. I mean, he -- this was filed on June 27th, '17, and what I'm trying to do is parse through and figure out what evidence DHS actually used to decide to arrest A.H. and what evidence the Federal Government gathered after the fact to justify A.H.'s detention and sort of look at those things step by step.

MS. FABIAN: I would say that --

THE COURT: Is the record clear on, you know, which of the evidence DHS -- are you saying that we don't have any -- enough in the record to discern what -- I mean, I understand your contention, right, is that "We don't need -- we don't need probable cause of the type that you're

describing, Judge, to arrest -- to arrest and detain these people. We can arrest them on grounds of removability," right?

MS. FABIAN: Yes.

THE COURT: That's your position. And -- and so are you saying that we don't really -- that you have made a -- an effort to -- that the Federal Government has gathered the information that it -- gathered as much information as it can on the dangerousness of A.H. sort of in response to this litigation but in the record we can't really discern which information the DHS agents considered before arresting A.H. and which information the Government has gathered after arresting A.H.?

MS. FABIAN: No, your Honor. I would say that --

THE COURT: Okay.

MS. FABIAN: -- the Government would rely on Mr. Kushoda's declaration and testimony with regard to what DHS relied on related to the arrest. Any other --

THE COURT: But he didn't -- but how does he -- how did he know -- I mean, I need to go back and read his testimony, but how did he know which information was considered beforehand and which information serves to justify the detention after the fact?

MS. FABIAN: He --

THE COURT: And I don't mean that in a pejorative

way. I'm just trying to delineate between the two.

MS. FABIAN: He reviewed HSI's files. HSI had the files of what they relied on when they did their analysis and, as he testified, that the (indiscernible) attorney would have signed off on the arrest based on that information. Any information gathered after that was gathered by HHS. And so some of that I -- I don't know off the top of my head if -- some of that information may have gone to HHS. Some may not have. Other information went from Suffolk County PD to HHS, but -- but what Mr. Kushoda was relying on was the evidence that HSI had gathered and --

THE COURT: Before the arrest?

MS. FABIAN: -- had signed off on before the arrest.

THE COURT: Okay.

MS. FABIAN: That --

THE COURT: I don't remember it being that clear, but, I mean, I guess the testimony will --

MS. FABIAN: And that may be -- I mean, HSI makes the arrest, and the -- and custody is transferred. At that point, HSI doesn't continue to gather -- they may -- other information may come up in the course of their investigations of other related individuals, but they don't continue -- again, this is where, you know, we -- we submit that these agencies are acting somewhat separately and not

-- it's not a sort of Federal Government issue. It's that DHS has made the arrest and has -- and then transfers custody to HHS. It is then HHS's function to determine for their purposes of custody whether they have the information they need to maintain custody. So our -- and if it wasn't clear, that may have been my not realizing that -- that the system isn't as clear as it is with my experience, but HSI and Mr. Kushoda, his testimony was with regard to what HSI relied on at the time of arrest.

THE COURT: Okay. And you look like you're disagreeing with that.

MS. MASS: I -- I mean, the testimony will speak for itself when we see the transcript, but my understanding of his testimony was that Mr. Kushoda did not know precisely what evidence they had before they got the arrest warrant, that he testified about the process, and then he testified about certain documents that he was looking at but that he wasn't able to say whether those documents were available to HSI before the arrest warrant was issued.

THE COURT: Okay. But what about this declaration from Daniel Lockner, from June 27th, '17? That seems to stand for the -- this seems to -- this seems to be an attempt to describe what DHS relied on to -- before arresting him.

MS. MASS: I'm afraid I haven't had a look at that

for sometime, your Honor, but I would -- if I may -- and I'm happy to hear -- we'd be happy to address it, but I believe that it may not matter because I would argue that if what they had was what, you know, has been presented so far, it's -- it's two -- two arrests --

THE COURT: Okay.

MS. MASS: -- both of which were adjourned in contemplation of dismissal. The only arrests that have any threats of -- any alleged threat of violence has actually since we believe been dismissed. We're working on getting the certificate of disposition for the Court. So those are -- those are arrests --

THE COURT: That was the intimidation one?

MS. MASS: Exactly, yes.

THE COURT: Okay.

MS. MASS: And then an inconsistent -- and an internally inconsistent memo that no one sort of went back and tried to talk to the original arresting officers about what the so-called self-admission was, and we just submit that that's the only evidence that's sort of come forward about what they could have been basing the arrest on, and that's insufficient. And I would just --

THE COURT: You don't think that's probable cause? I mean, maybe it's not enough to -- maybe it's not enough to continue detaining somebody, but might it be enough to

establish probable cause?

MS. MASS: Of dangerousness?

THE COURT: And probable cause inquiry is what a reasonable officer would know at the time, right? And -- and officers are allowed to rely on information from other officers.

MS. MASS: It's a good -- it's a good question. I think what we have to look at in terms of precedent that speaks to safety risk -- or safety and flight risk in the immigration context, there's a case called Judalang v. Bolder, and the citation is 562 F.Sup.2d, 1119. That's from the Southern District of California, and it's from 2008, and there --

THE COURT: What's the first name?

MS. MASS: Judalang, J-U-D-A-L-A-N-G. In this case the District Court held that -- that prior convictions -- and here we have merely arrests that were adjourned without any contemplation of dismissal -- so they're just allegations -- but in this case --

THE COURT: Is there anything on the record about adjourned in contemplation?

MS. MASS: There is, yes. In the declarations that were submitted in support of the initial TRO motion for A.H., Stephanie Gibbs, her declaration includes information about the adjournment and contemplation of dismissal.

It's also apparent from the records that we have -- evidence we have on the record that DHS actually relied on false information. They had the date of that -- that arrest, the threat -- the menacing arrest, was wrong. They had it dated in 2017, when it was actually in the spring of 2016. So that's -- they were relying on incorrect information as well.

But in the -- in the Judalang case, the Court held that criminal convictions including a 20-year-old voluntary manslaughter conviction and a five-year-old grand theft conviction were insufficient to prove present and future dangerousness for purposes of denying bond, and it -- it doesn't exactly speak to the probable cause question, but I think it does inform what the useful -- you know, what kind of criminal background is appropriate to consider for -- for a safety and flight risk -- or safety risk.

And then the other case I wanted to point the Court to is Olivas-Motta -- that's O-L-I-V-A-S hyphen M-O-T-T-A v. Holder, 746 F.3d 907, 2013.

THE COURT: 746?

MS. MASS: 746 F.3d 907, and in particular, there's a discussion of how -- it's a Ninth Circuit case, and in a concurrence by Justice Kleinfeld, he talks about how police reports are not -- are not generally considered reliable evidence for the underlying facts that they

describe. So I would -- I would urge the Court -- I would just make that precedent available in terms of considering whether there was probable cause based on these arrests.

THE COURT: Is that also in the context of a bond or --

MS. MASS: No. It was in the context of a removal proceeding.

THE COURT: Okay.

MS. MASS: So that goes, we think, to -- you know, we do believe that the evidence that's before the Court in terms of the arrest is insufficient to show probable cause of flight risk or certainly -- or not flight risk -- danger, certainly flight risk. He had been attending his immigration proceedings. He lived with his mother. There are a number of other factors that are considered in immigration bond hearings.

THE COURT: I'm curious about something.

MS. MASS: Yes.

THE COURT: Do you -- do you think -- let's say that there was strong evidence that A.H. was a member of the MS13 Gang, no evidence of criminal conduct, no evidence that, you know, he'd been -- he, you know, was in the process of committing or had committed crimes, but indisputable that he was a full fledged member of MS13, would that be enough?

MS. MASS: Well, I think if the Government put forward evidence that being a full fledged member of MS13 meant that you participated in the criminal conduct of the gang, which I believe Mr. Kushoda somewhat alluded to, then I think it may be enough.

THE COURT: Okay.

MS. MASS: That evidence isn't before the Court at all.

THE COURT: Okay.

MS. MASS: And we do -- we do urge the Court to -- because -- in terms of what should be -- what's needed to have probable cause of dangerousness, it should be more than mere association, clothing, or other indicia that in the Kushoda declaration include things like frequenting an area notorious for gangs, associating with known gang members, and being identified by a gang member as a gang member.

So some of these things are really not very reliable indicia, and so they shouldn't be included as -- as reasons to provide probable cause of dangerousness, and -- and we really take the position that there has to be conduct in furtherance of criminal activity or in furtherance of the gang in order to have proof of dangerous -- or probable cause of dangerousness for purposes of the arrest, and one -- one case -- we cite a number of cases in our -- in our brief. One of them is Vasquez v. Rocakus, which is a Ninth

Circuit opinion. It's cited in the brief, and there are also a number of cases cited at page -- at footnote 23 of our opening brief regarding the due process concerns and depriving liberty based on gang membership that have to do with the difficulties of proof and the unfairness of punishing mere association without a nexus to criminal activity. So that's the arrest side.

And then my understanding in terms of getting to the release question, the Defendants really haven't put in any additional evidence to support a finding of dangerousness. It appears that the only evidence that I can think of that the Defendants have submitted in response to our motion for a preliminary injunction and for release of A.H. is that -- those original arrests and the gang allegations.

THE COURT: What is the state of the evidence regarding Yolo County's position on all this? I know that there's the response to the request for admissions, right, in which they said that they had not been given -- I don't remember the exact wording, but it was something to the effect of "The Feds haven't given us sufficient information to support a conclusion that these people are gang members," right?

MS. MASS: Yes.

THE COURT: Was there something -- was there anything else -- is there anything else in the record on

what Yolo County has decided or determined with respect to these people?

MS. MASS: Are we speaking just about A.H. or are we speaking -- I think it goes to the appropriate --

THE COURT: Well, in particular A.H. I mean, maybe the other -- the other people may be relevant, but in particular, A.H.?

MS. MASS: There's not evidence from this round of briefing about what Yolo County has said with respect to A.H. There's --

THE COURT: Is there evidence in our record -- is there any other evidence in our record about what Yolo County has -- the position that Yolo County has taken regarding A.H.?

MS. MASS: As I recall, in the -- in the TRO hearing, there were some what were called --

THE COURT: Which, I mean, and there's no reason -- I mean, that stuff is part of the record, right?

MS. MASS: You can look at them certainly, of course, yes. There were some incident reports that we questioned Mr. De La Cruz about which we thought were inconclusive in terms of -- I mean, to me they didn't speak to dangerousness. There were some allegations in the reports that he had engaged in some fights or, you know, disputes with other folks at -- other -- other minors at

Yolo County. There were some -- you know, some information that he had yelled things at staff and gotten in trouble there.

There is also in the record a supplemental corrected response to a request for admission from the County. This is document 61-3 that says that the Defendant -- that the Federal Government provided some information on A.H.'s alleged gang affiliation on July 3rd, 2017, 20 days after his arrival at Yolo County, and it says that Defendant takes no position on whether the information provided is sufficient to establish alleged gang affiliation of A.H.

So he -- so Defendant Cardell (phonetic) took a non -- no position on the matter.

THE COURT: Okay.

MS. MASS: But I think, you know, we have put in -- I mean, the truth is there haven't -- you know, the lack of evidence, the lack of any significant problems while A.H. has been in custody, and certainly since that first TRO hearing, he has not had -- we're not aware of, and I don't believe there are any records in -- I don't believe there are any documents in the record or evidence in the record of incident reports since that TRO hearing, and that's been several months now. And he has continually denied -- the only competent evidence regarding his alleged gang membership is from A.H. himself who denies being a gang

member. So we think that's sufficient.

And then I should just try to move on quickly. The other matters that we addressed in the demonstrative that I shared with you and with counsel has to do with the -- kind of the procedural protections we'd ask that the Court include with respect to the prompt -- the prompt hearing --

THE COURT: Okay.

MS. MASS: -- post-arrest. And, in particular, I'll just go through quickly that we're seeking -- that the burden be on the Government to prove flight or safety risk by clear and convincing evidence, and we have -- I'll just --

THE COURT: Clear and -- I mean, I -- it strikes me that the burden has to be on the Government. The Government's made a previous decision to -- that this person should be released to a family member, and the Government has to justify that change, but why clear and convincing evidence?

MS. MASS: Well, and I'll say, your Honor, that this is -- in -- because it has to do with the fundamental interest of family integrity and liberty are at stake here, we think that there's some precedent for clear and convincing evidence standard, and we think it's useful to try to set forth what the standard should be at this point so that the parties are clear about sort of what the burdens

are, and I'll cite the Court to Singh v. Holder, which is a case we cited in our briefs for other reasons, and that's 638 F.3d 1196. In that case, the Ninth Circuit established clear and convincing evidence as the standard for certain kinds of bond hearings -- certain kinds of bond hearings where it's the Government's burden to prove flight risk or danger. So that's one -- one thing that I would cite, and in addition, the Smith v. Santos case, which I mentioned earlier which had to do with ORR custody, talked about family reunification in particular. And while the Court there didn't establish -- or speak to what a hearing should look like or what the burden should be, the Court there, just like the Court in Beltran v. Cardell, held that the burden should be on the Government where the family reunification interest is at stake, and it -- the Court in Santos mentions -- and this is at slip opinion page 11 -- talks about how in the pretrial detention and civil commitment context, the Government must establish necessity of detention by clear and convincing evidence and cites to cases in those contexts. And we think that that is persuasive -- a persuasive reason to adopt that standard.

Next we would -- we ask that there be notice of the evidence upon which the proposed custody decision is based and that that notice go to the child, the sponsor, and any counsel of record. And given problems that some of the

class members may have actually obtaining counsel, we ask that the order include that ORR help facilitate and help children -- or the class members obtain counsel and that notice go to class counsel also if there's no existing counsel, so we can facilitate class members' access to representation because it's critical in a hearing, of course, for a child especially to have counsel in order to have adequate procedural protections.

And then, finally, we do ask that there be limits on the -- limits on the use of witness statements, out-of-court, you know, sort of declarations and -- and statements proffered by witnesses who are not available to respond to cross examination, and that is particularly appropriate and necessary where -- in the factual record that we have here where we know that hearsay statements have been relied on by the Government to make the initial arrests and to deny --

THE COURT: What authority do you have for the idea that in a bond hearing or something along those lines that hearsay statements can't be relied upon?

MS. MASS: I think in bond -- bond hearings they often are relied upon. I think that what we --

THE COURT: Pretrial detention hearing or something?

MS. MASS: In -- I believe in Shaw v. Martin, which is a state juvenile detention case -- that's a Supreme

Court case that we cite in our briefs -- there's a mention that they uphold this state juvenile detention statute under the constitution because there's a formal and adversarial probable cause hearing which includes non-hearsay allegations, a requirement that the allegations be non-hearsay allegations.

So there's that, and, honestly, I don't know that we would say so much that there has to be --

THE COURT: I mean, I would think that the appropriate rule -- and this would be -- this, you know, comes from the administrative law context, is, you know, you cannot -- the -- you -- the hearsay only rule, you know, that --

MS. MASS: Right.

THE COURT: In administrative proceedings, hearsay is admissible all the time, but you can't deprive somebody of an important property or liberty interest on the basis of hearsay alone.

MS. MASS: Unconfirmed -- or uncorroborated hearsay.

THE COURT: Well, yeah, maybe that's another way to put it, yeah.

MS. MASS: Okay. Well, we try to get at that in -- in paragraph eight of this -- what I've given you, the Section E. Section D and E both talk about providing notice

of the evidence. In paragraph D, the evidence must bear sufficient indicia of reliability, and in E we say that the class member should have the right to request attendance of witnesses whose statements are proffered against him or her and that failure of the witness to attend the hearing would diminish the weight of his or her written statement. So it's not really admissibility that we were seeking in this proposed language, but we do think it's important that there be some clarity about what level of reliability and, you know, to give a real -- a meaningful hearing to children who are being held based on hearsay -- you know, three levels of hearsay statements, there has to be some -- there has to be some clarity about the reliability of the evidence. We ask that the Court include that in the order.

THE COURT: Okay.

MS. MASS: And I will -- that's all I have for now. As I said, Mr. Cooper is available to answer questions about the class certification motion if necessary.

THE COURT: Okay. Let's see if those come up maybe after Ms. Fabian takes her turn.

MS. FABIAN: Your Honor, I have some response to this, but I'll go ahead with -- with my points, and hopefully I can respond to this if I -- in the course of doing that.

The four points that I want to raise in case your Honor

has one you want to hear about more than others. First, the Government disputes the application of pendent venue in this case. We'd like the opportunity to brief that issue, but I'm prepared to argue it today as well.

THE COURT: Okay.

MS. FABIAN: Second -- and I say this, and you've already acknowledged we dispute certainly the certification of class, but for the purposes of today, at a minimum we believe that the class definition that you had articulated on the phone we had some concerns with it and whether it's appropriate in the context of A.H., the named -- the named Plaintiff.

THE COURT: Okay.

MS. FABIAN: Third -- and this may just be a matter of clarification, and, if not, then I'll argue, is whether the Government is required to show or in what manner the Court intends to require the Government to show probable cause of changed circumstances prior to arrest. As you're aware, DHS has authority that's been upheld by the Supreme Court with regard to making administrative arrests with regard -- using an administrative warrant to arrest on the basis of removability. If -- if there is a requirement of a showing of probable cause prior to arrest, it -- that's not required by the law, and so it's --

THE COURT: No, my -- my -- and I -- I'm sure I

didn't articulate it clearly enough when I was articulating my tentative ruling on the phone the other day, but my -- my -- what I was attempting to articulate is that just as in the context of an alien who has been released on bond and then is later arrested by DHS based on changed circumstances, as I understand it, DHS makes that arrest. They don't have to go through any special process of making a showing of changed circumstances to get some special warrant or something like that before they make the arrest. They can still use the removability warrant to arrest the person. It's just that they can only do it based on changed circumstances, and then -- and they -- they have to show that if they're challenged on it. So that was what I was envisioning here as well.

MS. FABIAN: Okay. And so that -- that may cut down my talking time today because in that case, then I would respond to some of the issues of what is required for probable cause as far as the hearing procedures.

And then, finally, the Government takes issue with the Court's statement with regard to requiring the hearing before the minors are transferred across the country. That requirement in our mind takes -- is far -- it's -- it really reads into the liberty interest, and interest that has not previously been found in at least my research over the last couple of days, and it -- it creates a situation where in

order to hold these hearings, a couple of dangers arise in that there may be a need to hold minors in facilities that are adult facilities or facilities that are -- where a minor may be considered a danger. So putting them into a facility that is less restrictive might create danger to other UAC's in HHS custody. So in either case, there may be not only issues of danger to other minors but also potential violations of the Flores Settlement Agreement.

Pendent venue is a judge-made doctrine that allows closely related cases to be -- to be joined. There is no law that applies pendent venue to attach in -- in my research in any way -- I can't prove the negative, but I was able to find no law that would attach a -- a 1391(e) case or claims to the venue -- the venued habeas claims. There's also no law that finds pendent venue in the Ninth Circuit anyway, and I didn't find any anywhere else either that applies pendent venue in the context of a 1391(e) venue claim, and I would point the Court to ACLU v. Browell where -- where that was noted.

THE COURT: Yes.

MS. FABIAN: I'll take that you're familiar with the case, so I --

THE COURT: Yeah, yeah, I --

MS. FABIAN: -- don't have to expand on that.

THE COURT: I saw that. And Judge Beeler said

that there may be reason to doubt whether the doctrine of pendent venue applies here, but that's not the reason she gave for refusing to allow the complaint to be amended.

MS. FABIAN: No, your Honor. That was one of the reasons, but there were -- there were others and certainly more -- more disparity between the claims in that case than here. I acknowledge that.

THE COURT: Yeah.

MS. FABIAN: The basis, though, if we look at habeas and, you know, whether -- whether habeas is even really true venue is a question left open by the Supreme Court in Padilla. The four dissenting justices would have wanted a more traditional venue analysis, but the majority opinion was divided, and the concurring opinion by Justice Kennedy talked about really that the Court was not deciding whether habeas jurisdiction and the proper respondent was a true venue rule, but the result of Padilla was that you have jurisdiction over habeas based on the location of the proper respondent and then whether there is jurisdiction over that individual.

Once the Court -- and, as you know, we dispute Alicia Smith as the proper respondent, but we accept that for purposes of today. The result, though, is the dismissal of the remaining -- of the remaining respondents. So the only proper -- there's one proper respondent to a habeas case.

If the Court finds that's Ms. Smith, then the remaining respondents should be dismissed and --

THE COURT: If it were -- or to put it another way, if it were only a habeas case, the other respondents should be dismissed and because -- if it were -- and pendent venue does not allow them to bring those under other Defendants into the case.

MS. FABIAN: That would be our position, your Honor. At least -- I mean, again, it's a judge-made doctrine, but if the Court is going to make a doctrine here, there's good reason not to do it in that context not to add back into the case defendants who would be dismissed from the only properly venued claim.

THE COURT: Well, but -- so I -- I get what you're saying, and I think it's a difficult question, but where then should -- I mean, if A.H. wants to file claims for declaratory or injunctive relief, where should he be filing them?

MS. FABIAN: I think, as the Court recognized in our call on Tuesday, that Washington D.C. or -- and I believe it's the Eastern District of New York that covers Long Island would be the locations with connections to the -- the arrest and decisions that were made in this case.

THE COURT: So if he wants to bring -- if he wants to seek habeas relief and he wants to seek declaratory and

injunctive relief, he should -- so, for example, let's say he wants to seek habeas relief, which the habeas relief is being released from custody, right, and let's say he also wants to pursue a claim for false arrest, right, and he wants a judicial ruling that he was subject to unlawful arrest. Maybe he wants to seek damages against the officers who arrested him or whatever. He has to bring the habeas lawsuit in San Francisco, and he has to bring the other lawsuit in either the Eastern District of New York or the -- or in the District of Columbia?

MS. FABIAN: I would agree with that, your Honor, and I would also --

THE COURT: But isn't that -- I mean, that's -- that -- I mean, I understand the -- you know, the kind of technical argument for why one might think that, but it seems rather silly, doesn't it? I mean, if you're -- these -- the two things are so intertwined, and, you know, I think the doctrine -- to the extent that you -- unless you're disputing the existence of the concept of pendent venue, maybe -- perhaps you'll say that that's just -- that I should disagree with the Courts who have said that there's any such thing as pendent venue, but if you accept that there can be pendent venue in certain cases, even in exceptional cases, even if it's only for exceptional cases, why isn't this scenario the kind of exceptional case where

pendent venue would be appropriate?

MS. FABIAN: Two reasons, your Honor. First, I would say that the habeas claims in this case, our position would be that habeas looks at current confinement and whether it is lawful, it violates the law. So the only claims if -- if pendent venue or if -- if any claims are looking at whether they're related to the question of habeas, that is the -- and Santos and -- and I call it DBA, but I think it's Beltran and -- those cases both were habeas looking at whether there was due process with regard to the release of the minors. And so to the extent that the challenge would be to the release process of HHS, it's possible that there could be pendent venue for those claims, but those are -- that's the only related claims to the question in the habeas case. I would also say that in this case it's -- the factors for -- for pendent venue, and --

THE COURT: Who would be the right -- who would be the right Defendant for the pendent claim relating to the release procedures?

MS. FABIAN: Probably the Secretary of Health and Human Services. I mean, the same issue would arise in my mind as far as the Defendant being dismissed, and if -- if Alicia Smith is the only Defendant in the case, I still think the problem exists of joining Defendants back who are the ones who provide the pendent venue or the 13 -- would be

the ones who provide the 1391(e) venue.

THE COURT: So on that issue, I mean, maybe contrary to Judge Beeler's question that she raised in her opinion, I mean, this makes me think that when you're talking about the Federal Government being a defendant, pendent venue makes more sense. Like, you know, when you're -- if you were talking about two separate unrelated Defendants and one -- you know, for one claim against one Defendant venue is proper and you try to drag some unrelated Defendant in on the doctrine of pendent venue, that seems kind of problematic. It also seems problematic, by the way, to drag other Plaintiffs in under the doctrine of pendent venue, but when you're talking about the Federal Government and you're talking about one agency and you're talking about the same lawyers representing the Federal Government and all of that, it seems to make -- it seems to be less problematic to apply the doctrine of pendent venue to the Federal Government.

MS. FABIAN: I don't know if I agree with that as a whole position. I can see it with regard to the limited notion of another individual at the agency. Again, and we're sort of talking without any guidance from case law here, and so, you know, I think -- off the cuff I can say I think, as I've posited having the Secretary of Homeland Security with regard to the limited same claims of the

release process, it has -- it has some logical -- it might be logical, but -- and I want to make my second point, though, which I think is very important in this case. Well, I'll say that that at a minimum would preclude pendent venue over -- or the ICE claims over the arrest claims because -- and over -- Flores claims over -- over the claims for whom those are not -- there's no related proper Defendants and no -- really those claims also don't involve the same body of law and the same -- same body of facts.

I would also urge the Court to consider in this context that we are talking about -- and I think the Court's conversation with Ms. Mass highlights this a little. We are talking about class claims and declaratory and injunctive relief that -- that are being proposed nationwide. One of the four main issues in --

THE COURT: Well, I mean, I sort of didn't realize this when I was giving you my tentative on the phone the other day, but it is I that proposed nationwide relief. The Plaintiffs didn't propose nationwide relief papers.

MS. FABIAN: Understood, your Honor. And -- and I mean that's why I'm here --

THE COURT: That gives -- that gives me pause. You know, that gives me pause whether it should be nationwide relief. But, anyway, go ahead.

MS. FABIAN: Well, and what I would say is that

the relief being proposed with -- I mean, the only facts we have concern arrests that are occurring across the country in Long Island. I mean, we heard from our witness with a very strong New York accent these are the folks who are -- who are doing the --

THE COURT: Is that why you brought him in, because of his strong --

MS. FABIAN: Absolutely, your Honor, just to --

THE COURT: -- New York accent?

MS. FABIAN: -- to highlight the New York nature.

THE COURT: It was -- it was effective actually.

MS. FABIAN: That the -- fairness to the litigants is one of the issues in pendent venue, and I think -- I would say that it is very opposite of fair to the -- to make these decisions on a nationwide basis that at this point the facts suggest would affect only actions occurring in New York by applying -- on claims that are available only through pendent venue that aren't -- aren't even part of the habeas case and couldn't be decided in the habeas case in our opinion. And so that -- that is, at a minimum, a reason for -- not to find pendent venue over claims against ICE and claims related to the arrest issues.

And so, for those reasons, the Government objects to the -- objects to the Court's proposal to find pendent venue.

THE COURT: Okay.

MS. FABIAN: Turning to the class certification, as I mentioned, of course, we oppose that generally, but if -- I wanted to point at a minimum to a couple of points.

First, the Court proposed the language "all UACs placed with a sponsor." I think our -- if we look at age, we look at the conversation that we've had, I think Ms. Mass mentioned it earlier -- we're talking about a family -- a liberty interest related to family reunification that's pled in our papers. And so, rather than a sponsor, I would suggest that the class needs to be limited to release to a parent.

THE COURT: Parent or legal guardian.

MS. FABIAN: A parent or legal guardian, which -- which is the only thing encompassed -- is the only -- is the situation of A.H. and the only thing encompassed by the liberty interest that has at least been pled with regard to family reunification.

THE COURT: At risk of bleeding into a discussion about the travel ban cases, I mean, what about a grandfather or uncle or whatever? I mean --

MS. FABIAN: I would state the difference --

THE COURT: -- isn't there still a family reunification interest there?

MS. FABIAN: I would state the difference as -- as

the -- relating to the issue of -- of who is an unaccompanied child. The release to a parent or legal guardian is -- a parent or legal guardian is the individual who would -- who begs the question of whether the child can be accompanied. Another family member would not suffice for that. I would also talk --

THE COURT: Right, but you can be placed with a sponsor who's not a parent or legal guardian, right?

MS. FABIAN: You can, your Honor, but that's not what A.H. experienced. So if we're -- if we're talking about we have a singular named Plaintiff, A.H. was placed with a parent, and that has been sort of the issue that we have argued in this case. I --

THE COURT: How often are people placed with sponsors who are not relatives?

MS. FABIAN: I think it's fairly common. I don't have the numbers, but I think that's fairly common.

THE COURT: Okay.

MS. FABIAN: The ORR -- and in Flores and also the ORR policy has a -- a list of priorities with reunification, and a parent is always the first priority but that if the parent is not suitable or otherwise not available, they will go down the list and then release to others. So the parent is the primary release under all applicable policy.

THE COURT: Okay.

MS. FABIAN: The second point on the class certification definition is that your Honor said who have been or are about to be arrested by DHS. We heard testimony from Commander White who talked about the numerous ways that a minor can be rearrested or arrested after they've been previously released to a sponsor. In this case -- and what we've talked about from the beginning is this rearrest based on -- and I would use Mr. Kushoda's testimony where he said a finding of gang membership under the HSI gang criteria, but to limit --

THE COURT: Or based on dangerous maybe.

MS. FABIAN: I would -- I think in this case the issue has been a finding of gang membership and whether the finding of gang membership is sufficient to establish dangerousness. I think -- so if the issue here is whether -- whether certain evidence is sufficient to establish gang membership and whether that establishes dangerousness, I think this case really has been limited to individuals being arrested based on a belief that they are a gang member, and Mr. Kushoda really clarified that that is under HSI gang criteria.

THE COURT: Okay.

MS. FABIAN: So we would -- we would urge the Court to apply that limitation.

On the issue of probable cause of changed circumstances

on -- I understand now that the Court wouldn't require any sort of separate warrant which -- which is some comfort. I guess what I would then turn to is the -- is the bigger question of then it sounds like the issue is then what -- what the procedures would be, and -- and I'm seeing this for the first time. So I'm -- I would -- would ask for -- if the Court is considering these as a -- a true roadmap for the procedures, I would ask for the opportunity to -- to take a longer look and to brief this more fully, but --

THE COURT: At least on the probable cause question it's basically the stuff -- largely the stuff they've argued already.

MS. FABIAN: Well, and what I'd say is -- and I -- I -- you know, this is -- I'm going to try not to wade too far into territory we've already argued, but I would just say that the Court has expressed some interest in -- in having the changed circumstances analysis that is already available to others with regard to 1226(b) arrests and that sort of thing.

What I'd say is that that's not -- a showing of probable cause of changed circumstance is not -- is not the procedures available. It is -- there needs to be a showing of changed circumstances that support a finding of dangerousness. The analysis isn't -- isn't probable cause. It's -- it's a showing by a preponderance. So the --

THE COURT: In other words a showing that the Federal Government has to make by a preponderance that circumstances have changed?

MS. FABIAN: That circumstances have changed, and that the evidence now supports a finding of danger or different conditions of release. So, you know, that is done in --

THE COURT: And that -- is that reflected, by the way, in your policy -- your policy documents? You know, you talked about -- last time you were here you talked about the IA authority saying there has to be changed circumstances and that DHS policy sort of implements that rule. Is that -- and is this a requirement that the Government has to show by a preponderance of the evidence in these hearings that -- that changed circumstances exist? Is that laid out in your policy documents?

MS. FABIAN: The only governing document would be the matter of Suguay (phonetic) that the Government cited in the supplement after responding to your Honor's question. The -- the policy -- and I am not aware -- I've tried to follow up. I haven't -- when I say policy, it's -- it's more of that -- it's --

THE COURT: Practice.

MS. FABIAN: -- a matter of policy practice than -- than -- I was not pointed to a specific policy.

THE COURT: But -- okay. So why don't you talk to me a little bit about what the practice is.

MS. FABIAN: And the --

THE COURT: So the practice is that DHS makes a decision that changed circumstances exist, right? And then based on the decision that DHS makes that changed circumstances exist, it arrests the person. Am I right so far?

MS. FABIAN: Yes.

THE COURT: Okay. And then the person can challenge the notion that there are changed circumstances, and that happens in a hearing before an immigration judge?

MS. FABIAN: What I would say is DHS will -- will pick the person up. If we're talking about a changed circumstances case --

THE COURT: Yeah.

MS. FABIAN: -- that person was previously released on a bond. Let's say the --

THE COURT: Yeah.

MS. FABIAN: -- IJ had released them on a bond of $30,000.

THE COURT: Yeah.

MS. FABIAN: When ICE picks them up again, ICE will revoke that bond and will then set a new -- new conditions of custody or a new -- it's a custody

determination. So they may --

THE COURT: Who -- when you say ICE revokes the bond, who?

MS. FABIAN: That would be the ICE officer. So in the first -- a bond -- bond hearing is really -- it would be more properly called a bond redetermination hearing. So it's the I286 I believe is the form. The ICE -- so when ICE takes someone into custody, they will make a custody determination, and that is -- it may be no bond. It may be rather than $30,000, $50,000 bond. That person then has the opportunity to either accept ICE's determination or to check the box that says I want this redetermined by an immigration judge.

THE COURT: Okay.

MS. FABIAN: And at that time, they're provided with the bond hearing within -- I'm told it's -- I think you had asked the question. It's one to two weeks. I had heard at some point an average of 10 days, which --

THE COURT: You're talking about somebody who ICE first picks up, not somebody who ICE determines should be picked up after they were released on bond?

MS. FABIAN: No. This is for -- in any -- in any case.

THE COURT: In any case.

MS. FABIAN: So --

THE COURT: Okay.

MS. FABIAN: So the -- then before the immigration judge, essentially DHS will have to show that the circumstances have changed so that revocation of the $30,000 bond, that they appropriately revoked the prior bond determination and there are changed circumstances such that ICE's new custody determination say no release is now appropriate, and that is --

THE COURT: So ICE needs to show -- the ICE officers need to show by a preponderance in this hearing before the IJ that there are, in fact, changed circumstances to justify the bond revocation?

MS. FABIAN: In a bond hearing actually the burden is on the -- is on the alien to show that he or she is -- is not a danger. So I --

THE COURT: What about in the -- what about in the changed circumstances context?

MS. FABIAN: I think it's the same, and I --

THE COURT: So ICE can arrest somebody and then the -- the alien has to prove that there are no changed circumstance?

MS. FABIAN: Yes, but ICE needs to make a showing that there are changed circumstances.

THE COURT: Well, so ICE needs to make a showing that there are changed circumstances, and then the judge

decides by a preponderance of the evidence whether that's true?

MS. FABIAN: The judge will decide if the alien has met their burden to show that they're not in danger. But if -- if ICE came in and presented the same evidence that -- you know, that had previously been the subject of a previous bond determination, the immigration judge would simply reinstate the prior bond determination.

So the question is whether ICE shows sufficient evidence for having revoked that prior determination. If that's the case, then immigration -- then the burden will be on the alien to then show that he or she is not a flight risk or danger.

THE COURT: And what's ICE's burden to show the changed circumstances at the outset, preponderance?

MS. FABIAN: I -- I don't want to -- I'm not 100 percent sure. I would need to check and submit on that.

THE COURT: Okay.

MS. FABIAN: I would defer if folks have more experience in Immigration Court than I, but off the top of my head I don't have that answer. So I believe it's -- it's just a showing, but I don't -- I can't be sure as to the standard.

THE COURT: Okay.

MS. FABIAN: So all of which goes to show that to

the extent that the Court is considering procedures that are -- that are akin to the procedures that are already in place, the -- this preponderance -- or the probable cause of changed circumstances and the many proposed procedures here by the Plaintiffs are sort of well beyond anything that currently exists in --

THE COURT: It doesn't sound that different. I mean, in the -- in the context -- in the changed circumstances context that exists now for aliens who are not classified as unaccompanied minors, without getting into the like gobbledygook of the different standards and burden of proof and whatnot, ICE officers need to make a determination that there are changed circumstances before arresting somebody and revoking their bond, and then an immigration judge has to be satisfied that there are, in fact, changed circumstances, right?

MS. FABIAN: Yes.

THE COURT: And that happens within a week or two you said?

MS. FABIAN: Yes, and then a new bond --

THE COURT: Right.

MS. FABIAN: -- determination is made. And I would say that there is -- is --

THE COURT: Why on -- why on earth, if that happens to somebody who's been released on bond, why on

earth shouldn't somebody who is an unaccompanied minor, who the Government has previously -- for whom the Government has previously conducted an assessment and the Government has decided to place that person with a parent, decided that person does not need to remain in custody, why on earth shouldn't the Government be required to make at least -- to clear at least the same hurdles for that unaccompanied minor?

MS. FABIAN: Your Honor --

THE COURT: What possible reason would there be for the unaccompanied minor to have less protection than the adult alien who ICE believes has become dangerous after it was previously determined that they were not?

MS. FABIAN: I think the first answer I'd give is to the extent that the -- that upon arrest that these minors are being designated as unaccompanied alien children and transferred to the custody of HHS, it's -- and -- it's the Government's position that that does provide greater protections. That's the purpose of the statute was to provide a different --

THE COURT: It doesn't provide greater protections if they're not getting a hearing on -- akin to the one that you just described for people who are released on bond.

MS. FABIAN: I think when I say protections, I'm speaking a little more broadly in that the TVPRA's was

designed to provide a different custody situation for unaccompanied alien children. You know, courts -- the Beltran court or the Santos court have -- have looked at the due process regarding --

THE COURT: Yeah, but if they don't get a hearing, how could they -- how could -- I mean, if you're talking about protection from deprivation of liberty, how could it -- how could it be that they get greater protection --

MS. FABIAN: Well --

THE COURT: -- by virtue of being unaccompanied minors when they get a hearing in front of an immigration judge within seven days in the other context but not in this context?

MS. FABIAN: And I think following the decision in the Flores case in -- minors in HHS custody are now also entitled to that hearing. It's a work in progress because it was a new requirement. So -- but at least two of the initial named Plaintiffs in this case, including A.H., hadn't requested that hearing. Now, that is -- in all respects, it is -- proceeds under the same regulations and the same case law that would be available in the other context. So, in fact, that is available. What it doesn't decide -- and I know this is the issue that's been raised is -- is it has to be squared with the TVPRA's suitability requirement or requirement that HHS determine suitability.

So in that context, it can't be a decision on complete release because HHS is still -- and the Ninth Circuit recognized this in the Flores decision -- HHS is still required to do their statutory mandate of a suitability analysis.

THE COURT: But your witness came up here and took the stand and said it's not appropriate for us to be going back and doing -- you know, circling back and doing suitability assessments. That's for CPS to do, right?

MS. FABIAN: I think -- I think what he would say is that it -- it -- once a minor comes into their custody, there's really no -- statutorily, there's just no way for them not to do the suitability analysis.

THE COURT: But the question is whether the minor should come back into their custody, whether it was appropriate for the DHS agents to arrest this person in the first place and whether it is appropriate to place them back in custody, and that I think is what -- that's my big concern is that you put them in -- you know, you put -- you're putting these people back into the vortex of the -- the ORR process before deciding if it's appropriate to do so and then initiating this reexamination of the parent and putting -- you know, sending somebody off into a secure placement facility before making a determination that it's appropriate to do so. And that's why it seems to me that

when the Federal Government has already made a decision that these people -- that it is appropriate and, in fact, in their interest and in everybody's interest to release this person to the -- to their parent, if the Government is going to change its mind, it has to justify that change of mind, and it has to justify that change of mind before sending them back into this vortex that -- that the minors in this case were sent into.

MS. FABIAN: Well, and what I'd say is I think that -- and that may -- this may bleed into my -- my fourth topic as well --

THE COURT: Right.

MS. FABIAN: -- is that it sounds like, leaving my disputes out there in our briefing, but, you know, if the Court is anticipating a hearing that sort of precedes any transfer to HHS custody, I think just as a --

THE COURT: I don't know if that necessarily is the case, but -- but go on.

MS. FABIAN: Well, and so what I'd say is that if it does not, I think that it would need to be clear that --

THE COURT: I don't want to be -- one concern I have is about micro managing the process. I mean, there are certain decisions that the federal officials are better equipped to make than I am, right, and -- and one of them might be whether this, you know, unaccompanied minor who has

been arrested by DHS agents should have their hearing after being transferred to HHS custody or before, and I -- I don't know if I want -- I'm not sure I should be dictating that one way or another. But, I'm sorry, I --

MS. FABIAN: Well, and I think what I'd say is I think that if -- it would really depend. I would need to see the language of the Court's ruling to determine if -- if -- HHS would need to have a way around its TVPRA mandate to determine suitability. If a minor comes into HHS custody and this hearing occurred, there is a question that we would need to figure out of how -- how that would interplay with the TVPRA's mandate of suitability and whether there could be a hearing that would somehow supersede that -- that mandate, and if the Court -- if that is exactly what the Court anticipates, we would probably need direct language to that effect. In the absence of that, I think it would just be a matter of determining whether any ruling could -- how that would interplay with the TVPRA.

But part of the issue -- I mean, the other option, of course, is always that for -- for minors to -- can be determined to be accompanied minors, they might also be -- they would be detained by ICE.

THE COURT: What would happen then? You made reference to sort of concerns about the facilities in which the minors would be detained pending their hearing if ICE is

detaining them, and that was one of the questions I had was there is such a thing as accompanied minors, right? And so what happens when ICE is detaining an accompanied minor? Where -- where does that put --

MS. FABIAN: Well, and that's -- that leads me I guess to my -- my fourth point which I'll say is that -- and I'll answer your question first. ICE does have juvenile -- facilities where it can hold juveniles. They are in Pennsylvania, Washington, Illinois and Oregon.

THE COURT: Say it one more time.

MS. FABIAN: Sorry. Pennsylvania, Washington State, Illinois, and Oregon. Similarly, there's -- as you've heard in this case, there are two secure facilities that HHS has which are in Shenandoah, Virginia and in Yolo, the Yolo facility.

THE COURT: So those four facilities in Pennsylvania, Washington, Illinois, and Oregon, those are the only facilities where ICE holds juvenile aliens?

MS. FABIAN: Well, also I would say the family detention facilities, but I don't think those are -- they're not applicable here.

THE COURT: Why not?

MS. FABIAN: Because those are for minors being held along with a parent. So the parent would be arrested with the minor.

THE COURT: I see.

MS. FABIAN: But so the -- ICE is generally not in the business since the TVPRA or since the Homeland Security Act in 2002 of holding unaccompanied minors. And so they have limited facilities for that.

THE COURT: Okay. Where were the minors in this case held by ICE before being turned over to ORR?

MS. FABIAN: Well, they're -- so for a brief period of time they're permitted -- the Flores agreement and then the TVPRA requires minors within 72 hours to be transferred to licensed facilities. So the facilities that -- these facilities that I'm referencing are -- and --

THE COURT: Right. But where was -- so the minors were arrested by ICE agents in New York. Where were they held before they reached ORR custody?

MS. FABIAN: So they'll be held at the -- at the ICE short of short-term facilities. As I understand it from the agents, you know, they do have -- it's sort of holding cells. When they have minors, they do try to, you know, make that a little better, but it's not -- it's not a facility designed for long-term detention, and it's not a facility designed for minors. So there -- there's no -- there's no availability -- it's not an ideal situation for prolonging custody in those -- in those locations. And under the Flores agreement, we would -- and the TVPRA,

although your Honor referenced maybe exceptional circumstances would apply here, but I -- in my opinion, longer -- longer holding in non-licensed facilities isn't the preferable route for the safety of the minors, and asking ICE to hold -- to -- the -- asking ICE to hold a minor in a given location, the way that they would have to do it would be to put them into an adult facility that ICE has -- either runs or is contracted with, and that would violate the Flores settlement agreement and likely not be in the best interest of the minor.

So I would add that -- and I think I briefly mentioned this, but to -- there are two -- it is -- it has been found that courts do not have jurisdiction to dictate the -- or to preclude the transfer of individuals in ICE custody. That is -- that is a discretionary determination by ICE. I can give your Honor some Ninth Circuit cites on that.

THE COURT: Please.

MS. FABIAN: It's -- I'm sorry. I can't read my own handwriting. The cite is 345 F.3d 683. I think it's Spencer Enters, Inc. v. United States. That's the Ninth -- a Ninth Circuit case. Rios Barios v. INS, 776 F.2d, 859. It's also a Ninth Circuit case. And then I have a Northern District of California case, 682 F.Supp. 1055, and that's a Northern District of California case, 1988.

THE COURT: Okay.

MS. FABIAN: The -- so -- and I would add that I think -- again, I don't -- didn't find case law really looking at location of detention being part of -- of the liberty interest. To the extent there may be an interest in being free from custody, to expand that to be an interest to be free from custody in a certain location goes beyond -- to the extent that there is applicable case law, which we -- we dispute somewhat, but it goes beyond what I understand --

THE COURT: Another way to put it is if I were to say that there must be a hearing within seven days, it's none of my business whether if -- if -- it's none of my business whether the person is held in the town where they were arrested for seven days as opposed to sent to Pennsylvania for a few days and then returned to the place of their hearing. Is that a way to -- is that basically --

MS. FABIAN: I would say the likely scenario would be that the hearing would be held wherever they were located. So I would say it would be unlikely that they would be transferred and then returned for the hearing. The hearing would be held in the Immigration Court where they were transferred to.

THE COURT: So they would be transferred to -- so arrested in New York, transferred to, say, Pennsylvania to the juvenile facility, and then given a hearing at the juvenile facility so the parent has to come down to

Pennsylvania within a week and the -- and if there are any officers testifying, say local law enforcement officers or ICE agents who are located in New York who are involved in the decision to arrest a person, they have to go down to Pennsylvania?

MS. FABIAN: I say that -- what I'm -- what I'm anticipating is a bond hearing in that -- so, yes, if -- if we're talking about a traditional bond hearing. To the extent that the Court's ruling requires something vastly different from a traditional bond hearing, I have a harder time saying whether that would occur at only a certain location or how that would be --

THE COURT: Well, why can't -- so if it's -- if it's something -- and, again, my instinct is not to micro manage on the hearing but, you know, to -- just to say that there needs to be a hearing before a neutral, you know, sort of in a proceeding analogous to the one that you've described for me for aliens who are under changed circumstances. But why couldn't the -- why couldn't that hearing just take place in the town -- in the town where the person was arrested?

MS. FABIAN: Well, at a minimum it would have to take place --

THE COURT: Or in the jurisdiction --

MS. FABIAN: -- in a location where --

THE COURT: Right.

MS. FABIAN: -- an immigration judge was located.

THE COURT: Yeah.

MS. FABIAN: I think the -- one of the reasons for -- for minors -- well, for anyone really -- I mean, part of the issue is having -- generally the immigration judge has jurisdiction over the cases, the immigration judge where the person is being held. So that is where the case -- I mean, if the person was arrested in New York and transferred to Pennsylvania, their immigration case would be transferred to Pennsylvania. I mean, whether it would be possible to do it differently, I would certainly have to talk to my clients.

THE COURT: When -- do you know how long these minors -- these three were held at the short-term detention facility before being transferred to ORR?

MS. FABIAN: I -- I don't. I believe it's usually -- I mean, it's required to happen in 72 hours when there's a minor ORR -- certainly as soon as ORR has a placement, the minor will be -- will be transferred to ERO and ERO will then --

THE COURT: ERO?

MS. FABIAN: Enforcement and Removal Operations. That's the other -- that's the branch of ICE that does transport. So HSI, Homeland Security Investigations, is the branch that did the arrest in this case. ERO is the branch

that does the transfers of -- of minors to HSS -- I don't know how many H's I said there -- HHS custody. And so when, you know, we heard that A.H. flew across the country or I believe his -- his declaration said he went from one ICE facility to another ICE facility and then flew across the country, that's consistent with being arrested by HSI, transferred to ERO and then flown by ERO to California and transferred to the custody of HHS.

MS. MASS: The minors' declarations speak to their experience. They were held overnight in a -- in a holding cell or I think one of them slept on like the office floor of the ICE office. So it -- and then they are taken by ICE -- they were taken by ICE to the facility, either Yolo, Yolo County or -- or in the case of -- I think it was Shenandoah.

THE COURT: What do you -- you may not be done, and that's fine, but since you've jumped in, what's your view on this issue?

MS. MASS: This is complicated, your Honor, because as Commander White testified, ORR is not really set up to be a child welfare agency. I think that's the main problem here. He also --

THE COURT: ORR is not set up to be a what?

MS. MASS: Really a child welfare agency to take care of children the way, you know, sort of local -- state and local child welfare agencies do, and he also did testify

that one of the options they use is to refer children or families to the local CPS where there's a problem with the fitness of a custodian, which, you know, we're just talking about a preliminary injunction. Maybe there's -- maybe there's more work to be done down the road, but for purposes of what we're talking about today, I think there are a couple of options. One is a quicker hearing so they shouldn't have to be sending people out of state to be in ORR custody. We do -- I think we share the concern about having minors held in ICE custody in like an adult facility. That seems concerning, but I do think that the possibility of working with the state child welfare agency seems like -- I don't understand. I mean, ICE is arresting -- ICE has arrested somebody. Okay. Let's write the -- let's write the injunction, okay. ICE has arrested somebody. What happens next? What is ICE ordered to do next? Within X hours?

MS. MASS: Yeah.

THE COURT: Okay. How many hours?

MS. MASS: I mean, within 72 hours, the statute requires that they be transferred to ORR custody. I don't think we want to pull back from that because ORR custody is preferable to adult ICE custody --

THE COURT: Okay.

MS. MASS: -- or to being in a holding cell for a

week. I actually think that of the options that you've been discussing, the best one is the one you mentioned, that the child is -- goes to Pennsylvania or Oregon or to one of the other ORR facilities. And there are --

THE COURT: ORR facilities?

MS. MASS: Yeah, ORR --

THE COURT: She was talking about ICE facilities for juveniles.

MS. FABIAN: Those are the four juvenile ICE facilities.

MS. MASS: ICE facilities, no --

MS. FABIAN: The two HHS facilities would be Yolo and Shenandoah.

THE COURT: Right. Well, those are the two secure facilities.

MS. FABIAN: The two secure facilities.

MS. MASS: Yeah. I mean, I think there are ORR facilities all over the country. So that's the other option.

THE COURT: Yeah, but if -- but if ICE -- if somebody commits a murder, ICE doesn't have to put them in a --

MS. MASS: Absolutely. I don't think we're talking about a situation --

THE COURT: Okay. So what --

MS. MASS: For the most part that we know of, we're not talking about a murder situation, and presumably those children would be in --

THE COURT: Jail.

MS. MASS: -- jail, right. So one would think that the Government could do a lot to figure out what they're doing with these kids before they're released.

THE COURT: They can arrest -- in fact, ICE has the --

MS. FABIAN: We do have --

THE COURT: -- authority under the statute to arrest them for a felony.

MS. FABIAN: We do have at least one case that I'm aware of, though, where a minor was arrested on suspected gang membership and was in ORR custody and was later transferred to the federal marshal's custody for a homicide trial. I'm not -- you know, I just say that -- that there are cases where there --

THE COURT: Sure.

MS. FABIAN: -- these minors -- and where there wasn't necessarily evidence --

THE COURT: Off the bat.

MS. FABIAN: -- of the murder that was provided to ORR. So --

THE COURT: Uh-huh. So the -- so the question is

what do you think. I mean, you want a prompt hearing. I think there should be a prompt hearing. What -- what should -- what should happen to the child?

MS. MASS: I think the thing that makes the most sense is the child is placed in the nearest available appropriate level of security facility, whether ICE or ORR, and brought back for the hearing, and there's facilitation of communication with the child so that the child can get counsel or whatever, but the -- it's very -- it would be incredibly burdensome, and while there is -- there is discretion to transfer, it's also the case that transferring -- and I think Rio Barios, which is one of the cases that Ms. Fabian mentioned, is also the case that where a -- where a transfer of detention facility results in like an unfair hearing. That's a reason to invalidate a removal order in certain cases. So it's not sort of this unfettered discretion.

So what I would say is that transferring the child for a brief -- for a week to the closest available appropriate security level facility while keeping -- you know, really facilitating contact with counsel, et cetera, and then bringing the child back to the Immigration Court where there is probably ongoing jurisdiction because there are -- they're in removal proceedings already, all three of our named children were, and I think anybody who's --

THE COURT: In the ORR?

MS. MASS: Uh-huh. So bringing them back to have the -- I mean, their case is already in front of an Immigration Court -- bring them back to that court, which is often a court that's already set up to be dealing with juvenile cases makes sense, and --

THE COURT: But is it always -- is it always the case that the unaccompanied minor who's then arrested will have removal proceedings pending?

MS. MASS: I think it's almost --

MS. FABIAN: I think that's -- if we're saying that the arrest is based on removability, then they would be NTA --

MS. MASS: Yes.

MS. FABIAN: -- in conjunction with the arrest if they hadn't already -- most of them will already be in removal proceedings. If they aren't, they would be NTA'd -- had a notice to appear, which is the initiation of removal proceedings in conjunction with --

THE COURT: And where does -- what's the default about where the removal proceedings take place?

MS. FABIAN: Well --

THE COURT: If they aren't already underway?

MS. FABIAN: That depends on some factors. It -- generally it would be -- the NTA will be filed in the

location where the detention is going to occur. So if -- if they're held in Pennsylvania, then that would be filed in Pennsylvania. But I think what we're talking about here, since we're -- in A.H.'s case and the other dismissed named Defendants, it was all cases where they had ongoing removal proceedings.

MS. MASS: And they do need -- I mean, it's really critical that they be in a place where the child is -- resides so that a sponsor -- these are not people with a lot of means, and I'm sure the Government is not going to pay for the sponsor to travel or for the counsel to travel or anything else. I mean, I think in order for it to be meaningful -- a meaningful procedural protection, it has to be manageable for the parties to be there.

THE COURT: Well, I mean, I think the answer to that is that I -- you know, if I were to rule that it has to take place within 72 hours or a week or two weeks or whatever, then that's -- you know, I think Ms. Fabian is probably right, that it is beyond the scope of this endeavor for me to micro manage what -- what the -- what the -- what ICE does with the minor between the time of the arrest and the time of the hearing. I mean, I think -- I think the Federal Government is in a better position to figure that out, other than to say that I think one of the easiest questions in this case, this very difficult case with many

many questions is that this is exceptional circumstances, if there's anything that's exceptional circumstances, and I'm referring to the provision of the TVPRA.

MS. FABIAN: And I guess -- I think that may be helpful. I would hope that that wouldn't have to be used in terms of either the minor will be determined to be accompanied and then would be transferred to ICE custody and that would be -- that would be the state of affairs as it were --

THE COURT: What do you mean determined to be accompanied? I mean, you've already determined that they're unaccompanied, right?

MS. FABIAN: No. As I think our briefing -- our first supplemental brief recently explained is that, yes, for A.H. he was determined to be an unaccompanied minor. It is within the scope of the definition for a minor who has been released to be classified as an accompanied minor, who has been released to a parent and is residing with the parent. They could --

THE COURT: Did that ever happen? I thought they were always --

MS. FABIAN: I --

THE COURT: I thought your consistent practice was to -- those people are still considered unaccompanied minors even after they've been placed with a parent.

MS. FABIAN: That is the majority practice. I don't believe -- it's not -- it's not 100 percent of the time. So it is --

THE COURT: Arbitrary?

MS. FABIAN: It's not arbitrary. I think it's -- it would be based -- I think -- I would say that the majority of the time -- and I don't have an example of the time recently that it was -- that it has not been.

THE COURT: What would be a factor that goes into deciding whether somebody, after they're released to their parent, is going to be considered going forward unaccompanied versus accompanied?

MS. FABIAN: I think it would be the -- maybe the location of arrest. For example, in the Beltran case which we've talked about, the minor was -- had been released to a parent and was determined to be an unaccompanied alien child because they were found across the -- they were arrested across the country from their parent because they had run away. In that situation, they were determined to be unaccompanied, and so that was based on sort of location and the -- the child's stated relationship with the parent in that the -- I believe the child stated that they didn't want the parent to come -- to come get them when they were arrested.

Another factor has been the sort of determination that

ORR custody was more suited for -- for a child -- children. I mean, that was the purpose of the TVPRA, and that was the purpose of the transfer, that -- so I think that's been part of the determination, but -- but ICE does have facilities where it could also hold a minor and proceed in that -- in that way.

The policy that we've talked about is a policy that only applies -- it's a currently existing policy, is only a CIS policy, and that relates to -- and I may have not understood this as well in previous argument, but it is this policy by CIS related to the --

THE COURT: What's CIS?

MS. FABIAN: Citizenship and Immigration Services, which is another branch of DHS. When they -- for an unaccompanied alien child, they get -- if they file for asylum, they're allowed to proceed before CIS, and the CIS policy that we've referred to has allowed unaccompanied alien children even after being reunified with the parent to continue having their asylum application heard before CIS rather than before an immigration judge, which would be the case with an unaccompanied child or an adult.

So that policy is very limited to a very specific circumstance. It doesn't govern other than that it has been sort of one consideration in overall looking at whether a minor who's been reunified should be determined

unaccompanied or accompanied.

THE COURT: Okay. I -- what I'd like to do is take a five-minute break and then come back and see if anybody else has any sort of additional burning points that they want to make. I think maybe you said you wanted to respond to some of the stuff that Ms. Mass presented.

But, in any event, let's take a five-minute break, think about any burning points you want to make, and then we'll wrap up. Okay.

MS. FABIAN: Thank you, your Honor.

(Proceedings recessed briefly.)

THE COURT: Okay. Ms. Fabian, anything further from you?

MS. FABIAN: I just want to briefly mention to the extent the Court is considering some of these procedures proposed by Plaintiff with regard to the hearings, and I guess I'll speak generally because I don't know the extent to which the Court is considering sort of making -- making a new set of procedures or applying existing ones.

What I want to say generally is all of these issues are sort of already existing in the -- in the existing procedures, they are dealt with a certain -- a certain way, and to the extent the Court needs to tweak them or otherwise make rulings with regard to them, I want to note it -- it seems at least with regard to providing counsel, there is --

there is -- the TVPRA requires provision of access to counsel as does the Flores agreement. JEFM, the Ninth Circuit has held that there's no right to counsel for minors -- or right for the Government -- the Government to -- no need for the Government to provide counsel for minors in hearings, you know. To the extent the request is that additional facilitation of counsel is required, I think it's important that while access to counsel is already part of the existing landscape, facilitation of counsel is not. So we would -- would dispute that that's -- that that's required.

The burden issue, I would say, as I -- as I mentioned, the burden in bond hearings is on the alien to show that they are not a danger or a flight risk. I acknowledge that there has been case law in which courts have found that -- for example, it's usually in prolonged detention cases -- the Court has found that a shifted burden is required to remedy the constitutional concern of prolonged detention, but that is -- that is the only circumstances. The Court hasn't -- at least in the Ninth Circuit, to my knowledge, no court has found that the burden on the alien is per se unconstitutional other than when necessary to remedy the constitutional situation of prolonged detention. I think we may hear something from the Supreme Court on that in Jennings, and we may not, but that -- so I would say that

the burden -- that there's really no basis to find that the burden is per se unconstitutional as it currently is.

THE COURT: Right. But, again, at least in the context of somebody who's already been -- has been released on bond and is now coming back, you agree that ICE has to make some presentation about why the circumstances have changed, right?

MS. FABIAN: Yes, your Honor, under -- under existing BIA case law, that's required. But I would say, though, that the burden to show that the individual is not a danger or a flight risk remains on the alien.

THE COURT: In other words, it's -- ICE has to make some sort of showing, presuming akin to probable cause at a minimum, and then it's on the -- it's on the alien to rebut the presumption?

MS. FABIAN: I would say more that if ICE came in and sat on its hands and said "We have no new evidence. We've just decided to rearrest," that the IJ would say "Then I reinstate the prior release decision," which would have been made by --

THE COURT: What's it called, reinstatement of bond? Is that what it's called?

MS. FABIAN: Redetermination. So --

THE COURT: Redetermination.

MS. FABIAN: Only because the procedure is that

ICE determines the -- the custody. It's a custody determination and then a custody redetermination by the immigration judge.

THE COURT: Oh, I see. So everybody -- so every hearing, whether it's -- whether ICE is picking somebody up for the first time or after release on bond, every hearing is a redetermination hearing?

MS. FABIAN: Yes, because ICE will make -- at least in the -- in the right to release context, ICE makes the first determination, and an alien may be happy with that. They may -- $10,000 bond may be good enough for them to say they don't need an immigration judge to --

THE COURT: Got it. Okay.

MS. FABIAN: And then I would just say that there is existing case law that governs the type of evidence that can be considered, the -- the presentation of evidence, the -- you know, how evidence is shared with opposing counsel. The various confrontation issues, you know, to the extent we're talking that one of the issues is speed of the hearing, there -- there certainly -- to some extent, if we're depending -- if we're talking about this being -- and stated widely, that there does need to be a balancing of the speed with which the hearing needs to go forward and the amount that can be added to the Government's need to provide evidence or provide -- I think this proposes a statement of

the Government's position three days prior to the hearing. You're talking about immigration courts that are vastly overburdened as it is, and so adding a hearing and adding significant procedures to that and to the DHS counsel on a new type of hearing is a lot to ask.

THE COURT: Has -- has -- does the immigration judge usually make a decision right after the hearing, like from the bench or whatever?

MS. FABIAN: I believe so. It's not always written. It's frequently oral. It may or may not be recorded. So but I believe it's -- their docket is such that they tend to rule.

THE COURT: Okay. Okay. Yeah, I mean, I can't imagine taking those under submission. Okay. Anything else?

MS. FABIAN: No, your Honor.

MS. MASS: I will try to be brief. I do want to note that there's no requirement that the -- that the hearings be connected by an IJ. I believe there are administrative law judges in the Department of Health and Human Services as well. So if the -- it seems like if the Court doesn't want to designate who should be doing it and the Government thinks there are a lot of problems with doing it this way, it seems like there may be some options.

And I did just want to note I think what's most

important from -- in terms of these hearing issues for the Plaintiffs is to keep the hearing local, and that means, you know, as prompt a hearing as possible and to bring the child back if needed.

And I did just want to say too that it should be the case that we're focused on flight and safety risk as the Court's tentative was because if it's a matter of custodial fitness, you know, Defendants haven't explained any really at all why they couldn't engage in a -- some consideration of custodial fitness without arresting the child. So I do think it makes the most sense. And the issues of detention and placement, secure placement and all of those really are only necessary if the child is -- needs to be in the custody of Federal Government.

So then, quickly, I did want to mention on the pendent venue argument --

THE COURT: Uh-huh.

MS. MASS: We didn't brief pendent venue I don't believe, but I did -- in the last couple of days we did look at a few cases, and one that seemed particularly relevant was Martinson v. Kruck (phonetic) from this -- from the Northern District. It's 942 F.Supp.2d, 983.

MS. FABIAN: It's cited in ACLU v. Browell, just for the Court's convenience.

THE COURT: okay.

MS. MASS: That seemed particularly helpful. It involved the transfer of a plaintiff from Colorado to California, and pendent venue was found on some claims -- 1983 claims that arose out of conduct that only occurred in Colorado but, nevertheless, what --

THE COURT: Different Defendants?

MS. MASS: You know, I -- I confess I didn't get a chance to look at it carefully enough. So I'm not sure if the 1983 Defendant from Colorado was -- was included in the case.

THE COURT: Was that a case where it was both habeas in 1983?

MS. MASS: I don't believe so. It was false imprisonment in 1983.

THE COURT: Okay.

MS. MASS: We also didn't find -- yeah. So there's -- there are a couple of other pendent venue cases that I can mention if it's useful to you.

THE COURT: Sure.

MS. MASS: One is Legal Editions, LLC v. Krowalski (phonetic). That's also a Northern District of California case from 2009, and I have a Westlaw cite, 2009 WL 1226957. And another one is Sunshideman America v. Centrix Plastics, 2008 WL 11337411, and that's Central District of California from 2008.

We agree with the Court that there's pendent venue over A.H.'s 1333 claims. And, in particular, I'll just mention --

THE COURT: Over A.H.'s what?

MS. MASS: His -- his injunctive relief and declaratory relief claim. In particular, I'll just mention that the Fourth Amendment claim -- or the unlawful arrest claim sounds both in habeas and against the Federal DHS Defendant -- Defendant. So it's like the same -- the same facts lead to a Fourth Amendment claim in habeas because the detention is based on an unlawful arrest, and no change -- you know, sort of no different -- no probable cause hearing or anything else, and DHS officials were intricately involved obviously in the arrest itself. And so --

THE COURT: But there's no habeas relief for false arrest. There's -- there's habeas relief for unlawful detention, but there's no habeas relief for false arrest.

MS. MASS: Well, we took the position in our brief that there is a Fourth Amendment habeas claim, that it's proper and that had -- you know, Gerstein v. Pugh (phonetic) was a -- a case in which there was mention of a habeas --

THE COURT: Yeah, but you can't release -- you can't release somebody on habeas based on false arrest if -- if it's otherwise lawful to continue to detain them.

MS. MASS: That's correct. But if it's not

otherwise lawful to continue to detain them, the Fourth Amendment would give you a ground for exercising habeas jurisdiction.

THE COURT: Okay.

MS. MASS: That's -- that's all we're saying there. And -- and just in terms of the expansion or the -- the use of pendent -- the pendent venue, to reach the -- the class, my colleague, Mr. Cooper, is going to -- would like to say a couple of things, and I -- and one of them I believe has to do with -- this is a nationwide policy. It's not just about A.H., but there are policy documents in the record that speak to these -- the procedures and actions that we're challenging really being part of a -- a broad governmental scheme.

Thank you.

MR. COOPER: So I think once the Court has determined that it has pendent venue over the dec relief claims, there's really no reason not to go ahead and certify a nationwide class.

THE COURT: Why didn't you ask for it?

MR. COOPER: I think our -- the cases moved very quickly. Our understanding of the facts and the law has evolved.

THE COURT: Okay.

MR. COOPER: Frankly, we were trying to provide a

workable class definition regardless of how the balls fell --

THE COURT: Okay.

MR. COOPER: Given the way this is headed now with the focus on the arrest, we think it makes total sense to go ahead and do it as a nationwide class.

THE COURT: Okay.

MR. COOPER: We did -- I mean, there is a portion of the relief that's focused on the events that occurred in New York and -- and now New Jersey and the class members that are from there, but there's also the prospective portion of the relief we seek, and that's for the benefit of sponsored UCs, and they're located all over the country. It's a national policy. It affects people nationwide, and Rule 23 provides the requirements for class certification, and I think when you look at a nationwide class, the Rule 23 requirements are actually more readily met. The Government raised issues as to numerosity, but once they're nationwide, there's more people involved. Whether there are common questions that are capable of common answers, your Honor has proposed some common answers to the common questions that would, you know, occur if we had a nationwide class. I don't see that issue really changing.

And then the Government raised some administrability problems based on the class definition that we provided.

And, you know, in sum, the argument is if we're trying to figure out whether or not someone is going to come to Yolo before they're arrested, it creates this difficult issue where the Government -- I'd say it's less administrability and more whether the injunction is too vague, like how are they going to know, how is ICE going to know, how is DHS going to know before someone's arrested whether they're going to be sent to Yolo. That -- I mean, that issue is completely resolved once you certify a nationwide class, and we noted that in our reply brief towards the end.

So in terms of, you know, fairness to the Government, I think, you know, all the issues under Rule 23 are about the same, and these are -- these are nationwide policies. It's not unexpected that they would have to defend these in any court.

THE COURT: Okay.

MR. COOPER: There's also one other issue I wanted to put up on class or address on class. Ms. Fabian had the comment that the class definition should be limited to sponsored UC's who'd been placed with a parent, thinking about the liberty interest and family integrity. There's also a liberty interest that's addressed in our motion that belongs to the UCs. A.H. has a personal liberty interest, and a class member would have the same liberty interest in their own freedom from restraint regardless of whether they

were released to a parent or some other sponsor. So we think that limitation is inappropriate.

THE COURT: Okay. Thank you very much. I'm going to do my best to get a ruling out as soon as possible. It's a little bit of a game of Wack-a-Mole, particularly on the procedural side. So I'm struggling, but I'm doing my best.

MS. FABIAN: One thing that I wanted to request is to the extent that the Court is ordering new procedures for the Government, that there be a time period for compliance provided, it may be based on how -- how many new procedures the Court is anticipating, but we would ask for some time to come into compliance rather than serve no statement that would suggest immediate compliance.

THE COURT: That seems appropriate. So I'll -- I'll certainly take that into --

MS. MASS: I -- I have not mentioned it before and received no -- there's no statement on it from the Court, and we've had to scramble and seek emergency stays, and, you know, to the extent we consider whether to seek stays and appeal, it's better that if we don't need to, that we don't do it if there's some time built in, and we can make those considerations.

THE COURT: Okay. Any thoughts about that?

MR. COOPER: I think that's perhaps more appropriate with respect to the prospective relief than it

is for the --

THE COURT: Right.

MR. COOPER: -- kids that are already in custody, and we'd ask that they be given hearings as soon as possible.

THE COURT: Well, and -- and that leads back to her point about like how different is the hearing going to be from the process they already have in place. If it is -- you know, you need to be given effectively a redetermination hearing in your location, that can happen quite quickly, right.

MS. FABIAN: I believe so.

THE COURT: Or no new Rules of Evidence are imposed or anything like that.

MS. FABIAN: Yes.

THE COURT: Okay. All right.

MR. COOPER: As Ms. Mass mentioned, we would appreciate, though, being given notice of those hearings so that we can ensure that existing identified class members are able to secure counsel.

THE COURT: Okay. All right. Thank you.

ALL: Thank you, your Honor.

(Proceedings adjourned at 1:19 p.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Friday, December 1, 2017